**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| Stanford B. Weinstein, | ) |
| | ) Case No. 1:10-cv-01768 |
| | ) Judge Contreras |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| District of Columbia Housing Authority, | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____

## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Stanford B. Weinstein, through counsel, hereby moves for an Order

granting Summary Judgment on behalf of Plaintiff.  The grounds for this motion are set

forth in the accompanying Memorandum of Law, Appendix A to the Memorandum of

Law, Statement of Material Facts Not in Dispute, Affidavit of Stanford Weinstein and

Affidavit of Samuel Silverman.

Dated:      June 12, 2012

                                        Respectfully submitted,

                                        /s/ Judah Lifschitz
                                        Judah Lifschitz, Esq.  (DC Bar No. 963330)
                                        Laura Fraher, Esq. (DC Bar No. 979720)
                                        SHAPIRO LIFSCHITZ & SCHRAM, P.C.
                                        1742 N Street, NW
                                        Washington, DC  20036
                                        (202) 689-1900 (telephone)
                                        (202) 689-1901 (facsimile)
                                        Lifschitz@slslaw.com
                                        Fraher@slslaw.com

                                        *Attorneys for Plaintiff Stanford Weinstein*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
Stanford B. Weinstein,                              )
                                                    )        Case No. 1:10-cv-01768
                                                    )        Judge Contreras
                        Plaintiff,                  )
                                                    )
        v.                                          )
                                                    )
District of Columbia Housing Authority,             )
                                                    )
                                                    )
                        Defendant.                  )
_____    )


**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

SHAPIRO LIFSCHITZ & SCHRAM, P.C.
Judah Lifschitz, Esq.  (DC Bar No. 963330)
Laura Fraher, Esq. (DC Bar No. 979720)
1742 N Street, NW
Washington, DC  20036
(202) 689-1900 (telephone)
(202) 689-1901 (facsimile)
Lifschitz@slslaw.com
Fraher@slslaw.com

_Attorneys for Plaintiff_

**Table of Contents**

**Contents**

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS.......................................................................... 2

I.     Introduction.................................................................................. 2

II.    Late Charges and Interest .............................................................. 3

III.   Tax Assessment for Tax Year 2010 ................................................. 4

IV.    DCHA's Termination of the Lease .................................................... 5

V.     Condition of the Property and Repairs Necessitated by DCHA's
       Breach of the Lease ...................................................................... 6

VI.    Plaintiff's Actions to Enforce His Rights Pursuant to the Lease ........... 8

STANDARD OF REVIEW .......................................................................... 9

ARGUMENT........................................................................................... 9

I.     Introduction.................................................................................. 9

II.    There is No Material Issue of Fact in Dispute and Plaintiff is Entitled
       to Judgment as a Matter of Law as to Amounts Due for Real Estate
       Taxes and Utilities ...................................................................... 10

              A.  The Lease Terminated on July 31, 2010………………………………. 12
              B.  The Lease Provides for the Calculation of Late Charges and
                  Interest on a Monthly Basis…………………………………..................14
              C.  The Lease Provides for a Calculation of Late Fees Per the
                  Calculation Used by OTR…………………………………………………16
              D.  Plaintiff's Calculation of the Real Estate Taxes Due for
                  Tax Year 2010 is Pursuant to the Terms of the Lease…………………19

III.   There is no Material Issue of Fact in Dispute and Plaintiff is Entitled
       to Judgment as a Matter of Law as to Amounts Paid by Plaintiff  for
       Repairs to the Property ............................................................... 22

              A.      There is No Material Issue of Fact With Respect to the Need for
                      the Subject Repairs……………………………………………….....28
              B.      The Repairs and Replacements at Issue are Not "Ordinary Wear
                      and Tear" Within the Meaning of the Lease…………………………31

IV.   There is no Material Issue of Fact in Dispute and Plaintiff is Entitled
      to Judgment as a Matter of Law As to Costs Incurred to Enforce the
      Terms of the Lease............................................................................................... 33

V.    Defendant's   Asserted   Affirmative   Defense   of   Accord   and
      Satisfaction Fails as a Matter of Law ................................................................. 33

      A.  There is No Evidence That DCHA Proffered the June 2010
          Check with a Clear Intention of Effecting A Settlement in Full.....................39
      B.  Plaintiff Clearly Did Not Understand that He Was
          Accepting an Offer of Settlement in Full When He Cashed the
          June 2010 Check.................................................................................41
      C.  The Evidence Shows that DCHA Never Intended the June 2010
          Check to Constitute an Offer of Settlement.........................................42

CONCLUSION ......................................................................................................... 42

## Table of Authorities

### Cases

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199 (D.C.1984) ........... 18

*ABB Daimler-Benz Transp. (N.A.), Inc.* v. *Nat'l R.R. Passenger Corp.*, 14 F. Supp. 2d 75 (D.D.C. 1998) ...................................................................................................... 43

*Anderson v. Liberty Lobby,* 477 U.S. 242 (1986) ......................................................... 10

*Bias v. Advantage Intern., Inc.*, 905 F.2d 1558 (D.C. Cir. 1990) ...................................... 9

*Capital City Mortgage Corp. v. Habana Village Art & Folklore, Inc.*, 747 A.2d 564 D.C. (2000) ................................................................................................18, 22, 34

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)............................................................... 9

*Clark v. Hair*, No. 2010 SC2 69391, 2011 WL 1807966 (D.C. Super. Apr. 20, 2011) .... 13

*Curtis Builders, Inc. v. General Floor Service Co., Inc.*, 107 A.2d 705 (D.C. 1954)37,   39,   41

*Diamond v. Atwood,* 43 F.3d 1538 (D.C. Cir. 1995) ......................................................... 9

*Double H Housing Corp. v. David*, 947 A.2d 38 (D.C. 2008).......................................... 36

*Hastie v. Henderson*, 121 F. Supp. 2d 72 (D.D.C. 2000), *aff'd*,  Hastie v. Potter, 2001 WL 793715 (D.C. Cir. June 28, 2001) ................................................................. 30

*Hinson ex rel. N.H.* v. *Merritt Educ. Ctr.*, 579 F. Supp. 2d 89 (D.D.C. 2008) .................. 31

*In re Cohoes Indus. Terminal, Inc.*, 78 B.R. 681 (Bankr. S.D.N.Y. 1987) ...................... 34

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ............................................ 10, 28

*Lujan v. National Wildlife Fed'n,* 497 U.S. 871 (1990) ..................................................... 9

*Mamo v. Skvirsky*, 960 A.2d 595 (D.C. 2008) ............................................................... 10

*Pierola v. Moschonas*, 687 A.2d 942 (D.C. 1997) ........................................................ 36

*Saul Subsidiary II Ltd. Partnership v. Venator Group Specialty, Inc.*, 830 A.2d 854 (D.C. 2003) ................................................................................................36, 37, 38

*So v. 514 10th Street Associates, L.P.*, 834 A.2d 910 (D.C. 2003) ................................ 36

*Tirrell v. Osburn*, 55 A.2d 725 (D.C. Nov. 12, 1947)..................................................... 32

*Tsintolas Realty Co. v. Mendez*, 984 A.2d 181 (D.C. 2009) .......................................... 10

*U.S. v. Science Applications Intern. Corp.*, 555 F. Supp. 2d 40 (D.D.C. 2008) ............... 9

### Statutes

26 C.F.R. § 301.6651–1 (a) (2) ............................................................................. 16, 17

DC Code Title 42, §42-3207....................................................................................... 14

Fed. R. Civ. P. 56(a)................................................................................................. 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____  )
                                           )
Stanford B. Weinstein,                     )
                                           )      Case No. 1:10-cv-01768
                                           )      Judge Contreras
                   Plaintiff,              )
                                           )
      v.                                   )
                                           )
District of Columbia Housing Authority,    )
                                           )
                                           )
                   Defendant.              )
_____  )

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Stanford B. Weinstein ("Weinstein" or "Plaintiff"), through his undersigned

counsel, hereby submits this Memorandum of Law in Support of Plaintiff's Motion for

Summary Judgment, together with Plaintiff's Statement of Material Facts Not in Dispute,

the Affidavit of Stanford B. Weinstein, the Affidavit of Samuel Silverman and Appendix A

to Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment.

For the reasons stated below and in the accompanying papers, Plaintiff's motion should

be granted.

**PRELIMINARY STATEMENT**

Defendant materially breached the written lease agreement entered into between

the parties by, _inter alia_, (i) failing to pay real estate taxes, utility charges and late

charges; (ii) making substantial alterations to the property without authorization;

(iii) failing to make repairs and replacements necessary to maintain the leased property

and its systems in good working condition; (iv) failing to keep the lease property in a neat

and clean condition; (v) failing to repair damage caused by alterations it made to the

leased property; and, (vi) failing to remove (or reimburse the landlord for the cost of

removing) alterations it made to the leased property.  The express terms of the

applicable lease agreement are unambiguous and enforceable as a matter of law and

there are no material facts in dispute.  Thus, Plaintiff submits that its motion for summary

judgment should be granted.

## STATEMENT OF FACTS

    I.    Introduction

During all times relevant to the issues in this proceeding, Plaintiff was the owner

of certain real property located in the District of Columbia identified as Lot 839 in Square

672 with the improvements thereon, known as 16 M Street, NE and an adjacent parking

lot known as Lot 251 in Square 672, in the District of Columbia (the "Property").  *See* Pl.

SMF ¶1.[1]  On or about October 17, 1997, Defendant District of Columbia Housing

Authority ("Defendant" or "DCHA") and Plaintiff entered into a written Lease Agreement

pursuant to which the Property was leased to Defendant.  *See* Pl. SMF ¶2.  From time to

time thereafter, Defendant and Plaintiff entered into written extensions and addendums

to the Lease.  The latest and final amendment and addendum to the Lease is dated and

was entered into on or about August 8, 2008 (the "Final Addendum") (hereinafter, the

Lease, as amended from time to time, is referred to as the "Lease").  *See* Pl. SMF ¶3.

---

[1] References to Pl. SMF refer to Plaintiff's Statement of Material Facts Not in Dispute, filed with this motion.

II.     Late Charges and Interest

During DCHA's tenancy, DCHA often paid its rent and real estate taxes late.  *See* Pl. SMF ¶8.  When those charges were paid late, Plaintiff assessed late charges and interest on a monthly basis as expressly provided for in Paragraphs 4 and 5 of the Lease and/or the applicable addenda.  *See* Pl. SMF ¶8.  Specifically, pursuant to the unambiguous terms of the Lease, DCHA was obligated to pay late charges and interest for late payment of rent and real estate taxes as follows:

> If Tenant is delinquent in the payment of any rental installment for more seven (7) calendar days past the due date, Tenant shall pay both a late charge of five percent (5%) per month or fraction thereof, and interest of one and one-half percent (1 ½%) per month or fraction thereof.
>
> If Tenant does not pay to Landlord the total amount of such tax bills within fifteen calendar (15) days of such presentation, Tenant shall pay both a late charge of five percent (5%) per month or fraction thereof and interest of one and one-half percent (1 ½%) per month or fraction thereof. . . .

*See* Pl. SMF ¶5.

During the course of DCHA's tenancy, DCHA never objected to or questioned the calculation of late charges and interest and paid them as billed.  *See* Pl. SMF ¶10.  Rather, DCHA questioned Plaintiff's calculation of late charges and interest for the first time in a letter to Plaintiff dated May 21, 2010, after it notified Plaintiff of its intention to terminate the Lease.  *See* Pl. SMF ¶10.

The addendum to the Lease entered into in 2004 (the "2004 Addendum") included a new term which provided that if DCHA paid real estate taxes late, DCHA would "pay both a late charge of five percent (5%) per month or fraction thereof, and interest of one and one-half percent (1/12%) per month or fraction thereof, over and above any late payment charges imposed by the District of Columbia Office of Tax and Revenue."

3

*See* Pl. SMF ¶13.  After 2004 and continuing through the end of DCHA's tenancy in 2010, each time DCHA paid its real estate taxes late, Plaintiff imposed monthly late fees in accordance with the formula set forth in the 2004 Addendum (which remained the same in all later applicable addenda).  *See* Pl. SMF ¶14.  DCHA never objected to or questioned these calculations and paid them as billed.  *See* Pl. SMF ¶15.  DCHA questioned Plaintiff's calculation of late fees in accordance with this formula for the first time in May 2010.  *See* Pl. SMF ¶15.

III.   Tax Assessment for Tax Year 2010

For years, the OTR raised the tax assessment on the Property and, as a result, the amount of real estate taxes owed increased.  *See* Pl. SMF ¶19.  Plaintiff repeatedly advised DCHA of the increasing assessment and encouraged DCHA to appeal and seek a reduction.  *See* Pl. SMF ¶19.  Because DCHA failed to act, the parties agreed in the Final Addendum that Plaintiff would initiate the activity necessary to reduce the assessment and DCHA would pay for it.   *See* Pl. SMF ¶20.  Specifically, the parties agreed that "[i]f Landlord's efforts result in a reduction of the real property taxes, the parties agree that they will share equally in the net benefits of any such reductions.  (For example, if these efforts result in a $30,000 reduction in real property taxes, and if the costs and attorney's fees are $10,000, then the net reduction of $20,000 will be shared equally by the parties, resulting in a net benefit to each party of $10,000)."  *See* Pl. SMF ¶21.

Plaintiff retained the law firm of Wilkes Artis to file an appeal of the 2010 tax assessment.  *See* Pl. SMF ¶22.  That appeal was filed and was successful, resulting in a decrease in the assessment and the real estate taxes on the Property for the year 2010.

4

*See* Pl. SMF ¶22.  Plaintiff paid $4,910 for the services of Wilkes Artis.  *See* Pl. SMF ¶23.

    IV.   <u>DCHA's Termination of the Lease</u>

On or about January 20, 2010, Plaintiff received from Defendant, by Federal Express, a written "notice of nonrenewal" which purported to "confirm[] the lease termination date of May 31, 2010."  ("Notice")  *See* Pl. SMF ¶25. The Notice was dated December 1, 2009 and purportedly issued pursuant to paragraphs 2 and 23 of the Final Addendum.  *See* Pl. SMF ¶25. The Notice was originally sent by certified mail but was returned by the United States Postal Service as "Undeliverable as Addressed."  *See* Pl. SMF ¶25.

On or about April 30, 2010, Plaintiff sent Defendant a detailed accounting of amounts then due, owing, and overdue under the Lease.  *See* Pl. SMF ¶29.  By letter dated May 21, 2010, Defendant disputed Plaintiff's calculation of the amounts then due and owing under the Lease.  *See* Pl. SMF ¶30.

On or about June 3, 2010, Plaintiff received a check from Defendant in the mail, dated June 1, 2010.  *See* Pl. SMF ¶32.  It was DCHA's standard practice under this Lease for more than 12 years that it would periodically send checks as payment on account.  *See* Pl. SMF ¶33.  The June 1, 2010 check did not bear any notation, was not accompanied by any cover letter, and did not include any restrictive endorsement to indicate that it was being tendered as an offer of full and final settlement rather than as a payment on account.  *See* Pl. SMF ¶34.

On June 10, 2010, Plaintiff and his attorney Judah Lifschitz, Esq. met with Lisa Dean and DCHA Associate General Counsel Qwendolyn N. Brown.  *See* Pl. SMF ¶35.

The parties discussed the amounts then due under the Lease and a potential resolution of the outstanding amounts.  *See* Pl. SMF ¶35.  At the June 10, 2010 meeting, Plaintiff hand delivered a letter to Defendant acknowledging receipt of the June 1, 2010 rent check and advising Defendant that Plaintiff would be accepting the check as a payment on account and that the account had an outstanding balance.  *See* Pl. SMF ¶36.  Only after that meeting, on June 11, 2010, did Plaintiff cash the June 1, 2010 rent check.  *See* Pl. SMF ¶37.

On June 21, 2010, after the meeting and after the check was cashed, Ms. Brown, the Associate General Counsel for DCHA, wrote to Plaintiff's counsel and advised that DCHA's General Counsel was reviewing the dispute and what Ms. Brown referred to as Plaintiff's  "settlement offer" and that DCHA would get back to Plaintiff's counsel "shortly." *See* Pl. SMF ¶38.

Defendant remained in possession of the Property and did not vacate until on or about June 30, 2010.  *See* Pl. SMF ¶41.

V.     Condition of the Property and Repairs Necessitated by DCHA's
Breach of the Lease

While, pursuant to the unambiguous terms of the Lease, DCHA was permitted to "install[] any furniture, fixtures and equipment necessary in the conduct of its business", the Lease further provided that "[i]n the event any damage is done to said premises in the installation or removal of said furniture, fixtures and equipment, Tenant shall, at its cost and expense, restore said premises to their original condition, or promptly reimburse Landlord for all such costs."  *See* Pl. SMF ¶42.  Moreover, the Lease provided that if Tenant failed to remove any such material at the end of its tenancy, and Plaintiff disposed of those materials, "Tenant shall promptly reimburse Landlord for all

such costs of removal and disposal." *See* Pl. SMF ¶43.  Further, DCHA's right to make

alterations to the Property was limited.  The unambiguous terms of the Lease also

provided that "Tenant shall not, without the written approval of Landlord, make any

alterations or structural changes in or do any work <u>involving substantial additions to or</u>

<u>changes in plumbing or gas pipes and fixtures or electric wiring</u> in said premises or

building." *See* Pl. SMF ¶44.

The Lease also required DCHA to maintain and repair the Property.  Specifically,

the express terms of the Lease required that "Tenant shall, at its risk, cost and expense,

<u>make all repairs and replacements necessary to keep both the interior and exterior of</u>

<u>the Demised Premises and the fixtures and equipment therein in good repair and in</u>

<u>property sanitary condition</u>. . . .  Tenant shall, at its cost and expense, furnish heat to

said premises. . . and shall <u>maintain the heating and plumbing systems in good</u>

<u>operating condition at all times</u>. . . .Tenant shall keep the interior and exterior of the

Demised Premises in a <u>clean, neat, orderly and attractive condition at all times</u>." *See*

Pl. SMF ¶45.

Finally, the Lease required that "upon termination of the term herein and without

further notice" Tenant shall "surrender and deliver possession of said premises to

Landlord <u>in the same condition in which they were received</u>, usual wear and tear

excepted." *See* Pl. SMF ¶46.

During the course of DCHA's tenancy, DCHA made extensive and substantial

alterations to the Property.  *See* Pl. SMF ¶47.  DCHA never requested, and Plaintiff

never provided, written consent for any of the alterations.  *See* Pl. SMF ¶48.

Plaintiff retained Pizzano General Contractors, Inc. ("Pizzano") to make necessary repairs and replacements to the Property after it was vacated by DCHA.  *See* Pl. SMF ¶50.  Pizzano was instructed to make repairs and replacements necessary to restore the building to its original warehouse condition and not to make any upgrades to the Property.  *See* Pl. SMF ¶51-2.  Numerous repairs and replacements were necessary to restore the building to its original warehouse condition.  *See* Pl. SMF ¶53. Plaintiff paid Pizzano $56,125 for the work. *See* Pl. SMF ¶60.

Plaintiff retained Virginia Roofing Corporation ("Virginia Roofing") to make repairs necessary to the roof of the Property after it was vacated by DCHA.  *See* Pl. SMF ¶66. The contractor was instructed to make necessary repairs to restore the condition of the roof to be free of leaks and missing or damaged areas of roofing material (including flashing and gutters), and not to make any upgrades to the roof of the Property. *See* Pl. SMF ¶67.  Numerous repairs and replacements were necessary to restore the roof of the Property.  *See* Pl. SMF ¶68.  Plaintiff paid Virginia Roofing Corporation $10,460 for the work. *See* Pl. SMF ¶70.

VI.   <u>Plaintiff's Actions to Enforce His Rights Pursuant to the Lease</u>

Plaintiff retained the services of Shapiro, Lifschitz and Schram, P.C. to provide legal representation relating to the termination of the Lease by DCHA and the issues raised in this litigation, in order to enforce Plaintiff's rights pursuant to the terms of the Lease.  *See* Pl. SMF ¶72.  Plaintiff has, and continues, to pay for the services of Shapiro, Lifschitz and Schram, P.C. as invoiced.  *See* Pl. SMF ¶73.  Pursuant to the unambiguous terms of the Lease, DCHA is "obligated to pay for all reasonable fees and expenses

(including court costs and attorneys' fees) incurred by Landlord in enforcing the provisions of this Lease."  *See* Pl. SMF ¶71.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 884 (1990); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Diamond v. Atwood,* 43 F.3d 1538 (D.C. Cir. 1995).

The moving party must provide a sufficient factual record that demonstrates the absence of a genuine issue of material fact. *See U.S. v. Science Applications Intern. Corp.*, 555 F. Supp. 2d 40 (D.D.C. 2008). "Once the moving party has carried its burden ... [t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Bias v. Advantage Intern., Inc.*, 905 F.2d 1558, 1560-61 (D.C. Cir. 1990) (internal quotations and citation omitted) (emphasis in original). The nonmovant cannot manufacture a genuine issue of material fact with "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).  If the non-movant's evidence is "merely colorable, or is not significantly probative" summary judgment is appropriate.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 249-50 (1986).

## ARGUMENT

I.    Introduction

To establish a breach of contract a plaintiff must show (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of

that duty, and (4) damages caused by breach.  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).  "Where, as here, the dispute hinges on the interpretation of a contract . . . summary judgment is appropriate if the contract is unambiguous, because in the absence of ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence."  *Mamo v. Skvirsky*, 960 A.2d 595 (D.C. 2008). Summary judgment is also appropriate if the contract is ambiguous and "the probative evidence marshaled by the movant eliminates any genuine dispute about what a reasonable person in the position of the parties would have thought the contract means." *Id.*

Here, there is no dispute that the Lease was a valid contract between the parties.  *See* Pl. SMF ¶4.  Moreover, as set forth more fully below, DCHA has materially breached its obligations under the Lease and Plaintiff has suffered resulting damages.  The obligations of DCHA are all clearly established by the unambiguous terms of the Lease.  Even if the Court were to determine that any of the relevant contract language is ambiguous, the evidence in the record is clear and eliminates any genuine dispute as to what a reasonable person in the position of the parties would have thought the Lease means.  Plaintiff is, therefore, entitled to summary judgment.

II.     There is No Material Issue of Fact in Dispute and Plaintiff is Entitled to Judgment as a Matter of Law as to Amounts Due for Real Estate Taxes and Utilities

Pursuant to the unambiguous terms of the Lease, DCHA was obligated to timely pay to Plaintiff all real estate taxes and utility charges relating to the Property, together with fees and interest assessed in the case of late payment.  *See* Pl. SMF ¶5.  DCHA has failed to make full payment of amounts owed to Plaintiff for real estate taxes, utility

charges and applicable fees and interest, in material breach of its obligation under the

Lease and Plaintiff is entitled to judgment as a matter of law with respect to that breach.[2]

In the course of discovery, DCHA was asked its position regarding amounts that

Plaintiff claimed were due for real estate taxes and utility charges.   *See* Pl. SMF ¶6.

DCHA responded with its sole defense, *i.e.*, that no amounts were due Plaintiff because

of an alleged accord and satisfaction.   DCHA provided no further defense.   *See* Pl. SMF

¶6.   Thus, if the Court finds that there was no accord and satisfaction, DCHA has raised

no dispute as to the amount claimed by Plaintiff.   For all of the reasons stated in Section

IV of this Memorandum of Law, DCHA's defense of accord and satisfaction fails as a

matter of law and Plaintiff is entitled to summary judgment.

Nevertheless, even if DCHA could properly dispute the amounts Plaintiff claims he

is owed, each of DCHA's articulated disagreements with Plaintiff's calculations lacks

merit and is contrary to the unambiguous terms of the Lease.   Thus, Plaintiff is still

entitled to summary judgment.   Specifically, DCHA, in its May 21, 2010 letter to Plaintiff,

stated the following disagreements with Plaintiff's calculation of amounts due under the

Lease:

1. DCHA asserted that Plaintiff is incorrect that the Lease terminated on July 31,
   2010
2. DCHA disagreed with Plaintiff's inclusion of OTR penalties in the calculation of
   late fees owed as a result of late payment of real estate taxes
3. DCHA disagreed with Plaintiff's calculation of late charges and interest on a
   monthly basis
4. DCHA disagreed with Plaintiff's calculation of the amount due to for real estate
   taxes in 2010

*See* Pl. SMF ¶7.

---

[2] Attached to this Memorandum as Appendix A is a complete calculation of Plaintiff's damage claim with
record citations.

A.      The Lease Terminated on July 31, 2010

Pursuant to the unambiguous terms of the Lease, the Lease ran for a two year term from June 1, 2008 through May 31, 2010 and automatically renewed for an additional two year term from June 1, 2010 through May 31, 2012, subject to the termination rights of the parties.  *See* Pl. SMF ¶26.  The Lease further provided that it could be "terminated by either party by giving six months advance written notice" and that "[a]ll notices sent or required to be sent hereunder shall be sent by certified mail, return-receipt requested."  *See* Pl. SMF ¶27.

The uncontested facts are that DCHA mailed on December 1, 2009, by certified mail, a letter which indicated its intention to terminate the Lease, but that letter was not delivered and instead was returned by the United States Postal Service as "Undeliverable as Addressed".  *See* Pl. SMF ¶25.  Plaintiff did not actually receive the letter until January 20, 2010, when it was sent by Federal Express.  *See* Pl. SMF ¶25.

The Lease required that Plaintiff receive six months advance written notice of DCHA's intention to terminate the Lease.  That notice was received on January 20, 2010 and, thus, the Lease terminated six months later, on July 31, 2010.

In its December 1, 2009 letter, DCHA took the position that notice was provided "from the date of this letter" and, therefore, that the Lease terminated on May 31, 2010. *See* Pl. SMF ¶ 28.  This position is incorrect.  The terms of the Lease did not provide that notice was effective upon mailing.  Rather, a reasonable person in the parties' position would understand that the requirement in the Lease that notice be sent by certified mail, return receipt requested, indicates the intention of the parties that evidence of receipt is required for notice to be effective.   The uncontested facts here are that the notice was

12

not received until January 20, 2010 and, therefore, the Lease terminated, as a matter of law, on July 31, 2010.[3]

### B.     The Lease Provides for the Calculation of Late Charges and Interest on a Monthly Basis

Pursuant to the unambiguous terms of the Lease, DCHA was obligated to pay late charges and interest for late payment of rent and real estate taxes as follows:

> If Tenant is delinquent in the payment of any rental installment for more seven (7) calendar days past the due date, Tenant shall pay both a late charge of five percent (5%) per month or fraction thereof, and interest of one and one-half percent (1 ½%) per month or fraction thereof.

> If Tenant does not pay to Landlord the total amount of such tax bills within fifteen calendar (15) days of such presentation, Tenant shall pay both a late charge of five percent (5%) per month or fraction thereof and interest of one and one-half percent (1 ½%) per month or fraction thereof. . . .

*See* Pl. SMF ¶5.

The uncontested facts are that during DCHA's tenancy, DCHA often paid its rent and real estate taxes late.  *See* Pl. SMF ¶8.  When those charges were paid late, Plaintiff assessed late charges and interest on a monthly basis, as expressly provided for by the terms of the Lease.  *See* Pl. SMF ¶8.  Specifically, if DCHA did not pay rent in full by the 8th day of the month, a 6 ½ % charge was

---

[3] Alternatively, if the Court were to determine that DCHA's notice was effective upon mailing on December 1, 2009, then the Lease terminated on May 31, 2010.  The uncontested facts are that DCHA did not vacate the Property until June 30, 2010.  *See* Pl. SMF ¶41.  Thus, if the Lease terminated on May 31, 2010, DCHA was a hold-over tenant for the month of June 2010.  In that case, DCHA is obligated to pay "rent at double the rate of rent" for the month of June 2010.  DC Code Title 42, §42-3207; *see also Clark v. Hair*, No. 2010 SC2 69391, 2011 WL 1807966 at n.7 (D.C. Super. Apr. 20, 2011) ("An award of double rent appears to be <u>obligatory</u> if the tenant holds over after giving notice of the intent to vacate") (emphasis added).  Double rent for the month of June is the same amount as rent for the months of June and July ($15,400) and thus DCHA's rental obligation is the same whether the Lease terminated on May 31, 2010 or July 31, 2010.

imposed on that day and again on the 8th day of each month thereafter that a balance remained due.  *See* Pl. SMF ¶9.  If DCHA did not pay real estate taxes in full by the 15th day after the real estate tax bill was presented to DCHA, a 6 ½% charge was imposed on that day and again on the same day each month thereafter that a balance remained due, all in accordance with the express provisions of Paragraphs 4 and 5 of the Lease and/or applicable addenda.  *See* Pl. SMF ¶9.  DCHA did not object to or question the calculation of late fees and interest and paid them as billed.  *See* Pl. SMF ¶10.  DCHA for the first time objected to Plaintiff's calculation of late fees relating to real estate taxes and rent in its May 21, 2010 letter to Plaintiff.  *See* Pl. SMF ¶10.  In its letter, DCHA asserted that late fees should be assessed as if there were a daily rate, stating that "for late payments less than one month delinquent, the fees are calculated at 1/30[th] of the respective amounts."  *See* Pl. SMF ¶11.  DCHA is incorrect.  The Lease clearly provides that once DCHA's payment is late, it is assessed each element of the late charge as a single monthly charge (for each month or fraction of a month that a balance remains due) irrespective of how many days late the payment is.  The charges are clearly not daily rates as DCHA contends.

The clear and unambiguous terms of the Lease provide that late charges and interest are owed "If Tenant is delinquent in the payment of any rental installment for more seven (7) calendar days past the due date" and "If Tenant does not pay to Landlord the total amount of such tax bills within fifteen calendar (15) days of such presentation".  *See* Pl. SMF ¶5.  That means that the monthly late charges and interest become due and payable as of day 8 and day 15 and are assessed "per month or fraction thereof",

*i.e.* for each month or portion of a month that the payment remains unpaid.  The phrase "or fraction thereof" modifies the word "month", not the amount of the charge.  Thus, if DCHA's payment is 1 month late, it is assessed a late charge of 6 ½% of the unpaid amount; if DCHA is late a fraction of a month, *i.e.* 2 weeks, 3 weeks, etc., it still pays 6 ½% of the unpaid amount.  Nowhere does the Lease provide a daily late charge rate as DCHA belatedly claimed in May 2010.  DCHA's position is based on a tortured reading of the clear and unambiguous terms of the Lease and should be rejected as a matter of law.

This type of monthly late charge is typical.  Indeed, virtually identical language can be found in the United States Treasury Regulations.  Specifically, 26 C.F.R. § 301.6651–1 (a) (2) provides that if a taxpayer fails to pay the amount shown on his tax return on or before the date prescribed for payment he will be penalized "0.5 percent of the amount of tax shown on the return if the failure is for not more than 1 month, with an additional 0.5 percent *for each additional month or fraction thereof* during which the failure continues." 26 C.F.R. § 301.6651–1 (a) (2) (emphasis added).  The CFR provides illustrations to further explain the regulation.  Example 1 provides that if a taxpayer's tax payment is due on April 15, 1970 but the taxpayer pays the amount shown on his tax return late on August 21, 1970, *i.e.* 4 months and several days late, the tax payer will be assessed a charge of "2.5 percent (2% for the 4 months from April 16 through August 15, and 0.5% for the fractional part of the month from August 16 through August 21)."  *See* 26 C.F.R. § 301.6651–1 (a) (2) and Example 1.  This is precisely the way that the parties interpreted and applied this language in the Lease for over 12 years and is diametrically opposed to the new interpretation that DCHA advanced for the very first time in May 2010.

C.   The Lease Provides for a Calculation of Late Fees Per the
Calculation Used by OTR

In 2004, the Lease was amended to provide that late fees imposed upon DCHA for failure to timely pay real estate taxes were to be calculated as follows:   "Tenant shall pay both a late charge of five percent (5%) per month or fraction thereof and interest of one and one-half percent (1 1/2%) per month or fraction thereof, over and above any late payment charges imposed by the District of Columbia Office of Tax and Revenue."   *See* Pl. SMF ¶13.  Prior to 2004, such late fees were calculated to include only the 5% late charge and 1 ½% interest.  *See* Pl. SMF ¶13.

It is uncontested that during DCHA's tenancy, DCHA often paid its real estate taxes late.  *See* Pl. SMF ¶8.  Further, prior to 2004, late fees of 6 ½% were regularly assessed for late payment, but DCHA nevertheless continued to pay the real estate taxes late.  *See* Pl. SMF ¶12.  It is also uncontested that, after the Lease was amended in 2004, when real estate taxes were paid late, Plaintiff assessed the following charges: (a) a late charge of 5%; (b) interest of 1 ½%; and, (c) an amount equal to the penalty amount stated by the DC Office of Tax and Revenue ("OTR") on the tax bill for late payment of taxes.  *See* Pl. SMF ¶13-14.   For over five years, the parties shared the same understanding of the Lease; DCHA did not object or question the calculation of late fees and paid them as billed.  *See* Pl. SMF ¶15.  DCHA objected to Plaintiff's calculation of the amounts due for the first time in its letter to Plaintiff dated May 21, 2010.   *See* Pl. SMF ¶15.  DCHA then asserted that "[s]ince OTR never imposed any penalties against your Property, you are not entitled to collect any OTR penalties from DCHA."   *See* Pl. SMF ¶16.  This position is incorrect as a matter of law.

There is no dispute that when DCHA paid the real estate taxes late, Plaintiff had

no choice but to advance payment of the real estate taxes relating to the Property, so

that his interest in the Property and his credit rating were not adversely affected by

DCHA's delinquency.  *See* Pl. SMF ¶17.  As Plaintiff's uncontroverted testimony

explained,

> during the 40-odd years that [Plaintiff] owned this property, [Plaintiff] never
> once paid these taxes late, and [Plaintiff] had no reason to believe that in
> the future [Plaintiff] would ever pay them late.  During the term of this
> tenancy, the District of Columbia Housing Authority tenancy, [Plaintiff] still
> had no intention of ever paying the taxes late.  This provision was put in to
> give the Housing Authority further incentive to pay the landlord what they
> owed under the lease in a timely manner.  It was not intended to reimburse
> [Plaintiff] for charges that [Plaintiff] would be out of pocket for paying.

*See* Pl. SMF ¶18.  In short, it is unreasonable to expect that Plaintiff, as the owner of the

Property, would pay real estate taxes late to OTR (and be required to pay a penalty to

OTR), because that would jeopardize his property interest and his own credit rating.

Thus, if the relevant Lease provision were read to require that Plaintiff pay a penalty to

OTR before including it in the calculation of the late fee owed by DCHA - as DCHA in

May 2010 claimed for the first time - the provision would be rendered meaningless.

It is a fundamental rule of contract interpretation that "[t]he court construing a

contract cannot ignore a contract term; each provision must be given meaning if at all

possible."  *Capital City Mortgage Corp. v. Habana Village Art & Folklore, Inc.*, 747 A.2d

564, 569 D.C. (2000) (citing *1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.,*

485 A.2d 199, 205-206 (D.C.1984)).  In interpreting a contract, the Court's task is to

determine "what a reasonable person in the position of the parties would have thought

the disputed language meant." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485

A.2d 199, 205 (D.C.1984)  (citation omitted).   In so doing, the contract

"must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *Id.* (citing *Vicki Bagley Realty, Inc. v. Laufer,* 482 A.2d 359, at 366 (D.C.1984); *Davis v. Davis,* 471 A.2d 1008, 1009 (D.C.1984); RESTATEMENT (SECOND) OF CONTRACTS §§ 202(2),203(a) (1981)).

No reasonable person would understand that the inclusion of the new Lease language was intended to require Plaintiff to jeopardize his own economic self-interest by paying real estate taxes late.  Nor is it reasonable, or in accord with the well established rules of contract construction, to understand that the Lease language was included but intended to never be enforceable.  Rather, the only reasonable understanding of the language in the Lease - that DCHA shall pay "late charges imposed by the District of Columbia Office of Tax and Revenue" - is that, when DCHA paid its taxes late, DCHA would be required to pay to Plaintiff the same amount that the OTR imposes upon taxpayers who pay taxes late, as reflected on the tax bill.  It is not reasonable to interpret this language as imposing a condition precedent to the collection of this charge from DCHA that Plaintiff must pay his real estate taxes late and pay a penalty to OTR.

        D.     Plaintiff's Calculation of the Real Estate Taxes Due for Tax Year 2010 is Pursuant to the Terms of the Lease

It is uncontested that for years the OTR raised the tax assessment on the Property and Plaintiff suggested to DCHA that it challenge the assessment.  *See* Pl. SMF ¶19.  It is further uncontested that, because DCHA failed to act, Plaintiff and DCHA agreed in the Final Addendum that Plaintiff would initiate the activity necessary to reduce the assessment and DCHA would pay for it.   *See* Pl. SMF ¶20.

Specifically, the Final Addendum provides that:

> Landlord will undertake steps to obtain a reduction in the assessed value of the leased premises and the real property taxes imposed on the leased premises.  Tenant agrees that it will support any such efforts by Landlord or his agents.  If Landlord's efforts result in a reduction of the real property taxes, the parties agree that they will <u>share equally in the **net benefits** of any such reductions</u> obtained, **<u>after taking into account any attorney's fees and other costs incurred in obtaining such reductions</u>**.  (For example, if these efforts result in a $30,000 reduction in the real property taxes, and if the costs and attorney's fees are $10,000, then the net reduction of $20,000 will be shared equally by the parties, resulting in a net benefit to each party of $10,000).

*See* Pl. SMF ¶ 21.

Finally, it is uncontested that Plaintiff retained the law firm of Wilkes Artis to file an appeal of the 2010 tax assessment.  *See* Pl. SMF ¶22.  That appeal was filed and was successful, resulting in a decrease in the assessment and the real estate taxes on the Property for the year 2010.  *See* Pl. SMF ¶22.  Plaintiff paid $4,910 for the services of Wilkes Artis.  *See* Pl. SMF ¶23.

Given the uncontested facts and the clear and unambiguous terms of the Lease, it is clear that the proper calculation of real estate taxes owed by DCHA during tax year 2010 included (a) the real estate taxes pursuant to Paragraph 5 of the Final Addendum; (b) reimbursement to Plaintiff of all costs (including attorneys fees) incurred in achieving the reduction in assessment pursuant to Paragraph 24 of the Final Addendum; and, (c) compensation to Plaintiff in the amount of ½ of the net tax benefit pursuant to Paragraph 24 of the Final Addendum.  Plaintiff calculated taxes according to that formula and charged DCHA accordingly, as follows:

Tax Based on Original Tax Assessment for Tax Year 2010

Tax on 1st $6,000,000 at $1.65/$100 = $99,000
Tax on $1,468,750 at $1.85/$100 = $27,172
Total:  $126,172

Tax Owed For First Half 2010

Half Year Tax = $126,172/2 = $63,086[4]

½ Net Tax Benefit After Reduction in Assessment

$63,086 (tax liability under original assessment)
-$54,902 (tax liability after reduction in assessment achieved)[5]
-$4,910 (costs to achieve reduction)[6]
$3,274
$3,274/2 = $1,637

DCHA Real Estate Tax Owed for 1st Half 2010

$54,902 (1/2 year Real Estate Taxes)
+$4,910 (reimbursement of Plaintiff's cost of achieving reduction)
+$1,637 (1/2 Net Tax Benefit owed Plaintiff)
**$61,449**

2d Half 2010

½ Net Tax Benefit After Reduction in Assessment

4 months taxes (April-July 2010) under old assessment:  $63,086/6X4=$42,057
4 months taxes under new assessment:  $54,902[7]/6X4=$36,601

$42,057 – $36,601 = $5,456
5456/2=  $2,728

DCHA Real Estate Tax Owed for 2d Half 2010

$36,601 (4 months Real Estate Taxes)
+$2,728 (1/2 Net Tax Benefit owed Plaintiff)
 **$39,329**

In its May 21st letter, DCHA objected and refused to pay Plaintiff the properly

calculated charges and asserted "DCHA is responsible for payment of the 2010 real

estate taxes assessed by OTR in the amount of $54,902, not $63,086.  More importantly,

there is no such provision in the Lease that obligates DCHA to pay for attorney's fees.

---

[4] *See* Appendix A, Ex 27-31.
[5] See Appendix A, Ex 27, 30-33.
[6] See Appendix A, Ex 27 & 34.
[7] *See* Appendix A, Ex 27, 35-36.

As such, DCHA will pay no attorney's fees incurred in the tax assessment appeal

efforts."  *See* Pl. SMF ¶24.  This position is patently incorrect as a matter of law.

DCHA's position that it only owes Plaintiff $54,902 (the amount stated on the

actual tax bill for 2010) is completely erroneous.  DCHA owes Plaintiff $54,902 pursuant

to Paragraph 5 of the Final Addendum, but DCHA also owes obligations to Plaintiff

pursuant to Paragraph 24, quoted above.  As stated above, "[t]he court construing a

contract cannot ignore a contract term; each provision must be given meaning if at all

possible."  *Capital City Mortgage Corp;* 747 A.2d at 569.  DCHA's position that

Paragraph 24 should be ignored in its entirety is contrary to the law.  Moreover, DCHA's

assertion that there is no provision in the Lease that obligates it to reimburse Plaintiff for

the attorney's fees incurred in connection with the tax appeal is patently false.

Paragraph 24 of the Final Addendum clearly states that if Plaintiff is successful in

achieving a reduction in the tax assessment, DCHA will receive ½ of the <u>net</u> benefit of

that reduction "<u>after taking into account any attorney's fees</u> and other costs incurred in

obtaining such reductions."

The only reasonable interpretation of this provision is that Plaintiff is entitled to be

reimbursed for his out of pocket costs, including attorneys' fees <u>and </u>compensated with ½

of the net tax benefit.  Otherwise, Plaintiff would be denied his "net benefit" as expressly

provided for by the terms of the Lease.  Plaintiff was not obligated to pay the real estate

taxes on the Property in tax year 2010, DCHA was.  And, Plaintiff had no obligation to

take any effort to achieve a reduction in those taxes.  Thus, in order for Plaintiff to be

provided a "net benefit", he must be reimbursed for his out of pocket costs and

compensated with his ½ share of the reduction in tax liability.  There is no basis in the

law to invalidate Paragraph 24 of the Final Addendum and it is not reasonable to read

that provision to deny Plaintiff reimbursement of his costs and compensation for his

efforts – that is clearly what the Lease contemplated and is the only reasonable

interpretation of the language.

III.    There is no Material Issue of Fact in Dispute and Plaintiff is Entitled to
        Judgment as a Matter of Law as to Amounts Paid by Plaintiff for Repairs to
        the Property

While, pursuant to the unambiguous terms of the Lease, DCHA was permitted to

"install[] any furniture, fixtures and equipment necessary in the conduct of its business",

the Lease further provided that "[i]n the event any damage is done to said premises in

the installation or removal of said furniture, fixtures and equipment, Tenant shall, at its

cost and expense, restore said premises to their original condition, or promptly

reimburse Landlord for all such costs." *See* Pl. SMF ¶42.  Moreover, the Lease

provided that if Tenant failed to remove any such material at the end of its tenancy, and

Plaintiff disposed of those materials, "Tenant shall promptly reimburse Landlord for all

such costs of removal and disposal." *See* Pl. SMF ¶43.  Further, DCHA's right to make

alterations to the Property was limited.  The unambiguous terms of the Lease also

provided that "Tenant shall not, without the written approval of Landlord, make any

alterations or structural changes in or do any work involving substantial additions to or

changes in plumbing or gas pipes and fixtures or electric wiring in said premises or

building." *See* Pl SMF ¶44.

The Lease also required DCHA to maintain and repair the Property.  Specifically,

the express terms of the Lease required that "Tenant shall, at its risk, cost and expense,

make all repairs and replacements necessary to keep both the interior and exterior of

the Demised Premises and the fixtures and equipment therein in good repair and in property sanitary condition. . . .   Tenant shall, at its cost and expense, furnish heat to said premises. . . and shall maintain the heating and plumbing systems in good operating condition at all times. . . .Tenant shall keep the interior and exterior of the Demised Premises in a clean, neat, orderly and attractive condition at all times." *See* Pl. SMF ¶45.

Finally, the Lease required that "upon termination of the term herein and without further notice" Tenant shall "surrender and deliver possession of said premises to Landlord in the same condition in which they were received, usual wear and tear excepted." *See* Pl. SMF ¶46.

It is uncontested that during its tenancy, DCHA made substantial alterations to the Property and that DCHA never requested, and Plaintiff never provided, written consent for any of the alterations.  *See* Pl. SMF ¶47-8.  These alterations included, *inter alia*, installing a locker room, which included new walls embedded to the existing warehouse floor, new flooring, and new lighting; installing a kitchen, which included installing new plumbing; installing office space, which included installing new walls which were embedded into the floor of the warehouse, new flooring, and new wiring; and, installing a chain link fence in the interior of the warehouse, which included embedding concrete posts and large bolts into the warehouse floor.[8]  *See* Pl. SMF ¶49.

After the Lease terminated and DCHA vacated the Property, Plaintiff determined that DCHA had, in violation of the unambiguous terms of the Lease, caused and failed

---

[8] The very installation of many of these modifications was a material breach of the Lease, which expressly prohibited DCHA from make any "alterations or structural changes in or do any work involving substantial additions to or changes in plumbing or gas pipes and fixtures or electric wiring in said premises or building" without the written permission of the Landlord.  It is uncontested that Plaintiff never gave permission for these alterations.  *See* Pl. SMF ¶48.

to repair and/or reimburse Landlord for damage to the Property, failed to make repairs and replacements necessary to keep the premises in good repair and proper sanitary condition, and failed to keep the Property in a neat and orderly condition.

Plaintiff hired Pizzano to make repairs and replacements to the Property for the purpose of restoring the Property to its original warehouse condition.  *See* Pl. SMF ¶50. Pizzano was instructed to restore the Property to its original condition and not to make any upgrades.  *See* Pl. SMF ¶51-2.  Pizzano determined that various repairs and replacements were necessary to restore the warehouse to its original condition and to return the Property and its systems to a condition of good repair and working, sanitary condition.  *See* Pl. SMF ¶53.  Plaintiff also hired Virginia Roofing to make necessary repairs and replacements to the roof of the Property which had been damaged and not properly maintained by Defendant.  *See* Pl. SMF ¶66.  Upon completion of the necessary repairs and replacements, Plaintiff paid Pizzano $56,125.00 for its work and paid Virginia Roofing $10,460 for its work.  *See* Pl. SMF ¶60, 70.

The repairs performed by Pizzano included:

    a. Removal of weeds, overgrowth and debris in parking lot
    b. Furnish and install new fire extinguishers, existing extinguishers were out of date
    c. Replaced two broken rear exit doors and hardware
    d. Furnish and install toilet paper and soap dispensers, existing dispensers were missing
    e. Replace damaged and stained ceiling tiles in offices
    f. Replaced damaged or missing wall insulation along main wall in warehouse
    g. Removed fence posts and bolts from floor
    h. Furnish and install new vct floor and base in entry and offices
    i. Furnish and install new stairs leading from loading dock to warehouse
    j. Seal up existing window in rear of building
    k. Removed debris left on existing duct work and above office ceilings
    l. Patch and repair holes in walls in offices and bathrooms, prep and pain walls and ceilings

    m.  Removed abandon tele/data wiring hanging from ductwork
    n.  Removed miscellaneous debris from warehouse
    o.  Furnish and install new stair nosings on stairs at entry, nosing were
       missing from stairs
    p.  Removed skim coat of concrete from warehouse floor
    q.  Prep and pain warehouse wall

*See* Pl. SMF ¶54.  Pizzano also hired subcontractors to perform repairs and

replacements to the HVAC system, the electrical systems, the overhead doors, and to

replace a water cooler that had been removed by DCHA.  *See* Pl. SMF ¶55.  Specifically,

Subcontractor HVAC Precision Services, Inc. performed the following work:

    a)  Remove refrigerant lines that had been installed and run through the
       skylights of the Property
    b)  Seal bad patches inside duct work
    c)  Replace dry rotted belt on roof top exhaust fan
    d)  Remove exhaust fans and accompanying wiring that had been installed in
       the bathroom to replace the damaged roof top exhaust fan
    e)  Repair the roof top air conditioning unit (repair refrigerant leak, recharge
       unit and replace fan motor)
    f)  Replace missing belt inside air handling unit and clean and service the unit
    g)  Replace broken kitchen wall heater
    h)  Install missing thermostat and replace fan motor on the back left gas heater
    i)  Replace damaged front two gas heaters
    j)  Repair front through-the-wall heat pump motor

*See* Pl. SMF ¶56.  Subcontractor Overhead Door Co. of Washington DC performed the

following work:

    a)  Reattach the steel supports on the front overhead door
    b)  Remove and replace damaged door track on rolling door number 3
    c)  Remove and replace damaged door track and one slide lock on rolling door
       number 4
    d)  Furnish and install door limits on all four roll up doors, all of which were
       broken or missing
    e)  Replace missing pull ropes from all doors
    f)  Balance and apply lubricant to all doors

*See* Pl. SMF ¶57.  Subcontractor W&W Electric Co., Inc performed the following work:

    a)  Remove non working lamps and install replacements in office areas
    b)  Replace fixtures in bathrooms which were missing lenses

    c) Remove and replace non-functioning emergency exit lights
    d) Remove abandoned wiring throughout Property
    e) Remove outlets that had been added
    f) Repair outlets that were missing parts
    g) Replace non functioning lamps and ballast in loading dock area
    h) Replace damaged fluorescent fixtures throughout warehouse
    i) Removed broken fixtures from side walls of loading dock
    j) Removed non working fixtures and replace with new lamps in loading dock area
    k) Survey electrical panels to ensure working condition and check and verify condition of all exterior lighting
    l) Install missing cover plates throughout Property

*See* Pl. SMF ¶59.  And, Subcontractor Nutwell Plumbing & Heating replaced the missing

water cooler.  *See* Pl. SMF ¶58.

Additionally, Virginia Roofing performed the following work:

    a. Remove deteriorated plywood from 4 skylight covers/curbs and haul away
    b. Furnish and install new ½" plywood over existing skylight covers/curbs to replace deteriorated
    c. Fully adhere 060 EPDM (rubber) membrane over new plywood
    d. At gravel-stop, furnish and install 2 ply roof cement and fabric
    e. Re-attach gutter and gutter hangers as needed
    f. Al all gutter seams furnish and install 1 ply roof cement and fabric
    g. Furnish and install one hundred forty linear feet of shop formed coping to replace damaged/missing
    h. Remove one deteriorated roof plate and haul away
    i. Furnish and install new roof plate to replace deteriorated
    j. Re-flash three doghouses with roof cement and fabric
    k. Furnish and install one ply aluminum roof coating over all repairs

*See* Pl. SMF ¶69.  Pursuant to the unambiguous terms of the Lease, DCHA is obligated

to reimburse Plaintiff for all of the repairs at issue and summary judgment should be

granted with respect to this claim.

        A.     There is No Material Issue of Fact With Respect to the Need for the Subject Repairs

Samuel Silverman, the Project Manager that oversaw the repairs and

replacements performed at the Property after it was vacated by DCHA, was personally

familiar with the condition of the Property immediately prior to DCHA's tenancy.  *See* Pl.

SMF ¶53.  He determined that each of the repairs and replacements at issue was

necessary to restore the Property to the warehouse condition it was in as of October

1997 and to ensure that the Property and its systems were in good repair and sanitary

condition.  *See* Pl. SMF ¶53.  Indeed, DCHA does not contest the necessity for many of

the repairs and replacements that were performed.  For example, the DCHA 30(b)(6)

witness testified that at the time that DCHA vacated the Property:

- The light fixtures in the men's and ladies' restrooms were missing lenses
- DCHA left abandoned wiring in the Property
- There were missing outlet cover plates throughout the Property
- DCHA removed the watercooler from the Property
- The overhead doors were in "fair to poor condition"
- The wall insulation was in "poor" condition
- There were missing floor tiles at the entryway of the warehouse
- DCHA removed a staircase from the Property
- DCHA abandoned refrigerant lines it had installed in the Property
- DCHA abandoned exhaust fans it had installed in the Property
- Many of the lighting fixtures in the warehouse "did not work"
- The interior wall of the warehouse was "deteriorated"
- The condition of the roof was "deteriorated" and "needed to be replaced"
- Approximately 10% of the ceiling tiles in the offices were water damaged

*See* Pl. SMF ¶61.

Moreover, to the extent DCHA questioned the necessity of certain of the other

repairs, the testimony was non-specific, contradictory to other testimony given by DCHA,

and generally insufficient to raise a material issue of fact.  *See Little*, 37 F.3d at 1075

("This burden is not satisfied with some metaphysical doubt as to the material facts, by

conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."

(internal citations and quotations omitted)).

For example, DCHA's witness questioned the need for repairs to the Property's

HVAC system.  However, his testimony was merely that the systems were operable "as

far as [he] know[s]" and that the basis for this knowledge was that DCHA "was using

them while [DCHA] was working in there."   *See* Pl. SMF ¶62.  He also testified that he

did not inspect the system before move-out to ensure that it was properly serviced and in

good working condition.   Specifically, the following testimony was provided:

> Q:  The process of the move-out of the property, was there a specific policy or procedure that you followed?
> A:  No.
> Q:  Was there a checklist of tasks that was assigned?
> A:  No.
> Q:  You testified earlier that your boss instructed you generally to remove the buildout and leave the place clean and empty, correct?
> A:  Yes.
> Q:  Did you have any instructions relating to the heating systems for the time of move-out?
> A:  No specific instructions at all.
> Q:  Were there any specific instructions that related to the air conditioning?
> A:  No
> . . .
> Q:  Was there any task that you performed as part of the move-out to confirm the operability of the heating system
> A:  It was working during the winter when we used it, but that was June. We had the air-conditioning on.
> Q:  I'm really just trying to understand --
> A:  No on the heating system.  We wouldn't go double-check it.
> Q:  Was there anything specific that you did at the time of move-out to confirm whether the air-conditioning system was operable.
> A:  We were using it.

*See* Pl. SMF ¶63.  Plaintiff has not asserted that the HVAC system was completely

inoperable or that DCHA could not have turned on the air conditioning in June prior to

vacating the Property.  This, however, does nothing to contradict the evidence that the

HVAC system was in need of repairs and replacements in order to return it to good

working condition.  DCHA's contractual obligation was not to ensure that the air

conditioner could be turned on and "operate", its express contractual obligation was to

keep the HVAC system in "good repair" and "good working condition."  DCHA's

testimony that the system was "operable" because it was being used at the time of

move-out is not sufficient to raise a material issue of fact as to the necessity of the

repairs and replacements and DCHA's liability therefore.

In fact, the DCHA testimony revealed that Joseph Nee, who was responsible for

overseeing the move-out process, was never provided any instructions relating to

DCHA's contractual obligations with respect to the condition of the property at the time of

move-out, did not review the Lease prior to move-out, did not specifically inspect the

need for the necessary repairs and, was not familiar with the condition of the building at

the beginning of the Lease and thus, was unable to determine whether upon vacating the

Property DCHA had in fact restored the Property as required by the Lease. *See* Pl. SMF

¶64.  Moreover, his testimony was merely that certain items were "operable," not that the

building was in good repair and good working condition.  Considering DCHA's testimony

in its entirety along with Plaintiff's testimony that the repairs were necessary and the

testimony provided by the third-party contractor (who, unlike DCHA, has no direct

interest in the outcome of this litigation), DCHA's general questioning of the need for

some of the repairs is not sufficient to raise a genuine issue of material fact.  *See,*

*e.g.*, *Hastie v. Henderson*, 121 F. Supp. 2d 72, 81 (D.D.C. 2000), *aff'd*,  *Hastie v.*

*Potter,* 2001 WL 793715, at *1 (D.C. Cir. June 28, 2001) (finding no genuine issue of

material fact where the sole evidence plaintiff provided was "her own self-serving and

conclusory statement");  *Hinson ex rel. N.H.* v. *Merritt Educ. Ctr.*, 579 F. Supp. 2d 89,

102 n. 5 (D.D.C. 2008) ("Plaintiff's own unsubstantiated beliefs amount to nothing more

than hearsay, self-serving statements and speculation, and are insufficient as such to

defeat summary judgment.").

B.    The Repairs and Replacements at Issue are Not "Ordinary Wear and Tear" Within the Meaning of the Lease

DCHA's testimony suggests that, rather than contest the need for the repairs, its defense to this material breach relies upon a contention that the repairs and replacements were necessitated by mere "ordinary wear and tear" to the Property and that DCHA is not contractually obligated to pay for such repairs.[9]  DCHA is incorrect. The clear and unambiguous terms of the Lease require DCHA to pay for each of the repairs and replacements at issue.

First, certain of the repairs and replacements were necessary to remediate the impact of DCHA's alterations and other extraordinary actions taken with respect to the Property.  For example, the contractors were required to (a) remove refrigerant lines that had been installed and run through the skylights of the Property; (b) remove exhaust fans and accompanying wiring that had been installed in the bathroom; (c) remove abandoned wiring throughout the Property; (d) remove outlets that had been added; (e) remove fence posts and bolts from floor; (f) furnish and install new flooring; (g) patch and repair holes in walls in offices and bathrooms; (h) remove abandoned tel/data wiring; (i) furnish and install new stairs leading form loading dock to warehouse; and, (j) replace a removed watercooler.  *See* Pl. SMF ¶¶54, 56-59.  It is clear that repairs and replacements of this type, as a matter of law, cannot qualify as "ordinary wear and tear."

"[O]rdinary wear and tear is the depreciation which occurs when the tenant does nothing inconsistent with the usual use and omits no acts which it is usual for a tenant to perform."  *Tirrell v. Osburn*, 55 A.2d 725, 727 (D.C. Nov. 12, 1947).  Clearly, embedding

---

[9] *See, e.g.*, Pl. SMF ¶65 ("Q:  Okay.  Are you aware that there was insulation required on the walls in the main room? A:  I was aware that some of the old installation had deteriorated, but it was not damaged from cause.").

fence posts and bolts into a concrete floor, and otherwise altering the floor of a structure; altering the wiring, refrigeration lines and outlets in the Property; putting holes in the walls of the structure; and, removing a watercooler and staircase from the Property, are actions that are inconsistent with the "usual use" of a rented structure.

Moreover, each of the repairs and replacements at issue were the obligation of DCHA pursuant to the express and unambiguous terms of the Lease.  Specifically, the tenant was obligated to (a) "make all repairs and replacements necessary to keep both the interior and exterior of the Demised Premises and the fixtures and equipment therein in good repair and in property sanitary condition," to (b) "maintain the heating and plumbing systems in good operating condition at all times," to (c) "keep the interior and exterior of the Demised Premises in a clean, neat, orderly and attractive condition at all times"; and, (d) to reimburse Plaintiff for any damage caused by (or the cost to remove) its alterations and demolition.  *See* Pl. SMF¶¶42-5.  Every one of the repairs at issue falls squarely within one or more of those express obligations.  All the work at issue was the obligation of DCHA under the clear and unambiguous terms of the Lease and DCHA has not identified any item of work for which Plaintiff seeks reimbursement that does not fall within those clear and unambiguous obligations.

In addition to DCHA's obligation to make repairs and replacements, keep the Property and its systems in good operating condition, and keep the interior and exterior of the Property clean, the Lease also required that "Tenant shall surrender and deliver possession of said premises to Landlord in the same condition in which they were received, *usual wear and tear excepted*".  *See* Pl. SMF ¶46.  DCHA apparently takes the position that because there is an exception to its obligation under Paragraph 17 of the

Lease to surrender the Property in the same condition in which it was received for "usual wear and tear," it is also relieved of any obligation to perform repairs and replacements caused by "usual wear and tear".  This is an inappropriate reading of the Lease which has been rejected by the courts.

The exception for "usual war and tear" modifies DCHA's obligation to return the Property in a certain condition as set forth in Paragraph 17 of the Lease.  It does not, however, modify DCHA's separate obligations relating to repairs, replacements and clean and neat condition as set forth in Paragraphs 7 and 9 of the Lease.  "An obligation to repair during the term is not modified or cut down by the obligation to surrender at the end of the term in good condition, reasonable use and wear excepted. Even if the two clauses were read together, the tenant would be obligated to make repairs during the term as well as at the termination of the lease."  *In re Cohoes Indus. Terminal, Inc.*, 78 B.R. 681 (Bankr. S.D.N.Y. 1987).  As discussed above, it is a well established principle of contract law that "[t]he court construing a contract cannot ignore a contract term; each provision must be given meaning if at all possible." *Capital City Mortgage Corp.,* 747 A.2d at 569.

Given that each of the repairs and replacements at issue were expressly the obligation of DCHA pursuant to the specific terms of Paragraphs 7 and 9 of the Lease, which provisions were not modified by the concept of "usual wear and tear", DCHA's reliance on the reference to "usual wear and tear" in Paragraph 17 of the Lease is wrong as a matter of law.  DCHA's failure to fulfill its obligations under Paragraphs 7 and 9 of the Lease constitutes a material breach of the Lease and the reference to "usual wear and tear" in Paragraph 17 of the Lease does not render meaningless

DCHA's more specific obligations with respect to repairs and replacements set forth in Paragraphs 7 and 9 of the Lease.  For all of these reasons, Plaintiff is entitled to summary judgment as a matter of law for the full cost of all repairs and replacements performed in order to cure DCHA's material breach of the Lease.

IV.     There is no Material Issue of Fact in Dispute and Plaintiff is Entitled to Judgment as a Matter of Law As to Costs Incurred to Enforce the Terms of the Lease

Pursuant to the unambiguous terms of the Lease, DCHA is "obligated to pay for all reasonable fees and expenses (including court costs and attorneys' fees) incurred by Landlord in enforcing the provisions of this Lease."  *See* Pl. SMF ¶71.  As set forth in this Memorandum and the full record of this case, DCHA has materially breached its obligations under the Lease.  Plaintiff was forced to hire attorneys and prosecute this case in order to enforce his rights under the Lease and compel DCHA to remedy its breaches.  *See* Pl. SMF ¶¶ 72-3.  DCHA is thus obligated to reimburse Plaintiff for his expenses incurred in connection with those efforts, including attorneys' fees and costs.

For all of these reasons, Plaintiff is entitled to judgment as a matter of law for the recovery of all expenses incurred in connection with Plaintiff's enforcement of his rights under the Lease and the motion for summary judgment should be granted.

V.      Defendant's Asserted Affirmative Defense of Accord and Satisfaction Fails as a Matter of Law

The uncontested facts reveal that in May 2010, a dispute arose between the parties as to amounts due to Plaintiff for rent and other charges under the Lease.  *See* Pl. SMF ¶¶ 29-30.  It is also uncontested that, in a May 21, 2010 letter, DCHA set forth in detail its position as to what amounts it owed to Plaintiff and what amounts it contested.  Pl SMF ¶30.  Further, it is uncontested that in June 2010, DCHA proffered a check to

Plaintiff for the same amount that it had identified in its May 21, 2010 letter as being

uncontested. Pl. SMF ¶¶ 30, 32. It is also uncontested that Plaintiff and his attorney met

with representatives of DCHA in June 2010 and, at that meeting hand delivered a letter

clearly stating his understanding that the check was accepted as a payment on account

and that DCHA continued to owe other amounts to Plaintiff. Pl. SMF ¶¶ 35-6. Finally it

is undisputed that, only after that meeting, on June 11, 2010, Plaintiff cashed the June

2010 check. Pl. SMF 37. DCHA now asserts as an affirmative defense that, by cashing

the June 2010 check, Plaintiff agreed as a matter of law to an accord and satisfaction in

respect of all charges due for rent, real estate taxes, utility charges and associated late

fees and interest.[10]  For the reasons set forth below, DCHA's affirmative defense fails as

a matter of law.

"Accord and satisfaction is a valid affirmative defense to a breach of contract

claim where there is proof of: (1) a legitimately disputed or unliquidated claim, (2) a

mutual agreement that the debtor will pay and the creditor will accept something other

than the original amount due in satisfaction of the disputed claim, and (3) the actual

giving and taking of the agreed upon substitution." *Pierola v. Moschonas*, 687 A.2d 942,

947 (D.C. 1997) (citations omitted); *see also Double H Housing Corp. v. David*, 947 A.2d

38, 43 (D.C. 2008); *Saul Subsidiary II Ltd. Partnership v. Venator Group Specialty, Inc.*,

830 A.2d 854 (D.C. 2003); *So v. 514 10th Street Associates, L.P.*, 834 A.2d 910 (D.C.

2003). Here, there is absolutely no evidence that a mutual agreement was ever

reached to settle any disputed claims. Rather, the uncontested facts demonstrate that

DCHA paid Plaintiff the amount of his claim that was undisputed and continued to

negotiate with Plaintiff regarding disputed amounts.

---

[10] DCHA does not assert this affirmative defense as to Plaintiff's claim for repairs. *See* Pl. SMF ¶40.

Merely because one party tenders a check for less than a disputed amount and that check is cashed by the receiving party, does not mean that an accord and satisfaction has occurred.  Rather, for an accord and satisfaction to occur the debtor must send the check "*clearly expressing his intention that it is sent as a settlement in full, and not on account or in part payment . . .*" *Saul Subsidiary*, 830 A.2d at 865 (emphasis in original).  *See also Curtis Builders, Inc. v. General Floor Service Co., Inc.*, 107 A.2d 705, 706 (D.C. 1954) ("An accord and satisfaction arises only where there is a mutual agreement to accept a sum less than that demanded.  Defendant must intend the amount paid as a liquidation of plaintiff's claim, and *the plaintiff in accepting it must understand that it is so intended.*" (emphasis added)); *So*, 834 A.2d at 912 ("'[W]here the amount due is in dispute, and the debtor sends cash or check for less than the amount claimed, *clearly expressing the intention that it is sent as settlement in full, and not on account or in part payment*, the retention and use of the money or cashing of the check is almost always held to be an acceptance of the offer operating as full satisfaction.'" (quoting *Pierola*, 687 A.2d at 947) (emphasis added)).  Moreover, the creditor must "understand that it is so intended."  *Curtis Builders*, 107 A.2d at 706.

Courts routinely find that an accord and satisfaction has not been established, even after a creditor has cashed the debtor's check.  For example, in *Saul Subsidiary*, 830 A.2d 854, F.W. Woolworth Co. was the tenant under a commercial lease with landlord Saul Subsidiary II Limited Partnership.  There was a dispute amongst the parties as to the amount of rent that was owed by Woolworth pursuant to the lease. When the landlord sued Woolworth for breach of contract, Woolworth asserted that the claim should be dismissed because an accord and satisfaction had occurred when the

landlord cashed Woolworth's tendered check for less than the amount claimed by the

landlord.  However, the Court held:

> In tendering the check, Woolworth did not "clearly express" its intention that
> the payment be treated as settlement in full of Saul's claim for additional
> 1997 rent.  The check did not bear the notation "payment in full" or other
> words to that effect; the reference on the check stub to percentage rent
> was not sufficient by itself to convey that message with the requisite clarity,
> for it could have signified only Woolworth's acknowledgement that it owed
> at least that much.  Nor did Saul accept the check as anything other than "a
> payment on account and not full payment," as Saul said at the time.  In
> short, we do not have the "mutual agreement that the debtor will pay and
> the creditor will accept something other than the original amount due in
> satisfaction of the disputed claim" that is a prerequisite for the doctrine of
> accord and satisfaction to operate.

*Saul Subsidiary*, 830 A.2d at 865 (internal citations omitted).  Just like in *Saul Subsidiary*,

here (a) the check did not bear the notation "payment in full" or other words to that effect

(*see* Pl. SMF ¶23); (b) the letter that Defendant sent weeks before did not suggest that

the check was payment in full; rather, the letter acknowledged that it owed at least the

amount of the check that was later sent (*see* Pl. SMF ¶21); and, (c) Plaintiff did not

accept the check as anything other than a payment on account and not full payment, as

Plaintiff said at the time (*see* Pl. SMF ¶¶25-6).  In other words, like *Saul Subsidiary*, the

fact that Plaintiff cashed Defendant's June 1, 2010 check on June 11, 2010 cannot alone

support a finding that Plaintiff's claim is barred by the doctrine of accord and satisfaction

as a matter of law.

### A.     There is No Evidence That DCHA Proffered the June 2010 Check with a Clear Intention of Effecting A Settlement in Full

For an accord and satisfaction to have occurred, the evidence must establish that

DCHA proffered the June 2010 check with a clear intention of effecting a settlement in

full.  *See, e.g.*, *Curtis Builders*, 107 A.2d at 706.  ("An accord and satisfaction arises only

where there is a mutual agreement to accept a sum less than that demanded.
*Defendant must intend the amount paid as a liquidation of plaintiff's claim*, and the
plaintiff in accepting it must understand that it is so intended." (emphasis added)).  There
is no such evidence in this case.

DCHA did not proffer its June 2010 check with a clear intention of effecting a
settlement in full, rather than as a payment on account.  The June 1, 2010 check bore no
notation suggesting that it was intended as an offer of "payment in full" rather than as a
payment on account.  *See* Pl. SMF ¶34.  Moreover, although "other manners of
conveying the debtor's intent in tendering the check may be a sufficient basis for
application of the doctrine," *Double H Housing Corp.*, 947 A.2d at 44, no such facts exist
here.  The June 1, 2010 check not only bore no notation even suggesting that it was
offered as payment in full, it also was not accompanied by any letter or other
communication that would relay Defendant's intent.  *See* Pl. SMF ¶34.   For over 13
years, Defendant had periodically sent checks to Plaintiff as a payment on account and
there was nothing unique about the June 1, 2010 check to suggest that it was intended
to be any different than the checks previously sent as a payment on account.  *See* Pl.
SMF ¶¶33-4.

DCHA suggests that its May 21, 2010 letter should have put Defendant on notice
of its intention that the June 1, 2010 check constituted an offer of full and final
settlement.   This suggestion lacks merit.  First, nothing in the May 21, 2010 clearly
expressed an intention to fully and finally resolve the parties' dispute.  The May 21, 2010
letter was five pages long.  In its five-page letter, Defendant did not mention the term
"accord and satisfaction," it did not mention the concept of a "full and final" resolution,

and it did not request, offer, or even reference a release of the then existing claims of the parties.  *See* Pl. SMF ¶31.  Rather, the letter made clear that DCHA was not disputing a portion of the amount Plaintiff claimed was due and DCHA's June 1, 2010 check paid Plaintiff exactly that undisputed amount.  *See* Pl. SMF ¶¶30, 32.  DCHA made a payment of undisputed amounts; it did not indicate that such payment was conditional on acceptance of a settlement.  Certainly this does not clearly establish that DCHA intended to offer to settle the disputed amounts (apparently for $0).  Moreover, this letter was sent more than two weeks before the June 1, 2010 check was received by Plaintiff and absolutely no reference to the May 21, 2010 letter was included with the check when it was sent.  *See* Pl. SMF ¶¶31, 32, 34.  DCHA cannot now assert as a matter of law that a letter it sent two weeks prior to the check, and which was in no way referenced when the check was sent, is a clear expression of an intention to require Plaintiff to accept a settlement of disputed amounts in order to accept the payment of amounts that DCHA did not dispute.

> B.    Plaintiff Clearly Did Not Understand that He Was Accepting an
>          Offer of Settlement in Full When He Cashed the June 2010 Check

For an accord and satisfaction to have occurred, the evidence must establish that Plaintiff understood that, by cashing the June 2010 check, he was accepting an offer to be bound by a full and final settlement of disputed amounts. *See, e.g.*, *Curtis Builders*, 107 A.2d at 706.  ("An accord and satisfaction arises only where there is a mutual agreement to accept a sum less than that demanded.  Defendant must intend the amount paid as a liquidation of plaintiff's claim, *and the plaintiff in accepting it must*

*understand that it is so intended."* (emphasis added)).   There is no such evidence in this case.

The evidence is undisputed that at no time did Plaintiff understand that he was accepting an offer of settlement in full when he cashed the June 2010 check.   First, as explained above, at no time did DCHA propose a full accord and satisfaction.   Second, the check that Plaintiff cashed represented payment of an undisputed amount, and not a penny more.   *See* Pl. SMF ¶32.   There is no evidence that Plaintiff understood that he was settling his disputed claim for $0 merely by accepting payment of an undisputed amount.   Moreover, after Defendant sent its June 1, 2010 check, on June 10, 2010, Plaintiff and his counsel met with Lisa Dean and DCHA Associate General Counsel Qwendolyn N. Brown for the specific purpose of discussing the amounts then due and a resolution of the outstanding amounts.   *See* Pl. SMF ¶35.   At that meeting, Plaintiff hand delivered a letter to Defendant acknowledging receipt of the June 1, 2010 rent check and advising Defendant that the check was a payment on account and that the account had an outstanding balance.   *See* Pl. SMF ¶36.   This is a clear expression of Plaintiff's understanding and intent -- that the June 1, 2010 rent check was a payment on account, that the account had an outstanding balance, and that the parties would continue to work to resolve their dispute.   It was not until June 11, 2010, <u>after</u> Plaintiff had clearly expressed his understanding to DCHA representatives that the June 1, 2010 rent check was intended as a payment on account that Plaintiff cashed the June 1, 2010 rent check. *See* Pl. SMF ¶37.   There are no facts in the record to suggest that Plaintiff's understanding or intent ever changed or that DCHA ever contradicted Plaintiff's understanding or intent.   These facts cannot support a finding that Plaintiff understood

that, by cashing the June 1, 2010 rent check, he was accepting a settlement in full of his disputed claim.

C.   The Evidence Shows that DCHA Never Intended the June 2010
     Check to Constitute an Offer of Settlement

Not only are there no facts sufficient to establish the parties' mutual agreement to satisfy the claim, the undisputed facts clearly support a finding that the Defendant never intended the June 1, 2010 check as an offer of full and final settlement and, therefore that an accord and satisfaction did not occur.  Even after the June 1, 2010 rent check had been cashed, Defendant never gave any indication that it believed the check to have represented a full and final settlement offer, binding when cashed.  On the contrary, as late as June 21, 2010, Ms. Brown, the Associate General Counsel for DCHA, wrote to Plaintiff's counsel and advised that DCHA's General Counsel was reviewing the dispute and what Ms. Brown referred to as Plaintiff's "settlement offer" and would get back to Plaintiff's counsel "shortly."  *See* Pl. SMF ¶38.

Clearly, had Defendant regarded its June 1, 2010 check as a binding offer of full and final settlement, it would not have continued to negotiate the dispute with Plaintiff a full ten days after the Plaintiff cashed the June 1, 2010 check.  But the Defendant did continue to negotiate (*see* Pl. SMF ¶38) and it was not until a motion to dismiss was filed in this action months later that Defendant first claimed that it had intended its May 21, 2010 letter and June 1, 2010 check to constitute an offer of full and final settlement and that it understood Plaintiff to have accepted that offer by cashing the proffered check. *See* Pl. SMF ¶39.  These belated assertions are clearly belied by the parties' conduct in June 2010.  Even if this evidence didn't clearly establish that DCHA never intended its June 2010 check as an offer of settlement, at the very least it establishes that Plaintiff

had no reasonable basis to understand it as such.  Thus, as a matter of law, an accord and satisfaction did not occur.

"Accord and satisfaction is an affirmative defense. Thus, [Defendant] bears the burden of proof, and an agreement is not to be presumed."  *ABB Daimler-Benz Transp. (N.A.), Inc.* v. *Nat'l R.R. Passenger Corp.*, 14 F. Supp. 2d 75, 93 (D.D.C. 1998).  In this case, given the lack of evidence presented by Defendant in support of its contention that an accord and satisfaction occurred and the compelling evidence that suggests the contrary, the Court should find, as a matter of law, that an accord and satisfaction did not occur and reject Defendant's affirmative defense.  Summary judgment should, therefore, be granted in favor of Plaintiff and the affirmative defense should be dismissed with prejudice.

**CONCLUSION**

For all of the reasons set forth herein, Defendant's affirmative defense fails as a matter of law.  Moreover, there are no material issues of fact in dispute and Plaintiff is entitled to judgment as a matter of law as to his claims for (a) real estate taxes, utility payments and late charges; (b) reimbursement of all costs incurred to perform repairs and replacements to the Property necessitated by DCHA's breach of the Lease; and, (c) costs incurred by Plaintiff to enforce his rights under the Lease.  Plaintiff's Motion for Summary Judgment should, therefore, be granted.

 Dated:       June 12, 2012

Respectfully submitted,

/s/ Judah Lifschitz

Judah Lifschitz, Esq.  (DC Bar No. 963330)
Laura Fraher, Esq. (DC Bar No. 979720)
SHAPIRO LIFSCHITZ & SCHRAM, P.C.
1742 N Street, NW
Washington, DC  20036
(202) 689-1900 (telephone)
(202) 689-1901 (facsimile)
Lifschitz@slslaw.com
Fraher@slslaw.com

*Attorneys for Plaintiff Stanford Weinstein*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
Stanford B. Weinstein,                              )
                                                    )        Case No. 1:10-cv-01768
                                                    )        Judge Contreras
                         Plaintiff,                 )
                                                    )
         v.                                         )
                                                    )
District of Columbia Housing Authority,             )
                                                    )
                                                    )
                         Defendant.                 )
_____            )

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Plaintiff Stanford B. Weinstein ("Weinstein" or "Plaintiff") submits the following Statement of Material Facts Not in Dispute in support of his Motion for Summary Judgment:

1.      During all times relevant to the issues in this proceeding, Plaintiff Stanford B. Weinstein ("Plaintiff") was the owner of certain real property located in the District of Columbia identified as Lot 839 in Square 672 with the improvements thereon, known as 16 M Street, NE and an adjacent parking lot known as Lot 251 in Square 672, in the District of Columbia (the "Property").

**Citation:**

- Defendant's Counterclaim ¶ 5, attached hereto as Exhibit A, ECF No. 27;
- Affidavit of Stanford B. Weinstein, sworn to June 6, 2012 ("Weinstein Aff."), ¶ 2.

2.      On or about October 17, 1997, Defendant District of Columbia Housing Authority

("Defendant" or "DCHA") and Plaintiff entered into a written Lease Agreement, pursuant

to which the Property was leased to Defendant.

**Citation**:

- Defendant's Amended  Answer at ¶ 5, attached hereto as Exhibit A, ECF No. 27;
- Weinstein Aff. ¶ 3 and Ex. 1.

3.      From time to time thereafter, Defendant and Plaintiff entered into written

extensions and addendums to the Lease.  The latest and final amendment and

addendum to the Lease is dated August 8, 2008 (the "Final Addendum") (hereinafter,

the Lease, as amended from time to time, is referred to as the "Lease").

**Citation**:

- Weinstein Aff. ¶ 3 and Ex. 2;

4.      The Lease is a valid and enforceable contract between the parties.

**Citation**:

- Defendant's Responses to Plaintiff Stanford B. Weinstein's First Set of Requests for Admission to Defendant District of Columbia Housing Authority  ("Def. RFA"), attached hereto as Exhibit B, No.1;
- Defendant's Answers to Plaintiff's First Set of Interrogatories to Defendant District of Columbia Housing Authority ("Def. First Interrogatories"), attached hereto as Exhibit C, No. 9.

5.      The Lease provided that DCHA was obligated to pay late charges and interest for

late payment of rent and real estate taxes as follows:

If Tenant is delinquent in the payment of any rental installment for more seven (7)
calendar days past the due date, Tenant shall pay both a late charge of five
percent (5%) per month or fraction thereof, and interest of one and one-half
percent (1 ½%) per month or fraction thereof.

If Tenant does not pay to Landlord the total amount of such tax bills within fifteen
calendar (15) days of such presentation, Tenant shall pay both a late charge of
five percent (5%) per month or fraction thereof and interest of one and one-half
percent (1 ½%) per month or fraction thereof. . . .

**Citation:**

- Weinstein Aff. Exs. 1 and 2 at ¶¶ 4-5.

6.      In the course of discovery, DCHA was asked its position regarding amounts that

Plaintiff claimed were due for real estate taxes and utility charges.  DCHA responded

with its sole defense, *i.e.*, that no amounts were due Plaintiff because of an alleged

accord and satisfaction.   DCHA provided no further defense.

**Citation:**

- Def. First Interrogatories, Nos. 7 and 8;
- Letter from Laura Fraher, Esq. to Nicola Grey, Esq., dated March 23, 2012, attached
  hereto as Exhibit D.

7.      In a letter to Plaintiff, dated May 21, 2010, DCHA stated the following

disagreements with Plaintiff's calculation of amounts due under the Lease:

    a.      DCHA asserted that Plaintiff is incorrect that the Lease terminated on July 31, 2010

    b.      DCHA disagreed with Plaintiff's inclusion of OTR penalties in the calculation of late fees owed as a result of late payment of real estate taxes

    c.      DCHA disagreed with Plaintiff's calculation of late charges and interest on a monthly basis

    d.      DCHA disagreed with Plaintiff's calculation of the amount due to for real estate taxes in 2010

## Citation:

- Weinstein Aff. Ex. 37.

8.      During the term of the Lease, DCHA often paid its rent and real estate taxes late.

When those charges were paid late, Plaintiff assessed late charges and interest on a

monthly basis as expressly provided for in Paragraphs 4 and 5 of the Lease and/or the

applicable addenda.

## Citation:

- Def. RFA (Ex. B) Nos. 15-19;
- Weinstein Aff. ¶ 4, Exs. 1 and 2 at ¶¶ 4 and 5, and Exs. 3-23;
- Transcript of Deposition of Stanford B. Weinstein ("Weinstein Tr.") dated Nov. 10, 2011, attached hereto as Exhibit E, 22:22-23:4 and 23:6-22.

9.      Specifically, if DCHA had not paid rent in full by the 8th day of the month, a 6 ½ %

charge was imposed on that day and again on the 8th day of each month thereafter that

a balance remained due.  If DCHA had not paid real estate taxes in full by the 15th day

after the real estate tax bill was presented to DCHA, a 6 ½% charge was imposed on

that day and again on the same day each month thereafter that a balance remained due

all in accordance with the express provisions of Paragraphs 4 and 5 of the Lease and/or

applicable addenda.

**<u>Citation</u>:**

- Weinstein Aff. ¶ 5 and Exs. 1 and 2 at ¶¶ 4 and 5.

10.     During the course of its tenancy DCHA never objected or questioned the

calculation of late charges and interest and paid them as billed.  DCHA for the first time

objected to Plaintiff's calculation of late fees relating to real estate taxes and rent in its

May 21, 2010 letter to Plaintiff.

**<u>Citation</u>:**

- Weinstein Aff. ¶¶ 4, 8 and Exs. 25-26.

11.     In its May 21, 2010 letter, DCHA asserted that late fees should be assessed as if

there were a daily rate, stating that "for late payments less than one month delinquent,

the fees are calculated at 1/30th of the respective amounts."

**<u>Citation</u>:**

- Weinstein Aff. Ex. 37.

12.     Notwithstanding the imposition of late charges and interest, DCHA continued to make late payments.

**Citation**:

- Def. RFA (Ex. B) Nos. 17-19;
- Weinstein Aff. ¶ 4 and Exs. 3-23.

13.     In 2004, the Lease was amended to provide that late fees imposed upon DCHA for failure to timely pay real estate taxes were to be calculated as follows:   "Tenant shall pay both a late charge of five percent (5%) per month or fraction thereof and interest of one and one-half percent (1 1/2%) per month or fraction thereof, over and above any late payment charges imposed by the District of Columbia Office of Tax and Revenue." Prior to 2004, such late fees were calculated to include only the 5 % late charge and 1 ½% interest.

**Citation**:

- Weinstein Aff. ¶  6 and Ex. 24 at ¶ 5;

14.     After 2004 and continuing through the end of DCHA's tenancy in 2010, each time DCHA paid its real estate taxes late, Plaintiff imposed monthly late fees in accordance with the formula set forth in the 2004 Addendum (which remained the same in all later applicable addenda).

**Citation**:

- Weinstein Aff. ¶  8 and Exs. 24 and 2 at ¶ 5.
- Weinstein Tr. (Ex. E) 68:23-70:02; 72:24-73:25.

15.     For over five years, DCHA did not object or question the calculation of late fees and paid them as billed.  DCHA objected to Plaintiff's calculation of the amounts due for the first time in its letter to Plaintiff dated May 21, 2010.

**Citation**:

- Weinstein Aff. ¶ 8 and Exs. 25-26.

16.     In its May 21, 2010 letter, DCHA asserted that "[s]ince OTR never imposed any penalties against your Property, you are not entitled to collect any OTR penalties from DCHA."

**Citation**:

- Weinstein Aff. Ex. 37.

17.     When DCHA paid the real estate taxes late, Plaintiff had no choice but to advance payment of the real estate taxes relating to the Property, so that his interest in the Property and his credit rating were not adversely affected by DCHA's delinquency.

**Citation**:

- Weinstein Aff. ¶ 7;
- Weinstein Tr. (Ex. E) 66:4-6; 66:7-8, 71:5-20.

18.      Weinstein testified that "during the 40-odd years that [Plaintiff] owned this

property, [Plaintiff] never once paid these taxes late, and [Plaintiff] had no reason to

believe that in the future [Plaintiff] would ever pay them late.  During the term of this

tenancy, the District of Columbia Housing Authority tenancy, [Plaintiff] still had no

intention of ever paying the taxes late.  This provision was put in to give the Housing

Authority further incentive to pay the landlord what they owed under the lease in a

timely manner.  It was not intended to reimburse [Plaintiff] for charges that [Plaintiff]

would be out of pocket for paying."

**Citation**:

- Weinstein Tr. (Ex. E) 71:7-20.

19.      For years, the OTR raised the tax assessment on the Property and Plaintiff

suggested to DCHA that it challenge the assessment.

**Citation**:

- Weinstein Aff. ¶ 9 and Exs. 27-29.

20.      Because DCHA failed to act, Plaintiff and DCHA agreed in the Final Addendum

that Plaintiff would initiate the activity necessary to reduce the assessment and DCHA

would pay for it.

**Citation**:

- Weinstein Aff. ¶ 10 and Ex. 2 at ¶24.

21.    Specifically, the Final Addendum provides that:

Landlord will undertake steps to obtain a reduction in the assessed value of the leased premises and the real property taxes imposed on the leased premises. Tenant agrees that it will support any such efforts by Landlord or his agents.  If Landlord's efforts result in a reduction of the real property taxes, the parties agree that they will share equally in the **net benefits** of any such reductions obtained, **after taking into account any attorney's fees and other costs incurred in obtaining such reductions**.  (For example, if these efforts result in a $30,000 reduction in the real property taxes, and if the costs and attorney's fees are $10,000, then the net reduction of $20,000 will be shared equally by the parties, resulting in a net benefit to each party of $10,000).

**Citation:**

- Weinstein Aff. Ex. 2 at ¶24.

22.    Plaintiff retained the law firm of Wilkes Artis to file an appeal of the 2010 tax

assessment.  That appeal was filed and was successful, resulting in a decrease in the

assessment and the real estate taxes on the Property for the year 2010.

**Citation:**

- Weinstein Aff. ¶ 11 and Exs. 30-32;
- Weinstein Tr. (Ex. E) 63:6-19.

23.    Plaintiff paid $4,910 for the services of Wilkes Artis.

**Citation:**

- Weinstein Aff. ¶ 11 and Exs. 30-32;
- Weinstein Tr. (Ex. E) 63:10-19.

24.      In its May 21st letter, DCHA objected and refused to pay Plaintiff the properly

calculated charges and asserted "DCHA is responsible for payment of the 2010 real

estate taxes assessed by OTR in the amount of $54,902, not $63,086.  More

importantly, there is no such provision in the Lease that obligates DCHA to pay for

attorney's fees.  As such, DCHA will pay no attorney's fees incurred in the tax

assessment appeal efforts."

**<u>Citation</u>:**

- Weinstein Aff. Ex. 37.

25.      On or about January 20, 2010, Plaintiff received from Defendant, by Federal

Express, a written "notice of nonrenewal" which purported to "confirm[] the lease

termination date of May 31, 2010."  ("Notice")  The Notice was dated December 1, 2009

and purportedly issued pursuant to paragraphs 2 and 23 of the Final Addendum.   The

Notice was originally sent by certified mail but was returned by the United States Postal

Service as "Undeliverable as Addressed."

**<u>Citation</u>:**

- Weinstein Aff. ¶ 12 and Exs. 33-35;
- Weinstein Tr. (Ex. E) 28:6-8.

26.      The Lease ran for a two year term from June 1, 2008 through May 31, 2010 and

automatically renewed for an additional two year term from June 1, 2010 through May

31, 2012, subject to the termination rights of the parties.

**<u>Citation</u>:**

- Weinstein Aff. Ex. 2 at ¶ 2.

27.     The Lease provided that it could be "terminated by either party by giving six months advance written notice" and that "[a]ll notices sent or required to be sent hereunder shall be sent by certified mail, return-receipt requested."

**Citation**:

- Weinstein Aff. Ex. 2 at ¶¶ 21, 23.

28.     In the Notice, DCHA took the position that notice was provided "from the date of this letter" and, therefore, that the Lease terminated on May 31, 2010.

**Citation**:

- Weinstein Aff. Ex. 33.

29.     On or about April 30, 2010, Plaintiff sent Defendant a detailed accounting of amounts then due, owing, and overdue under the Lease and the Final Addendum.

**Citation**:

- Weinstein Aff. ¶ 13 and Ex. 36.

30.     By letter dated May 21, 2010, Defendant disputed Plaintiff's calculation of the amounts then due and owing under the Lease and stated in detail the amount it did not contest it owed Plaintiff.

**Citation**:

- Weinstein Aff. ¶ 14 and Ex. 37;

31.    The May 21, 2010 letter was five pages long.  In its five-page letter, Defendant did not mention the term "accord and satisfaction," it did not mention the concept of a "full and final" resolution, and it did not request, offer, or even reference a release of the then existing claims of the parties.

**Citation**:

- Weinstein Aff. ¶ 15 and Ex. 37.

32.    On or about June 3, 2010, Plaintiff received a check from Defendant in the mail, dated June 1, 2010.  The check was for $65,082.44, which is the exact amount identified by DCHA as uncontested in its May 21, 2010 letter.

**Citation**:

- Weinstein Aff. ¶ 17 and Exs. 37-38;

33.    It was DCHA's standard practice under this Lease for more than 12 years that it would periodically send checks as payment on account.

**Citation**:

- Weinstein Aff. ¶ 18;
- Appendix A Exs. 4-15.

34.    The June 1, 2010 check did not bear any notation, was not accompanied by any cover letter, and did not include any restrictive endorsement to indicate that it was being tendered as an offer of full and final settlement rather than as a payment on account.

**Citation**:

- Def. RFA (Ex. B) Nos. 40-41;
- Weinstein Aff. ¶ 19 and Ex. 38.

35.      On June 10, 2010, Plaintiff and his attorney Judah Lifschitz, Esq. met with Lisa

Dean and DCHA Associate General Counsel Qwendolyn N. Brown.  The parties

discussed the amounts then due under the Lease and a potential resolution of the

outstanding amounts.

**Citation**:

- Weinstein Aff. ¶ 21;
- Weinstein Tr. (Ex. E) 98:24-99:16.

36.      At the June 10, 2010 meeting, Plaintiff hand delivered a letter to Defendant

acknowledging receipt of the June 1, 2010 check and advising Defendant that Plaintiff

would be accepting the check as a payment on account and that the account had an

outstanding balance.

**Citation**:

- Def. RFA (Ex. B) No. 43
- Weinstein Aff. ¶ 22 and Ex. 39;

37.      Only after that meeting, on June 11, 2010, did Plaintiff cash the June 1, 2010

check.

**Citation**:

- Weinstein Aff. ¶ 24 and Exs. 38 and 39.

38.     On June 21, 2010, after the meeting and after the check was cashed, Ms. Brown,

the Associate General Counsel for DCHA, wrote to Plaintiff's counsel and advised that

DCHA's General Counsel was reviewing the dispute and what Ms. Brown referred to as

Plaintiff's  "settlement offer" and that DCHA would get back to Plaintiff's counsel

"shortly."

**Citation:**

- Weinstein Aff. ¶ 25 and Ex. 40.

39.     In its motion to dismiss filed in November 2010, DCHA for the first time asserted

its contention that the June 1, 2010 check was intended as an offer of a full and final

settlement.

**Citation:**

- Defendant's Motion to Dismiss or, In the Alternative, for Summary Judgment,
  attached hereto as Exhibit F, ECF No. 3.

40.     Defendant does not assert the affirmative defense of Accord and Satisfaction

with respect to Plaintiff's claim for repairs.

**Citation:**

- Transcript of 30(b)(6) deposition of DCHA (Witness Lorry Bonds), dated February

  28, 2010 ("Bonds Tr.), attached hereto as Exhibit G, at 73:3-8.

41.     Defendant remained in possession of the Property and did not vacate until on or

about June 30, 2010.

**Citation:**

- Def. RFA (Ex. B) No. 9;
- Def. First Interrogatories (Ex. C) No. 5;
- Weinstein Aff. ¶ 27;

42.      The Lease provide that DCHA was permitted to "install[] any furniture, fixtures and equipment necessary in the conduct of its business", but that, "[i]n the event any damage is done to said premises in the installation or removal of said furniture, fixtures and equipment, <u>Tenant shall, at its cost and expense, restore said premises to their original condition, or promptly reimburse Landlord for all such costs</u>."

**<u>Citation</u>:**

- Weinstein Aff. Ex. 1 at ¶ 7(b).

43.      The Lease provided that if Tenant failed to remove any such material at the end of its tenancy, and Plaintiff disposed of those materials, "<u>Tenant shall promptly reimburse Landlord for all such costs of removal and disposal</u>."

**<u>Citation</u>:**

- Weinstein Aff. Ex. 1 at ¶ 7(b).

44.      The Lease provided that "Tenant shall not, without the written approval of Landlord, make any alterations or structural changes in or do any work involving substantial additions to or changes in plumbing or gas pipes and fixtures or electric wiring in said premises or building."

**<u>Citation</u>:**

- Weinstein Aff. Ex. 1 at ¶ 10.

45.     The Lease also required that "Tenant shall, at its risk, cost and expense, <u>make all</u>
<u>repairs and replacements necessary to keep both the interior and exterior of the</u>
<u>Demised Premises and the fixtures and equipment therein in good repair and in</u>
<u>property sanitary condition</u>. . . .   Tenant shall, at its cost and expense, furnish heat to
said premises. . . and shall <u>maintain the heating and plumbing systems in good</u>
<u>operating condition at all times</u>. . . .Tenant shall keep the interior and exterior of the
Demised Premises in a <u>clean, neat, orderly and attractive condition at all times</u>."

**Citation:**

- Weinstein Aff. Ex. 1 at ¶ 9.

46.     The Lease required that "upon termination of the term herein and without further
notice" Tenant shall "surrender and deliver possession of said premises to Landlord <u>in</u>
<u>the same condition in which they were received</u>, usual wear and tear excepted."

**Citation:**

- Weinstein Aff. Ex. 1 at ¶ 17.

47.     During its tenancy, DCHA made substantial alterations to the Property.

**Citation:**

- Def. RFA (Ex. B) No. 36;
- Weinstein Aff. ¶ 28 and Exs. 41-42;
- Weinstein Tr. (Ex. E) 33:9-34:10; 35:17-25; 36:2-23;
- Transcript of Deposition of Joseph Nee dated November 15, 2011 ("Nee Tr."), attached hereto as Exhibit H, at 37:15-48:22.

48.     Defendant never requested, and Plaintiff never provided, written consent for any
of the alterations.

**Citation:**

- Weinstein Aff. ¶ 30;
- Weinstein Tr. (Ex. E) 48:6-8; 53:7-54:8.

49.     The alterations to the building included, *inter alia*:

   a.    Installing a locker room, which included new walls embedded to the
         existing warehouse floor, new flooring, and new lighting
   b.    Installing a locker room, which included new walls embedded to the
         existing warehouse floor, new flooring, and new lighting;
   c.    Installing a kitchen, which included installing new plumbing;
   d.    Installing office space, which included installing new walls which were
         embedded into the floor of the warehouse, new flooring, and new wiring;
         and, installing a chain link fence in the interior of the warehouse, which
         included embedding concrete posts and large bolts into the warehouse
         floor.

**Citation**:

- Weinstein Aff. Exs. 41-42.
- Nee Tr. (Ex. H) 37:15-48:22.

50.     Plaintiff retained Pizzano General Contractors, Inc. ("Pizzano") to make

necessary repairs and replacements to the Property after it was vacated by DCHA.

**Citation**:

- Weinstein Aff.  ¶ 31;
- Affidavit of Samuel Silverman, sworn to on June 7, 2012 (Silverman Aff.) ¶5.

51.     Pizzano was instructed to make repairs and replacements necessary to restore

the building to its original warehouse condition to return the Property and its systems to

a condition of good repair and working, sanitary condition.

**Citation**:

- Weinstein Aff.  ¶ 31;
- Silverman Aff. ¶ 6 and Exs. 1-2.

52.     Pizzano was instructed not to make any upgrades to the Property.

**Citation**:

- Weinstein Aff.  ¶ 31;
- Silverman Aff. ¶ 6 and Exs. 1-2.

53.     Samuel Silverman, the Pizzano Project Manager that oversaw the repairs and replacements performed at the Property after it was vacated by DCHA, was personally familiar with the condition of the Property immediately prior to DCHA's tenancy.  He determined that a number of repairs and replacements were necessary to restore the building to its original warehouse condition and to restore the Property and its systems to good repair and proper working, sanitary condition.

**Citation:**

- Silverman Aff. ¶¶ 7-21, Exs. 3-26.

54.     Specifically, Pizzano performed the following work:

    a.    Removal of weeds, overgrowth and debris in parking lot
    b.    Furnish and install new fire extinguishers, existing extinguishers were out of date
    c.    Replaced two broken rear exit doors and hardware
    d.    Furnish and install toilet paper and soap dispensers, existing dispensers were missing
    e.    Replace damaged and stained ceiling tiles in offices
    f.    Replaced damaged or missing wall insulation along main wall in warehouse
    g.    Removed fence posts and bolts from floor
    h.    Furnish and install new vct floor and base in entry and offices
    i.    Furnish and install new stairs leading from loading dock to warehouse
    j.    Seal up existing window in rear of building
    k.    Removed debris left on existing duct work and above office ceilings
    l.    Patch and repair holes in walls in offices and bathrooms, prep and pain walls and ceilings
    m.    Removed abandon tele/data wiring hanging from ductwork
    n.    Removed miscellaneous debris from warehouse
    o.    Furnish and install new stair nosings on stairs at entry, nosing were missing from stairs
    p.    Removed skim coat of concrete from warehouse floor
    q.    Prep and pain warehouse wall

**Citation:**

- Silverman Aff. ¶23-24 and Ex. 13.

55.     Pizzano also hired subcontractors to perform repairs and replacements to the

HVAC system, the electrical systems, the overhead doors, and to replace a water cooler

that had been removed by DCHA.

**Citation:**

- Silverman Aff. ¶¶ 9-19.

56.     Subcontractor HVAC Precision Services, Inc. performed the following work:

    a.    Remove refrigerant lines that had been installed and run through the skylights of the Property

    b.    Seal bad patches inside duct work

    c.    Replace dry rotted belt on roof top exhaust fan

    d.    Remove exhaust fans and accompanying wiring that had been installed in the bathroom to replace the damaged roof top exhaust fan

    e.    Repair the roof top air conditioning unit (repair refrigerant leak, recharge unit and replace fan motor)

    f.    Replace missing belt inside air handling unit and clean and service the unit

    g.    Replace broken kitchen wall heater

    h.    Install missing thermostat and replace fan motor on the back left gas heater

    i.    Replace damaged front two gas heaters

    j.    Repair front through-the-wall heat pump motor

**Citation:**

- Silverman Aff. ¶10-11 and Exs. 5 and 6.

57.     Subcontractor Overhead Door Co. of Washington DC performed the following

work:

      a.     Reattach the steel supports on the front overhead door
      b.     Remove and replace damaged door track on rolling door number 3
      c.     Remove and replace damaged door track and one slide lock on rolling
           door number 4
      d.     Furnish and install door limits on all four roll up doors, all of which were
           broken or missing
      e.     Replace missing pull ropes from all doors
      f.     Balance and apply lubricant to all doors

**<u>Citation</u>:**

• Silverman Aff. ¶¶ 13-14 and Exs. 7 and 8.

58.     Subcontractor Nutwell Plumbing & Heating replaced the missing water cooler.

**<u>Citation</u>:**

• Silverman Aff. ¶ 16 and Ex. 9.

59.     Subcontractor W&W Electric Co., Inc performed the following work:

      a.     Remove non working lamps and install replacements in office areas
      b.     Replace fixtures in bathrooms which were missing lenses
      c.     Remove and replace non-functioning emergency exit lights
      d.     Remove abandoned wiring throughout Property
      e.     Remove outlets that had been added
      f.     Repair outlets that were missing parts
      g.     Replace non functioning lamps and ballast in loading dock area
      h.     Replace damaged fluorescent fixtures throughout warehouse
      i.     Removed broken fixtures from side walls of loading dock
      j.     Removed non working fixtures and replace with new lamps in loading
           dock area
      k.     Survey electrical panels to ensure working condition and check and verify
           condition of all exterior lighting
      l.     Install missing cover plates throughout Property

**<u>Citation</u>:**

• Silverman Aff. ¶ 18-19 and Exs. 10 and 11.

60.     Plaintiff paid $56,125.00 for the work of Pizzano, including work performed by

subcontractors.

**Citation**:

- Weinstein Aff. ¶ 31 and Ex. 43;
- Silverman Aff. ¶ 38 and Ex. 27.

61.     DCHA testified that at the time that DCHA vacated the Property:

    a.     The light fixtures in the men's and ladies' restrooms were missing lenses (85:22-86:14)

    b.     DCHA left abandoned wiring in the Property (88:3-9)

    c.     There were missing outlet cover plates throughout the Property (90:6-14)

    d.     DCHA removed the watercooler from the Property (93:1-10)

    e.     The overhead doors were in "fair to poor condition" (97:2-16)

    f.     The wall insulation was in "poor" condition (109:17-18)

    g.     There were missing floor tiles at the entryway of the warehouse (110:11-15)

    h.     DCHA removed a staircase from the Property (110:19-111:3)

    i.     DCHA abandoned refrigerant lines it had installed in the Property (112:20-113:5)

    j.     DCHA abandoned exhaust fans it had installed in the Property (119:20-120:7)

    k.     Many of the lighting fixtures in the warehouse "did not work" (134:20-135:3)

    l.     The interior wall of the warehouse was "deteriorated" (59:15-19; 136:15-22)

    m.     The condition of the roof was "deteriorated" and "needed to be replaced" (139:4-141:6)

    n.     Approximately 10% of the ceiling tiles in the offices were water damaged (177:1-178:20)

**Citation**:

- Transcript of 30(b)(6) Deposition of DCHA (Witness Nee), dated February 28 and March 28, 2010 "Nee 30(b)(6) Tr.", attached hereto as Exhibit I, at pinpoint cites stated above.

62.    DCHA witness Joseph Nee testified that the Property's HVAC systems were

operable "as far as [he] know[s]" and that the basis for this knowledge was that DCHA

"was using them while [DCHA] was working in there."

**Citation:**

- Nee Tr. (Ex. H), 29:8-21.

63.    Mr. Nee also testified that:

Q:  The process of the move-out of the property, was there a specific policy or
procedure that you followed?
A:  No.
Q:  Was there a checklist of tasks that was assigned?
A:  No.
Q:  You testified earlier that your boss instructed you generally to remove the buildout
and leave the place clean and empty, correct?
A:  Yes.
Q:  Did you have any instructions relating to the heating systems for the time of move-
out?
A:  No specific instructions at all.
Q:  Were there any specific instructions that related to the air conditioning?
A:  No
. . .
Q:  Was there any task that you performed as part of the move-out to confirm the
operability of the heating system
A:  It was working during the winter when we used it, but that was June.  We had the
air-conditioning on.
Q:  I'm really just trying to understand --
A:  No on the heating system.  We wouldn't go double-check it.
Q:  Was there anything specific that you did at the time of move-out to confirm whether
the air-conditioning system was operable.
A:  We were using it.

**Citation:**

- Nee Tr. (Ex. H), 87:1-88:17.

64.     DCHA testified that Joseph Nee, who was responsible for overseeing the move-out process, was never provided any instructions relating to DCHA's contractual obligations with respect to the condition of the property at the time of move-out, did not review the Lease prior to move-out, did not specifically inspect the need for the necessary repairs and, was not familiar with the condition of the building at the beginning of the Lease and thus, was unable to determine whether upon vacating the Property DCHA had in fact restored the Property as required by the Lease.

**Citation**:

- Nee 30(b)(6) Tr. (Ex. I) 21:17-22:17; 39:17-40:16; 41:10-14; 43:7-18; 46:22-48:03.

65.     DCHA testified:

 "Q:  Okay.  Are you aware that there was insulation required on the walls in the main room?
A:  I was aware that some of the old installation had deteriorated, but it was not damaged from cause."

**Citation**:

Nee 30(b)(6)Tr. (Ex. I) 59:15-19.

66.     Plaintiff retained Virginia Roofing Corporation ("Virginia Roofing") to make repairs necessary to the roof of the Property after it was vacated by DCHA.

**Citation**:

- Weinstein Aff. ¶ 32;
- Silverman Aff. ¶¶ 21-22 and Ex. 12;

67.    Virginia Roofing was instructed to make necessary repairs to restore the

condition of the roof to be free of leaks and missing or damaged areas of roofing

material (including flashing and gutters), and not to make any upgrades to the roof of

the Property.

**Citation**:

- Weinstein Aff. ¶ 32.

68.    Virginia Roofing determined that a number of repairs and replacements were

necessary to restore the roof of the building.

**Citation**:

- Weinstein Aff. ¶ 33 and Exs. 44-45.

69.    Virginia Roofing performed the following work:

    a.    Remove deteriorated plywood from 4 skylight covers/curbs and haul away
    b.    Furnish and install new ½" plywood over existing skylight covers/curbs to
          replace deteriorated
    c.    Fully adhere 060 EPDM (rubber) membrane over new plywood
    d.    At gravel-stop, furnish and install 2 ply roof cement and fabric
    e.    Re-attach gutter and gutter hangers as needed
    f.    Al all gutter seams furnish and install 1 ply roof cement and fabric
    g.    Furnish and install one hundred forty linear feet of shop formed coping to
          replace damaged/missing
    h.    Remove one deteriorated roof plate and haul away
    i.    Furnish and install new roof plate to replace deteriorated
    j.    Re-flash three doghouses with roof cement and fabric
    k.    Furnish and install one ply aluminum roof coating over all repairs

**Citation**:

- Weinstein Aff. ¶ 33 and Exs. 44-45.

70.    Plaintiff paid $10,460 for the work of Virginia Roofing.

**Citation**:

- Weinstein Aff. ¶ 33 and Exs. 44-45.

71.     The Lease provides that DCHA is "obligated to pay for all reasonable fees and expenses (including court costs and attorneys' fees) incurred by Landlord in enforcing the provisions of this Lease."

**Citation**:

- Weinstein Aff. Ex. 1 at ¶ 15(b).

72.     Plaintiff retained the services of Shapiro, Lifschitz and Schram, P.C. to provide legal representation relating to the termination of the Lease by DCHA and the issues raised in this litigation in order to enforce Plaintiff's rights pursuant to the terms of the Lease.

**Citation**:

- Weinstein Aff. ¶ 34.

73.     Plaintiff has, and continues, to pay for the services of Shapiro, Lifschitz and Schram, P.C. as invoiced.

**Citation**:

- Weinstein Aff. ¶ 34;
- Appendix A Exs. 45-58.

Dated:        June 12, 2012

Respectfully submitted,

/s/ Judah Lifschitz
Judah Lifschitz, Esq.  (DC Bar No. 963330)
Laura Fraher, Esq. (DC Bar No. 979720)
SHAPIRO LIFSCHITZ & SCHRAM, P.C.
1742 N Street, NW
Washington, DC  20036
(202) 689-1900 (telephone)
(202) 689-1901 (facsimile)
Lifschitz@slslaw.com
Fraher@slslaw.com
*Attorneys for Plaintiff Stanford Weinstein*