## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANFORD B. WEINSTEIN, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) **Civil Action No. 2010 CA 01768** |
| | ) |
| DISTRICT OF COLUMBIA HOUSING | ) **Judge Rudolph Contreras** |
| AUTHORITY, *et al.*, | ) |
| | ) |
| DEFENDANT. | ) |

## DEFENDANT DISTRICT OF COLUMBIA HOUSING
## AUTHORITY'S MOTION FOR SUMMARY JUDGMENT[1]

Defendant District of Columbia Housing Authority ("DCHA") by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56(b), hereby moves this Court for an order granting summary judgment to DCHA on all claims. Plaintiff Stanford Weinstein ("Plaintiff") has failed to meet his burden of proof on all claims asserted against DCHA and summary judgment is appropriate. This Court should grant summary judgment as a matter of law for the following reasons:

(1) Judgment must be entered against Plaintiff on his Breach of Contract claim because DCHA did not breach its commercial lease with Plaintiff;

(2) Judgment must be entered against Plaintiff on his claims reimbursement for money paid out to make repairs to his Property as DCHA is not liable for any repairs and or damage to Plaintiff's Property;

(3) Plaintiff is not entitled to attorney's fees and costs; and

---

1  Undersigned is refilling this Pleading as the Court caught an error in filing and has instruct DCHA to re-file.

(4) In the Alternative, if this Court determines that no Accord and Satisfaction was reach, DCHA is entitled to reimbursement of its security deposit and any overpayments made to Plaintiff.

A Memorandum of Points and Authorities, the Affidavits of Lisa Dean, Hugh Triggs, Joseph Nee, Kenneth Arthur, Lorry Bonds, Ralph Staley, and Qwendolyn Brown, annexed herewith as Exhibit 1, and a proposed Order is also attached hereto.

Because this is a dispositive motion, no request for Plaintiff's consent is required under Local Rule 7.1(m).

Dated: June 12, 2012

Respectfully Submitted,

_____ */s/ Nicola N. Grey* _____
Nicola N. Grey
Bar No. 492150
Office of the General Counsel
District of Columbia Housing Authority
1133 North Capitol Street, NE, Suite #210
Washington, DC  20002
(202) 535-2835 (telephone)
(202) 535-2521 (facsimile)

*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANFORD B. WEINSTEIN, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) Civil Action No. 2010 CA 01768 |
| | ) |
| DISTRICT OF COLUMBIA HOUSING | ) Judge Rudolph Contreras |
| AUTHORITY, | ) |
| | ) |
| DEFENDANT. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
DISTRICT OF COLUMBIA'S HOUSING
AUTHORITY'S MOTION FOR SUMMARY JUDGMENT[2]**

Defendant District of Columbia Housing Authority ("DCHA"), by and through

undersigned counsel, submits this Memorandum of Points and Authorities in support of

its Motion.

I.      **PRELIMINARY STATEMENT**

Plaintiff Stanford Weinstein ("Plaintiff") brings this lawsuit against DCHA for

Breach of Contract alleging that DCHA breached its commercial lease with Plaintiff. *See*

Plaintiff's Complaint ("Complaint") p. 9, Count I. Specifically, Plaintiff contends that

DCHA "materially breached the Lease, as amended, and the Final Addendum, inter alia,

by (i) failing to pay rent and additional rent; (ii) failing to pay real estate taxes; (iii)

failing to pay water and sewer charges; (iv) failing to pay late charges; (v) making

substantial alterations to the Property without authorization; (vi) failing to restore the

Property; and (vii) damaging the Property." *Id.* at ¶ 32.

---

2  Undersigned is refiling as the Court caught an error in filing and has instruct DCHA to re-file.

Plaintiff contends that he is entitled to damages, costs, attorney's fees and disbursements, and interest. *Id.* p. 9, Prayer for Relief. Specifically, Plaintiff claims that he is entitled to damages in the amount of $553,793.69 as of May 31, 2012. DCHA denies Plaintiff's allegations.

## I.    STATEMENT OF FACTS

### A.    DCHA's Tenancy

On or about October 17, 1997, DCHA entered into a written Lease with Plaintiff. See Defendant's Statement of Material Facts as to Which There is no Dispute ("SMF"), ¶ 1; see also, Affidavit of Lisa Dean (Dean Aff.), ¶ 4, annexed herewith as Exhibit 1. When DCHA entered into the Lease, DCHA paid Plaintiff an $8,000 security deposit.

In October 1997, after DCHA Leased the Property, Hugh Triggs assessed the Property for DCHA's needs. See Affidavit of Hugh Triggs ("Triggs Aff.") ¶ 3. Plaintiff had not done anything to the Property in preparation for DCHA's tenancy. As the Property was not turnkey[3] ready, Mr. Triggs determined that Property needed to be improved in order to meet DCHA's needs which included repairing and or replacing existing wiring and plumbing. Id. ¶ 4. The Property was a dirty, vacant shell of a building and required several months of work to get it to usable condition and habitable for DCHA's employees to work in. Id. ¶ 5.

In order to make the Property usable, DCHA put in some electrical outlets. Id. ¶ 6. Upon my occupancy of the Property, Mr. Triggs observed that the electrical circuit panel was not labeled. Id. ¶ 6. There were abandoned wires hanging from the ceiling and throughout the Property. Id. ¶ 7. Upon his occupancy of the Property, Mr. Triggs

---

3 The Property was leased to DCHA was not move in ready and not ready to be used.

observed abandoned duct work throughout the Property. Id. ¶ 8.  During his occupancy,

DCHA did not label the electrical circuit panel as it was not required to do so. Id. ¶ 9.

In 1997, the Property contained three offices along the left wall that were in need

of substantial repair. The office space had a drop ceiling.  Id. ¶ 10.  With Plaintiff's

knowledge, DCHA repaired, cleaned, and painted the entire Property walls and floors and

tiled the office floors.  Id. ¶ 11.  DCHA put in a new water fountain as the one that was

there was in such poor condition that it was unusable as it appeared not to have been used

for a lengthy period of time.  Id. ¶ 12. DCHA also renovated the men's and women's

bathrooms and put them back into usable condition. Id. ¶ 13.  DCHA put in a fence and

storage racks through the entire building to store material and equipment for DCHA

employees.  Id. ¶ 14.

DCHA repaired the stairs and also repaired and fixed all the two overhead garage

doors located at the front of the building as they were in poor condition and none worked.

Id. ¶ 15.  Due to the poor condition of the overhead garage doors the overhead garage

doors required frequent repair.  Id. ¶ 16. DCHA entered into a maintenance contract and

continued to have the overhead garage doors serviced and repaired as needed.    Id.

Additionally, during Mr. Triggs' occupancy, DCHA repaired the roof and any

leaks to the roof as needed.   Id. ¶ 17. During his occupancy, Mr. Triggs stored paint,

plumbing supplies, cleaning supplies, equipment and tools in the Property.   Id.¶ 18.

Additionally, he kept the heating and cooling systems and fans maintained and serviced.

Id. ¶ 19.  He occupied the Property until 2002. Id. ¶ 20. As a tenant of the Property,

DCHA was not required to bring the Property to code. Id. ¶ 21.

In 2005, Joseph Nee occupied the 16 M Street Warehouse (the "Property").   See Affidavit of Joseph Nee ("Nee Aff.") ¶ 5. He is employed by the DCHA as the Manager of Mechanical Operations and has worked at DCHA for 16 years. Id. ¶ 2.  As part of his duties and responsibilities as the Manager of Mechanical Operations, he oversaw the budget and management of DCHA's heating and cooling systems.  Exhibit A p. 11 l. 5-8; Exhibit B p. 5 l. 10.  Id. ¶ 3. His department maintains and oversees the heat and air conditions and hot water for approximately 8,000 units and I supervise a staff of 15.  Id. ¶ 4.  He and his staff also maintained the Property and the adjacent parking lot, and the heating, air conditioning, and water at the Property from 2005 to 2010. Exhibit A. p. 19 l. 2-7. Id. ¶ 6.  His staff consisted of licensed boiler personnel and HVAC mechanics and plumbers who performed preventive maintenance before the heating season on the heat and before the summer season on the air conditioning and repairs as needed.  Id. ¶ 7.

In 2006, DCHA made some improvements to the Property and put in three free standing offices. Id. ¶ 8. The offices were not affixed to the ceiling of the Property. Id. ¶ 9.  DCHA put in a free standing new locker room and converted the existing locker room to a lunchroom. Id. ¶ 10. DCHA also put in three new heating units because the old ones were inoperable as they were too old. Id. ¶ 11.  The new heating units also consisted of two through the wall units. Id.¶ 13. The through the wall units went into the same place as the old units and the others were placed on top of the office build outs at the Property and did not disturb the wall and connected the units to new duct work.  Id. ¶ 14.

As part of the improvements, DCHA also put in parking lot fencing.  Id ¶ 15. From 2005 to 2010, Plaintiff would visit the Property once or twice a year.  Id ¶ 16. Plaintiff would park in the parking lot and step into the loading dock to look around.  Id.

¶ 17. After the 2006 improvements, Mr. Nee spoke with Plaintiff about the renovations. He was proud of the work and during his visits, he asked Plaintiff if he wanted to come up and see the work that had been done and Plaintiff said, "no," because he could see that we were keeping his building in good shape and he said, "thank you." Id. ¶ 18. Plaintiff however, could see the new offices from the street and the two fans that were installed over the new offices. Id. ¶ 19. In addition to the new offices, Plaintiff could see the interior fence. Id. ¶ 20.

### B.  The Lease Termination

During the course of the Lease, DCHA and Plaintiff entered into a new addendum to the Lease approximately every two years. *See* SMF, ¶ 2. As part of the Lease, the Lease references rent and additional rent as the base rent, taxes, and insurance. Id. Nowhere in the Lease does it state that utilities, late charges and interest, and penalties imposed by the Office of Tax and Revenue ("OTR"), are considered rent or additional rent. Id.

On or about August 11, 2008, the Parties entered into an amendment and addendum to the Lease ("Final Addendum"). *See* SMF, ¶ 2; *see also*, Dean Aff., ¶ 5. Paragraph 23 of the Final Addendum provided, in part, that the following:

> This Lease Extension may be terminated by either party by giving six months advance written notice in accordance with provisions of Paragraph 21, At the end of said six-month period, this Lease shall terminate, and Tenant will surrender the entire Leased Premises to Landlord free and clear of any sub-tenancies or other encumbrance.

By letter dated December 1, 2009, DCHA served written Notice of Nonrenewal ("Notice") on Plaintiff by Certified Mail Receipt # 7002 3150 0001 0273 6281. *See* SMF, ¶ 3; *see also*, Dean Aff., ¶ 7. The Notice was mailed to Plaintiff's address of

record where DCHA also mailed Plaintiff's monthly rent payments. *See* SMF, ¶ 4; *see also*, Dean Aff., ¶ 8. Defendant's records indicate that Plaintiff received the monthly rental payments at the same address for September, October, November, and December, and all months prior to and subsequent to mailing of the December 1, 2009, Notice. *See* SMF, ¶ 5; *see also*, Dean Aff., ¶ 9. Pursuant to the Notice, Plaintiff was advised that DCHA intended to terminate its lease effective May 31, 2010 and advised that DCHA did not intend to renew the additional two-year term beginning June 1, 2010. *See* SMF, ¶ 6; *see* also, Dean Aff. ¶ 10.

By email dated December 2, 2009, DCHA also notified Plaintiff and advised that DCHA intended to vacate the Property at the end of the Lease. *See* SMF, ¶ 7; *see also*, Dean Aff., ¶ 11. Upon information and belief, on December 4, 2009, the U.S. Postal Service ("USPS") made its first attempt to deliver the Notice. *See* Dean Aff., ¶ 12. The USPS was unsuccessful and made several unsuccessful subsequent attempts to deliver the Notice. *See* Dean Aff., ¶ 13. The Notice remained unclaimed at Plaintiff's local post office until it was returned to DCHA in January 2010. Id., ¶ 14.

Upon receipt of the returned Notice, DCHA immediately sent the Notice Federal Express overnight delivery. Id., ¶ 15. On or about January 20, 2010, Plaintiff accepted and acknowledged receipt of the Notice. *See* SMF, ¶ 8; *see also,* Complaint ¶ 19. Plitniff considered the December 1, 2009 Notice a Notice to Terminate. By letter dated April 30, 2010, Plaintiff alleged that DCHA owed Plaintiff $77,762.97 which Plaintiff claims included amounts due for unpaid rent, real estate taxes, water and sewer charges, and accrued late charges. Id., ¶ 9; *see also*, Dean Aff., ¶ 17; *see also*, Complaint, ¶ 20.

By letter dated May 21, 2010, DCHA advised Plaintiff that DCHA intended to settle all lawful charges owed pursuant to the Lease as follows:

1. First half of the 2010 real estate taxes, late fees and interest in the amount of $46,897.11;

2. One additional month of rent for June in the amount of $7,000.00;

3. First half of the 2010 Business Improvement District ("BID") taxes in the amount of $2,162.40;

4. 1/6 of the real estate taxes for the Property for the second half of the 2010 tax year at $9,150.83; and

5. 1/6 of the 2010 BID taxes for the Property for the second half of the year at $305.02

*See* SMF, ¶ 10; *see also,* Dean Aff., ¶ 18.  In its May 21, 2010, settlement letter, DCHA advised that the total amount due was $65,082.44 which included all late fees, interests and credits for some of Defendant's overpayments. *See* SMF, ¶ 11; *see also*, Dean Aff., ¶ 19.  DCHA also advised that the total amount offered in settlement of this matter did not include the cost of insurance because DCHA had not received the bill from Plaintiff at that time. *See* SMF, ¶ 12; *see also*, Dean Aff., ¶ 20.   DCHA requested that Plaintiff provide the insurance premium bill as soon as possible or DCHA would pay for the prorated insurance cost from 6/15/10 through 6/30/10 using $1,313.00, the amount of the last premium paid by DCHA. *See* SMF, ¶ 13; *see also*, Dean Aff., ¶ 21. Finally, in the May 21, 2010 letter, DCHA also requested that Plaintiff permit DCHA to remain in the Property until June 30, 2010.

Pursuant to its May 21, 2010, settlement letter, DCHA mailed check number 299204 in the amount of $65,082.44 dated June 1, 2010 to Plaintiff. *See* SMF, ¶ 14; *see also*, Dean Aff., ¶ 22.  Included with the sum of $65,082.44, was $7,000 in consideration

for Plaintiff allowing DCHA to remain in the Property until June 30, 2010. See SMF. On June 10, 2010, Plaintiff met with Ms. Dean and Associate General Counsel, Qwendolyn Brown. On that date, Plaintiff handed Ms. Dean a letter. By letter dated June 10, 2010, Plaintiff acknowledged receipt of the check and claimed a balance due of $39,056.34. *See* SMF, ¶ 15; *see also*, Dean Aff., ¶ 23.

During the June 10, 2010 meeting, Ms. Dean advised Plaintiff that the check was for the settlement of all funds due and owing under the Lease through the Lease termination date of June 30, 2010. See Affidavit of Qwendolyn Brown ("Brown Aff.") ¶ 9. On that same date, Ms. Brown also personally reiterated DCHA's position to Plaintiff as it related to the June 1, 2010 check, which was for settlement of all outstanding claims as outlined in the May 21, 2010 letter. Id. ¶ 10. On June 11, 2010, Plaintiff deposited the June 1, 2010 settlement check. *See* SMF, ¶ 18 *see also*, Dean Aff., ¶ 24.

DCHA does not owe Plaintiff any money under the terms of the lease as DCHA made payment in full accord and satisfaction as outlined in DCHA's May 21, 2012 letter to Plaintiff. See Affidavit of Lorry Bonds ("Bonds Aff.") ¶ 5. After Plaintiff received the May 21, 2010 letter and the June 1, 2010 check, Plaintiff cashed the June 1, 2010 check. Id. ¶ 6. DCHA intended that the June 1, 2010 letter was for final payment as outlined in the May 21, 2010 letter. Id. ¶ 7. Had Plaintiff retuned the check and not cashed it, no accord and satisfaction would have been reaches as it relates to the issues addressed in the May 21, 2010 letter. Id.¶ 8. Pursuant to the Lease, DCHA was not responsible for the normal wear and tear of the property. Id. ¶ 9.

**C.**     **DCHA Move Out**

Approximately two months before DCHA vacated the property, Mr. Weinstein walked through on different occasions and he was not alone.  On those visits, Mr. Nee would walk Mr. Nee from the front of the warehouse to the back of the warehouse to unlock a gate so that Plaintiff could gain access to that side of the warehouse.  When Plaintiff walked from the front to the back of the warehouse, Plaintiff had a view of the new offices, locker rooms, the storage shelves, and all the heating and air conditioning equipment including the duct work.  During this time, Plaintiff did not comment on any of the enhancements that DCHA made to the property except that he was happy with the way DCHA maintained his property.

In 2010 when DCHA vacated the Property, the heating and air conditioning systems were operable.  Id. ¶ 21. During Mr. Nee's occupancy, DCHA had the interior of the Property cleaned three times a week.  Id. ¶ 22.  His staff was responsible for cleaning the parking lot. Id. ¶ 23. If there were leaks in the building, DCHA repaired them.  Id. ¶ 23.  In 2010 at the time of the move out, DCHA was unaware of any leaks at the property.  Id ¶ 24.  DCHA had repairs made to the overhead garage doors as needed.  Id. ¶ 25.   The doors were operable at the time of the move out.  Id. ¶ 26. As part of the 2006, repairs, roof work was done.  Id. ¶ 27. At move out, DCHA left the property clean and broom swept.  Id.   Mr. Nee was directed by Chris Stennett to remove everything that we put in the Property and leave it broom swept.  He was advised that Plaintiff requested that DCHA do so. Id. ¶ 28.

Prior to vacating the property, DCHA hired a contractor to do the demolition work. Id. ¶ 29. When DCHA vacated the Property, the HVAC system was working. Id. ¶ 30. On June 30, 2010, prior to the move out, Plaintiff walked through the warehouse and indicated additional items he wanted removed. Plaintiff told Mr. Nee that he wanted everything in the area where the temporary wooden stairs removed and broom swept. Mr. Nee did as he was directed and removed everything including the stairs and had that area broom swept. Id. ¶ 31. When Plaintiff returned to the Property later that day Plaintiff asked about the steps and Mr. Nee asked Weinstein if he wanted them and he said no, that's okay. Id. ¶ 32. Mr. Nee would have retrieved the steps and put them back because they were still on the truck. Id. ¶ 33.

Finally, the Property contained outdated light fixtures in the bay and warehouse that were obsolete and could not be repaired or maintained as DCHA no longer had access to the required bulbs. Id. Id. ¶ 34. The wall heater had a life expectancy of 8 to 10 years. Id. ¶ 35. The rooftop air conditioning unit had a life of 20 years. Id. ¶ 36. The roof top exhaust fan had a life of approximately 10 years. Id. ¶ 37. The gas heater had a life of approximately 20 years, and the wall heat pump had a life of approximately 10 to 15 years. Id. ¶ 38. The normal life for a shingled roof is about 12 to 15 years. Id. ¶ 39. The roof was worn and rusted by whether and is the results of normal wear and tear. Id. ¶ 40.

### D.   DCHA's Overpayment

DCHA's Deputy Executive Director of Administration in the Office of Finance Management ("OFM") reviewed the records and determined that DCHA does not owe Plaintiff any money as outlined in DCHA's May 21, 20109 letter as DCHA made

payment in full accord and satisfaction.   See Affidavit of Ralph Staley ("Staley Aff.") ¶

5.  DCHA determined the following:

    a.  DCHA paid an $8,000 security deposit.

    b.  DCHA overpaid Plaintiff in the amount of $16,764.70 in Office and Tax and
       Revenue penalties and interest.

    c.  DCHA overpaid Plaintiff in the amount of $1,615.60 in penalties and interest.

    d.  DCHA overpaid Plaintiff in the amount of $7,000 in base rent.

Id.  ¶ 6.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only when the record, viewed in the light most

favorable to the non-moving party, establishes that there is no genuine issue as to any

material fact and the moving party is entitled to a judgment as a matter of law." *Taylor v.*

*Akin, Gump, Strauss, Hauer & Feld,* 859 A.2d 142, 146 (D.C. 2004) *(internal quotations*

*and citations omitted)*.  A movant is entitled to summary judgment on all properly

supported issues identified in its motion, except those for which the non-moving party

has provided evidence to show that a question of material fact remains.  *Bowers,* 9 F.

Supp.2d at 471. Once the movant has discharged his burden, "its opponent must do more

than simply show that there is some metaphysical doubt as to material facts." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also, Anderson*,

477 U.S. at 247-48 ("by its very terms, this standard provides that the mere existence of

some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion . . . ; the requirement is that there be no genuine issue of material fact")

(emphasis in original).  Although all reasonable inferences are drawn in favor of the non-

movant, that party "bear[s] the burden of pointing to 'affirmative evidence' establishing a

genuine factual dispute." *Coward v. ADT Security Sys., Inc.*, 140 F.3d 271, 273 (D.C. Cir. 1998). Even making all reasonable inferences in the Plaintiff's favor, the Plaintiff cannot state a recoverable claim against the Defendant.  The Defendant is entitled to judgment as a matter of law and summary judgment should be granted in its favor.

II.   **ARGUMENT**

   A.   **Judgment must be entered against Plaintiff on his Breach of Contract claim because DCHA did not breach its commercial lease with Plaintiff as DCHA does not owe Plaintiff any rent as an accord and satisfaction was reached**

   Contrary to Plaintiff claims, DCHA did not fail to pay rent, additional rent, real estate taxes, water and sewer charges, and late charges and interest.  Judgment must be entered against Plaintiff on his Breach of Contract claim because DCHA did not breach its commercial lease with Plaintiff.  For breach of contract claim under federal common law, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.  *See Red Lake Band of Chippewa Indians v. U.S. Department of the Interior, et al.*, 624 F.Supp.2d 1 (D.D.C. 2009).

   Plaintiff has established two of the elements of breach of contract.  Here, a valid contract existed under the contract as Plaintiff and DCHA entered into a Lease in October 1997.  In additional Plaintiff and DCHA entered into subsequent modifications and addenda through the Lease term from October 1997 to the termination of the Lease on June 30, 2010.  Pursuant to the Lease, DCHA was required and did pay rent, taxes, insurance and utilities in consideration for the use of the Property.  Plaintiff however, is unable to establish a breach of duty and damages caused of the alleged breach as an

Accord and Satisfaction had been reached as it relates to certain claims arising from the termination of the Lease.

     i.     **An Accord and Satisfaction was reached when Plaintiff cashed the June 1, 2010 check.**

Judgment must be entered against Plaintiff on his Breach of Contract claim because DCHA did not breach its commercial lease with Plaintiff as DCHA does not owe Plaintiff any rent as an accord and satisfaction was reached when plaintiff cashed the June 1, 2010 Check.  For an Accord and Satisfaction, the fundamental requirement is that the debtor "must intend the amount paid as a liquidation of [the creditor's] claim, and the [creditor] in accepting it must understand that it is so intended." *See Curtis Builders v. General Floor Service, Inc.,* 107 A.2d 705, 706 (D.C. 1954) (*citing Andrews v. Haller*, 32 App. D.C. 392 (D.C. 1909)).

If the creditor cashes the check with that understanding, it is of no moment that the creditor withheld assent to treating the payment as payment in full or even "expressed protest before the check was tendered or that the parties came away from their meeting with contrary understandings," because "the creditor's action speaks louder than his words and is operative as an acceptance of the offer was made.  *See Double H Housing Corp. v. David*, 947 A.2d 38 (2008); *see also, Laganas v. Installation Specialists*, 291 A.2d 187 (1972).

Here, DCHA intentions were clear in its May 21, 2010 letter.  "Under the doctrine of accord and satisfaction, as to the agreement that the debtor will pay and the creditor will accept something other than the original amount due, not only need it not be explicit, but even if the creditor affirmatively rejects the debtor's offer of accord and satisfaction, the accord and satisfaction will still be effective if the creditor proceeds to cash the

check." *See Double H Housing Corp. v. David*, 947 A.2d 38 (D.C. 2008).   For there to

be an accord and satisfaction, there must be (1) a legitimately disputed or unliquidated

claim, (2) a mutual agreement that the debtor will pay and the creditor will accept

something other than the original amount due in satisfaction of the disputed claim, and

(3) the actual giving and taking of the agreed upon substitution. *Id.*

Moreover, the fundamental requirement for accord and satisfaction is that the

debtor must intend the amount paid as a liquidation of the creditor's claim, and the

creditor in accepting it must understand that it is so intended; if the creditor cashes the

check with that understanding, it is of no moment that the creditor withheld assent to

treating the payment as payment in full or even expressed protest before the check was

tendered or that the parties came away from their meeting with contrary understandings,

because the creditor's action speaks louder than his words and is operative as an

acceptance of the offer.  Id.  If a creditor takes the satisfaction by accepting payment for

an amount less than the amount of the debt originally claimed, he is bound by the

accord.  Here, Plaintiff is bound by the accord.

In this case, an Accord and Satisfaction was reached.  Here, DCHA intended to

terminate the Lease.   In response, Plaintiff served DCHA with a letter dated April 30,

2010, claiming amounts owed pursuant to the Lease.  In response, DCHA disputed the

amount Plaintiff claims were owed by settlement letter dated May 21, 2010 and offered

Plaintiff a different amount from the amount Plaintiff believed was due.  DCHA

explicitly included in its May 21, 2010 settlement letter an accounting of the various

payment discrepancies and advised Plaintiff that the total amount due and payable,

including all late fees, interest and credits for DCHA overpayments is $65,082.44.

Pursuant to the May 21, 2010 letter, DCHA issued a check in the amount of $65,082.44. to Plaintiff.

Here, even though by letter and at a meeting dated June 10, 2010, Plaintiff affirmatively rejected DCHA's offer of accord and satisfaction, and after DCHA advised Plaintiff that with the payment of the $65,082.44, was to settle all lawful amounts owed pursuant to the Lease as outlined in the May 21, 2010 letter, the accord and satisfaction was effective once Plaintiff cash the check on June 11, 2010. Since Plaintiff did not return the check and instead cashed it, the accord and satisfaction was reached and he is bound by the accord. *See* SMF, ¶ 16; *see also,* Dean Aff., ¶ 24.

Moreover, even though the settlement offer amount of $65,082.44 was less than the amount Plaintiff believed was due and owing, the settlement offer considered money DCHA overpaid to Plaintiff as well as included consideration for the June 2010 payments and a new Lease termination dated of June 30, 2010, the accord and satisfaction was effective when Plaintiff took the satisfaction by depositing the June 1, 2010 check on June 11, 2010.

### B. <u>Judgment must be entered against Plaintiff on his claims reimbursement for money paid out to make repairs to his Property as DCHA is not liable for any repairs and or damage to Plaintiff's Property</u>

Contrary to Plaintiff's claims, DCHA did not make substantial alterations to the Property without authorization. DCHA also did not fail to restore the Property or damage the Property and as such DCHA did not breach its Lease with Plaintiff.

The Lease provided the following under § 7 Use of Premises:

(b) Tenant shall have the privilege of installing any furniture, fixtures and equipment necessary in the conduct of its business and the same shall remain the property of the Tenant provided same shall be removed by Tenant before the

expiration of the term herein.  In the event any damage is done to said premises in the installation or removal of said furniture, fixtures and equipment, Tenant shall, at its cost and expense, restore said premises to the original condition, or promptly reimburse Landlord for all such costs.  In the event Tenant shall fail to remove said furniture, fixtures and equipment from said premises before the termination of the term herein, it is agreed that Tenant has abandoned same, in which event, such furniture, fixtures and equipment shall then become the property of Landlord, who shall have the right to use, remove or dispose of them.  I such furniture, fixtures and equipment are disposed of by Landlord, Tenant shall promptly reimburse Landlord for all such costs of removal and disposal.

The Lease provided the following under § 9 Maintenance:

Landlord warrants that the building and premises including the roof, are clean and in good condition, and that all heating, plumbing and electrical systems are in good working condition at the beginning of the tenancy. Tenant shall, at its risk, cost and expense, make all repairs and replacements necessary to keep both the interior and exterior of the Demised Premises and the fixtures and equipment therein in good repair and in property sanitary condition, and all repairs, replacements and additions necessary to comply with and carry out all orders requirements or conditions now or hereafter imposed by the ordinances, rules or regulations of the District of Columbia, whether required of landlord or otherwise.  Tenant shall, at its cost and expense furnish heat to said premises at such times and season of the year when heat may be required, and shall maintain the heating and plumbing systems in good operating condition at all times, and repair (including replace, if necessary), any damages caused by freezing or by its negligence or the negligence of its employees or invitees.  Tenant shall keep the interior and exterior of the Demised Premises in a clean, neat, orderly and attractive condition at all times.  Tenant shall furnish adequate and proper receptacles for trash, debris and garbage and shall remove trash, debris and garbage from said premises as often as necessary.  Notwithstanding, the forgoing Tenant shall not be liable for responsible for any hazardous materials which was not abated prior to the beginning of this tenancy.

The Lease provided the following under § 10 Alterations:

Tenant shall not, without the written approval of Landlord, make any alterations or structural changes in or do any work involving substantial additions to or changes in plumbing or gas pipes and fixture or electric wiring in said premises or building. All alterations, additions or improvements to the Demised Premises, made by either party (except movable furniture, fixtures and equipment of Tenant), shall immediately become a part of said premises and be surrendered with said premises upon the termination of the term herein without disturbance or injury.

The Lease provided the following under § 17 Surrender:

Tenant shall upon the termination of the term herein and without further notice, surrender and deliver possession of said premises to Landlord in the same condition in which they were received, usual wear and tear excepted.

DCHA did not breach any provisions of the Lease.

### i.     Use of Premises

Section 7(b) Use of Premises of the Lease permits DCHA to install any furniture, fixtures and equipment necessary in the conduct of its business.  Additionally, DCHA was permitted to remove said furniture, fixtures and equipment before the expiration of the term at its cost and expense, and to restore said premises to the original condition. Here, DCHA did just that and removed most improvements that DCHA made to the Property, and returned it clean and broom swept.

Here, in October 1997, after DCHA Leased the Property, Hugh Triggs assessed the Property for DCHA's needs.  Triggs Aff. ¶ 3.  Plaintiff had not done anything to the Property in preparation for DCHA's tenancy and received the Property "as is".  As the Property was not turnkey[4] ready, Mr. Triggs determined consistent with § 7(b) of the Lease that Property needed to be improved in order to meet DCHA's needs which included repairing and or replacing existing wiring and plumbing. Id. ¶ 4.  The Property was a dirty, vacant shell of a building and contained abandoned wires and duct work. DCHA required several months of work to get it to usable condition and habitable for DCHA's employees to work in. Id. ¶ 5. The electrical circuit panel was not labeled and at the conclusion of the tenancy on June 30, 2010, DCHA returned the Property and the electric circuit panel unlabeled just as it received it in 1997.

---

4 The Property was leased to DCHA was not move in ready and not ready to be used.

In 1997, DCHA also repaired the offices, and repaired, cleaned, and painted the entire Property walls and floors and tiled the office floors.  Id. ¶ 11.  DCHA put in a new water fountain as the one that was there was in such poor condition that it was unusable as it appeared not to have been used for a lengthy period of time.  Id. ¶ 12. DCHA also renovated the men's and women's bathrooms and put them back into usable condition. Id. ¶ 13.  DCHA put in a fence and storage racks through the entire building to store material and equipment for DCHA employees.  Id. ¶ 14.

DCHA repaired the stairs and also repaired and fixed all the two overhead garage doors located at the front of the building as they were in poor condition and none worked. Id. ¶ 15.   Due to the poor condition of the overhead garage doors the overhead garage doors required frequent repair.  Id. ¶ 16. DCHA entered into a maintenance contract and continued to have the overhead garage doors serviced and repaired as needed.    Id.

Additionally, during Mr. Triggs' occupancy, DCHA repaired the roof and any leaks to the roof as needed.   Id. ¶ 17. During his occupancy, Mr. Triggs stored paint, plumbing supplies, cleaning supplies, equipment and tools in the Property.   Id.¶ 18. Additionally, he kept the heating and cooling systems and fans maintained and serviced. Id. ¶ 19.  He occupied the Property until 2002. Id. ¶ 20. As a tenant of the Property, DCHA was not required to bring the Property to code. Id. ¶ 21.

In 2005, Joseph Nee occupied the 16 M Street Warehouse (the "Property").  See Nee Aff.  He also made additional improvements to the property consistent with § 7(b) of the Lease.  As part of those improvements to continue to meet the needs of the office, Mr. Nee contracted and put in three free standing offices and locker room.  None of the freestanding structures were affixed to the ceiling of the Property.  DCHA also put in

three new heating units because the old ones were inoperable as they were too old. Id. ¶ 11.  The new heating units also consisted of two through the wall units. Id.¶ 13. The through the wall units went into the same place as the old units and the others were placed on top of the office build outs at the Property and did not disturb the wall and connected the units to new duct work.  Id. ¶ 14.   Additionally, as part of the improvements, DCHA also put in parking lot fencing.   Id ¶ 15.  At the end of the tenancy and consistent with §§ 7(b) and 17 of the Lease, DCHA removed most of the improvements.

ii.     **Alterations**

DCHA did not violate any provision of § 10 of the Lease.  DCHA was not required to get the Landlord's written approval before it made improvements to the Property as DCHA complied with § 7(b) of the Lease.  Moreover, the improvements made during DCHA's tenancy by DCHA did not consist of alterations or structural changes in or do any work involving substantial additions to or changes in plumbing or gas pipes and fixture or electric wiring in said premises or building. The improvements made were not substantial and did not include substantial additions to or changes in plumbing or gas pipes, fixture or electric wiring.

Additionally, from at least 2005 to 2010, Plaintiff has acknowledged and Mr. Nee confirmed that Plaintiff visited the Property once or twice a year.  Id ¶ 16.  Plaintiff would park in the parking lot and step into the loading dock to look around.  Id. ¶ 17.  Moreover, after the 2006 improvements, Mr. Nee spoke with Plaintiff about the work he had done in the Property and wanted to show it to Plaintiff who declined.  Plaintiff however, could see the improvements form the loading dock of the Property during each

of his visits and when he entered the property in or around April 2010 to June 30, 2010

prior to the termination of the Lease.  Plaintiff had not complained or requested that

DCHA remove any of the improvements until in or about April 2010. In fact from 2005

to 2010, Plaintiff routinely commented to Mr. Nee that he was happy about the way that

DCHA maintained his property in clean and good condition.  At the end of the tenancy

and consistent with §§ 7(b) and 17 of the Lease, DCHA removed most of the

improvements.

iii.   <b>Maintenance</b>

DCHA properly maintained the Property consistent with § 9 of the Lease. Mr.

Triggs and Mr. Nee and their staff maintenance the property and contracted for service,

repair and replacement of fixtures and equipment located in the Property.  Mr. Nee's

Staff also maintained the Property and the adjacent parking lot, and the heating, air

conditioning, and water at the Property from 2005 to 2010. See Nee Aff. Exhibit A. p. 19

l. 2-7. Id. ¶ 6.  His staff consisted of licensed boiler personnel and HVAC mechanics and

plumbers who performed preventive maintenance before the heating season on the heat

and before the summer season on the air conditioning and repairs as needed.  Id. ¶ 7.

Additionally, Mr. Nee and his staff maintained the exterior of the Property including the

parking lot.  Again, Plaintiff never objected to the maintenance of the Property during the

Lease and routinely commented on the fact that DCHA kept his building in good shape.

Moreover, Plaintiff complains of various fixtures and equipment that were

inoperable or that needed significant repair.  Plaintiff however, waited several months

before he had work done on his Property. As DCHA left the Property in good working

condition, DCHA is not responsible for any damage or repair that resulted or was

22

necessary during the period of time that DCHA did not occupy the Property after June 30, 2010.

Here, the Property contained outdated light fixtures in the bay and warehouse were obsolete and could not be repaired or maintained as the required bulbs DCHA no longer had access to.  For example most of the Property fixtures, equipment, furnishing and roofing has a life expectancy and will deteriorate over time.  For example the wall heater had a life expectancy of 8 to 10 years.  The rooftop air conditioning unit had a life of 20 years. The roof top exhaust fan had a life of approximately 10 years.  The gas heater had a life of approximately 20 years, and the wall heat pump had a life of approximately 10 to 15 years.  In fact, DCHA installed three lights in the loading dock as a result.  Plaintiff has owned the Property for at least 40 years and DCHA leased the Property for 13 years.  Pursuant to the Lease, DCHA is not responsible for the normal wear and tear of the Property, its equipment, fixtures or furniture.

        iv.    **Building Codes**

Plaintiff also seeks compensation for the renovations that Plaintiff is legally required to do when leasing to a new tenants.  Plaintiff owned the Property for over 40 years and the Property was not up to code at the end of DCHA's tenancy.  A commercial Tenant is not required to bring the Demised Premises up to code.  Furthermore, the Lease does not contain any provision that required DCHA to bring the Property up to code.  Here, DCHA took possession of the Property that contained an unlabeled electric circuit panel, it contained hanging abandoned wires, and abandoned duct work.

Therefore, Plaintiff's claim for reimbursement for the cost of renovations to his Property after DCHA terminated the Lease should be denied and this Court should grant DCHA summary judgment as a matter of law.

C. **Plaintiff is not entitled to attorney's fees and costs**

Contrary to Plaintiff's claims, Plaintiff is not entitled to attorney fees and costs. As demonstrated above, Plaintiff fails to establish a breach of contract claim as an accord and satisfaction was reached and as such, he is not entitled to attorney's fees and costs.

     i.     **In the alternative, if this Court determines that no accord and satisfaction was reached, DCHA is entitled to reimbursement of its security deposit and any overpayments made to Plaintiff**

DCHA contends that based on the above and the entire record that an accord and satisfaction was reached as demonstrated above. Here, in response to DCHA's notice of termination of the Lease, by letter dated April 30, 2010, Plaintiff made a claim for money that he felt was due and owing under the Lease. By letter dated May 21, 20I0, DCHA offered to fully settle claims as provided in the same letter in the amount of $65,082.44. Pursuant to the May 21, 2010 letter, DCHA issued a check dated June 1, 2010 in the amount of $65,082.44. Plaintiff acknowledged receipt of the June 1, 2010 check on June 3, 2010. In response to the settlement offer, by letter dated June 10, 2010, Plaintiff rejected the offer and advised that he intended to accept the $65,082.44 as rent. On that same date, Plaintiff met with Ms. Dean and her counsel, Ms. Brown where they reiterated to Plaintiff the Agency's position and again advised that the June 1, 2010 check was for settlement of claims pursuant to the May 21, 2010 letter. Despite knowing that it was DCHA's intent that the $65,082.44 was a settlement offer, Plaintiff admittedly accepted

the check on June 11, 2010 when he deposited it into his account and as such an Accord and Satisfaction was reached.   *See Double H Housing Corp. v. David*, 947 A.2d 38 (2008); *see also, Laganas v. Installation Specialists*, 291 A.2d 187 (1972).

However, assuming *arguendo* that this Court determines that an Accord and Satisfaction was not reached between the Parties, DCHA would then be entitled to reimbursement of its security deposit and any money overpaid to Plaintiff under the Lease and any other lawful relief.   A review of the payments made to Plaintiff has established that DCHA overpaid Plaintiff in as follows:

    a.   DCHA paid an $8,000 security deposit.

    b.   DCHA overpaid Plaintiff in the amount of $16,764.70 in Office and Tax and Revenue penalties and interest.

    c.   DCHA overpaid Plaintiff in the amount of $1,615.60 in penalties and interest.

    d.   DCHA overpaid Plaintiff in the amount of $7,000 in base rent.

See Affidavit of Ralph Staley ("Staley Aff.") ¶ 5, 6.

III.    **CONCLUSION**

WHEREFORE, for the foregoing reasons, Defendants respectfully request that

the Complaints in this matter be denied and summary judgment be granted as a matter of

law in its favor.

Dated: June 12, 2012

Respectfully Submitted,

_____*/s/ Nicola N. Grey*_____

Nicola N. Grey
Bar No. 492150
Office of the General Counsel
District of Columbia Housing Authority
1133 North Capitol Street, NE, Suite #210
Washington, DC  20002
(202) 535-2835 (telephone)
(202) 535-2521 (facsimile)
*Counsel for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANFORD B. WEINSTEIN, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) Civil Action No. 2010 CA 01768 |
| | ) |
| DISTRICT OF COLUMBIA HOUSING | ) Judge Rudolph Contreras |
| AUTHORITY, | ) |
| | ) |
| DEFENDANT. | ) |

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE ISSUE

Defendant, pursuant to Fed. R. Civ. P. 56, respectfully submits the following statement of material facts as to which it contends there is no genuine issue:

1. On or about October 17, 1997, DCHA entered into a written lease Agreement ("Lease") with Plaintiff, Stanford Weinstein to lease Plaintiff's warehouse and adjacent parking lot located at 16 M Street, NE ("Property"). *See* Lease dated October 17, 1997, attached herewith as Exhibit A.

2. On or about August 11, 2008, the Parties entered into an amendment and addendum to the Lease ("Final Addendum"). *See* Final Addendum, annexed herewith as Exhibit B.

3. By letter dated December 1, 2009, DCHA served written Notice of Nonrenewal ("Notice") on Plaintiff by Certified Mail Receipt # 7002 3150 0001 0273 6281. *See* letter dated December 1, 2009, annexed herewith as Exhibit C; *see also*, letter dated May 21, 2010, annexed herewith as Exhibit D.

4. The Notice was mailed to Plaintiff's address of record where DCHA also mails Plaintiff's monthly rent payments. *See* Exhibits C and D.

5. Defendant's records indicate that Plaintiff received the monthly rental payments at the same address for September, October, November, and December, and all months prior to and subsequent to mailing of the December 1, 2009, Notice.  *See* Exhibits C and D.

6. Pursuant to the Notice, Plaintiff was advised that DCHA intended to terminate its lease effective May 31, 2010 and that DCHA did not intend to renew the additional two-year term beginning June 1, 2010.  *See* Exhibit C.

7. By email dated December 2, 2009, DCHA notified Plaintiff and advised that DCHA intended to vacate the Property at the end of the Lease.  *See* Exhibit D.

8. On or about January 20, 2010, Plaintiff accepted and acknowledged receipt of the Notice.  *See* Letter dated April 30, 2010, annexed herewith as Exhibit E.

9. By letter dated April 30, 2010, Plaintiff alleged that DCHA owed Plaintiff $77,762.97 which Plaintiff claims included amounts due for unpaid rent, real estate taxes, water and sewer charges, and accrued late charges.  *See* Exhibit E.

10. By letter dated May 21, 2010, DCHA advised Plaintiff that DCHA intended to settle all lawful charges owed pursuant to the Lease as follows:

    a. First half of the 2010 real estate taxes, late fees and interest in the amount of $46,897.11;

    b. One additional month of rent for June in the amount of $7,000.00;

    c. First half of the 2010 Business Improvement District ("BID") taxes in the amount of $2,162.40;

    d. 1/6 of the real estate taxes for the Property for the second half of the 2010 tax year at $9,150.83; and

      e.  1/6 of the 2010 BID taxes for the Property for the second half of the year at $305.02

*See* Exhibit D.

11. In its May 21, 2010, settlement letter, DCHA advised that the total amount due was $65,082.44 which included all late fees, interests and credits for some of Defendant's overpayments. *Id.*

12. DCHA also advised that the total amount offered in settlement of this matter did not include the cost of insurance because DCHA had not received the bill at that time. Id.

13. DCHA requested that Plaintiff provide the insurance premium bill as soon as possible or DCHA would pay for the prorated insurance cost from 6/15/10 through 6/30/10 using $1,313.00, the amount of the last premium paid by DCHA. *Id.*

14. Pursuant to its May 21, 2010, settlement letter, DCHA mailed check number 299204 dated June 1, 2010 to Plaintiff. *See* Check Number 299204, dated June 1, 2010, annexed herewith as Exhibit F.

15. By letter dated June 10, 2010, Plaintiff acknowledged receipt of the check and claimed a balance due of $39,056.34. *See* Letter dated June 10, 2010, annexed herewith as Exhibit G. Additionally, on that same date, Plaintiff met with Ms. Dean and Ms. Brown where they both advised Plaintiff that the June 1, 2010 check was settlement of claims pursuant to the May 21, 2010 letter.

16. On June 11, 2010, Plaintiff deposited the June 1, 2010 settlement check. *See* Exhibit F.

17. DCHA also determined the following:

    a.  DCHA paid an $8,000 security deposit.

    b.  DCHA overpaid Plaintiff in the amount of $16,764.70 in Office and Tax and Revenue penalties and interest.

    c.  DCHA overpaid Plaintiff in the amount of $1,615.60 in penalties and interest.

    a.  DCHA overpaid Plaintiff in the amount of $7,000 in base rent.

DCHA however, did not pursue said payments and overpayments as an accord and satisfaction was reached on June 11, 2010.

18. In order to re-Lease the Property and obtain permits, Plaintiff needed to bring the Property up to code.

Dated: June 12, 2012

Respectfully Submitted,

_____*/s/ Nicola N. Grey*_____
Nicola N. Grey
Bar No. 492150
Office of the General Counsel
District of Columbia Housing Authority
1133 North Capitol Street, NE, Suite #210
Washington, DC  20002
(202) 535-2835 (telephone)
(202) 535-2521 (facsimile)

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion was served electronically, on this

13th day of June, 2012, to the following:

Judah Lifschitz, Esq.
Laura Fraher, Esq.
Shapiro Lifschitz & Schram, P.C.
1742 N Street, NW
Washington, DC 20036

/s/ Nicola N. Grey