**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANFORD B. WEINSTEIN,** | ) |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 2010 CA 01768 (RC)** |
| | ) |
| **DISTRICT OF COLUMBIA HOUSING** | ) |
| **AUTHORITY,** *et al.,* | ) |
| | ) |
| **DEFENDANT.** | ) |

**DEFENDANT DISTRICT OF COLUMBIA HOUSING
AUTHORITY'S AMENDED OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT[1]**

Defendant District of Columbia Housing Authority ("DCHA") by and through

undersigned counsel submits its Amended Opposition ("Opposition") to Plaintiff's

Motion for Summary Judgment ("Motion").  For the reasons stated herein, Plaintiff's

Motion should be denied in its entirety.

I.       **BACKGROUND**

Defendant filed a Motion for Summary and contends that this Court should grant

summary judgment as a matter of law for the following reasons:

(1) Judgment must be entered against Plaintiff on his Breach of Contract claim

because DCHA did not breach its commercial lease with Plaintiff;

(2) Judgment must be entered against Plaintiff on his claims reimbursement for

money paid out to make repairs to his Property as DCHA is not liable for any

repairs and or damage to Plaintiff's Property;

(3) Plaintiff is not entitled to attorney's fees and costs; and

---

1 Undersigned counsel inadvertently failed to attach Exhibit A.

(4) In the Alternative, if this Court determines that no Accord and Satisfaction was reach, DCHA is entitled to reimbursement of its security deposit and any overpayments made to Plaintiff.

Plaintiff also filed a Motion for Summary judgment.  Contrary to Plaintiff's assertions, (1) Defendants did not materially breach the parties lease, (2) Plaintiff is not entitled to reimbursement, and (3) Defendants have established an accord and satisfaction.  As set forth fully herein, Plaintiff's Motion should be denied as Plaintiff fails to establish that Plaintiff is entitled to Summary Judgment as a matter of law and if the Court finds that no accord and satisfaction was reached, there are significant material facts in dispute and as such Plaintiff cannot demonstrate that there are no genuine issues of material fact not in dispute and as such is not entitled to judgment as a matter of law. Therefore, Plaintiff's Motion must be denied.

## II.  <u>STATEMENT OF FACTS NOT IN DISPUTE</u>

DCHA does not dispute the following paragraphs contained in Plaintiff's Material Facts Not in Dispute ("PL SMF"): ¶¶ 1, 2, 3, 4, 7, 11, 16, 22, 37, 40, 41, 44, and 65. DCHA does not dispute the following paragraphs of PL SMF except to the extent that emphasis was added:  ¶¶ 22, 27, 42, 43, 45, and 46.

## III. <u>MATERIAL FACTS IN DISPUTE</u>

DCHA did not materially breach the lease.

### i.    <u>Plaintiffs Alleged Repairs</u>

Plaintiff contends that his contractors were only instructed to make reprise and replacements necessary to restore the building to its original warehouse condition to return the property and its systems to a condition of good repair and working, sanitary

condition and not to make any upgrades to the Property.  *See* PL SMF ¶¶ 51, 52, 53, 54,

55, 56, 57, 58, 66, 67, 68. Contrary to Plaintiff's assertions, Plaintiff's contractors did not

return the warehouse to its original condition as the original condition of the property was

unusable and not turnkey ready.  *See* Defendant's Motion for Summary Judgment ("Def.

Motion"), Trigg Affidiff ¶¶ 4, 5, 6. Plaintiff also had to bring the Property to code in

order to rent his property after DCHA vacated the Property.  Plaintiff's contractors not

only did not restore the Property to its original condition, his electrician had to remove

abandoned wires and upgrade the electrical circuit panel as it was not labeled when

DCHA assumed tenancy of the Property. Id. ¶ 6, 7.  Additionally, Plaintiff's contractors

removed abandoned duct work that was present when DCHA assumed tenancy of the

Property. Id. ¶ 8.  During its occupancy, DCHA did not label the electrical circuit panel

as it was not required to do so. Id. ¶ 9.

      With Plaintiff's knowledge, DCHA repaired, cleaned, and painted the entire

Property walls and floors and tiled the office floors.  Id. ¶ 11.  DCHA put in a new water

fountain as the one that was there was in such poor condition that it was unusable as it

appeared not to have been used for a lengthy period of time.  Id. ¶ 12. DCHA also

renovated the men's and women's bathrooms and put them back into usable condition.

Id. ¶ 13.  DCHA put in a fence and storage racks through the entire building to store

material and equipment for DCHA employees.  Id. ¶ 14.

      DCHA repaired the stairs and also repaired and fixed all the two overhead garage

doors located at the front of the building as they were in poor condition and none worked.

Id. ¶ 15.  Due to the poor condition of the overhead garage doors the overhead garage

doors required frequent repair.  Id. ¶ 16. DCHA entered into a maintenance contract and

continued to have the overhead garage doors serviced and repaired as needed.    Id.

Additionally, during Mr. Triggs' occupancy, DCHA repaired the roof and any

leaks to the roof as needed.   Id. ¶ 17. During his occupancy, Mr. Triggs stored paint,

plumbing supplies, cleaning supplies, equipment and tools in the Property.   Id.¶ 18.

Additionally, he kept the heating and cooling systems and fans maintained and serviced.

Id. ¶ 19.  He occupied the Property until 2002. Id. ¶ 20. As a tenant of the Property,

DCHA was not required to bring the Property to code. Id. ¶ 21.

In 2005, Joseph Nee occupied the 16 M Street Warehouse (the "Property").   *See*

Def. Motion, Affidavit of Joseph Nee ("Nee Aff.") ¶ 5. He is employed by the DCHA as

the Manager of Mechanical Operations and has worked at DCHA for 16 years. Id. ¶ 2.

As part of his duties and responsibilities as the Manager of Mechanical Operations, he

oversaw the budget and management of DCHA's heating and cooling systems.  Exhibit A

p. 11 l. 5-8; Exhibit B p. 5 l. 10.  Id. ¶ 3. His department maintains and oversees the heat

and air conditions and hot water for approximately 8,000 units and I supervise a staff of

15.  Id. ¶ 4.  He and his staff also maintained the Property and the adjacent parking lot,

and the heating, air conditioning, and water at the Property from 2005 to 2010. Exhibit A.

p. 19 l. 2-7. Id. ¶ *6.*  His staff consisted of licensed boiler personnel and HVAC

mechanics and plumbers who performed preventive maintenance before the heating

season on the heat and before the summer season on the air conditioning and repairs as

needed.  Id. ¶ 7.

In 2006, DCHA made some improvements to the Property and put in three free

standing offices. Id. ¶ 8. The offices were not affixed to the ceiling of the Property. Id. ¶

9.  DCHA put in a free standing new locker room and converted the existing locker room to a lunchroom. Id. ¶ 10. DCHA also put in three new heating units because the old ones were inoperable as they were too old. Id. ¶ 11.  The new heating units also consisted of two through the wall units. Id. ¶ 13. The through the wall units went into the same place as the old units and the others were placed on top of the office build outs at the Property and did not disturb the wall and connected the units to new duct work.  Id. ¶ 14.

As part of the improvements, DCHA also put in parking lot fencing.   Id ¶ 15. From 2005 to 2010, Plaintiff would visit the Property once or twice a year.  Id ¶ 16. Plaintiff would park in the parking lot and step into the loading dock to look around.  Id. ¶ 17.  After the 2006 improvements, Mr. Nee spoke with Plaintiff about the renovations. He was proud of the work and during his visits, he asked Plaintiff if he wanted to come up and see the work that had been done and Plaintiff said, "no," because he could see that we were keeping his building in good shape and he said, "thank you."  Id. ¶ 18. Plaintiff however, could see the new offices from the street and the two fans that were installed over the new offices.   Id. ¶ 19.  In addition to the new offices, Plaintiff could see the interior fence. Id. ¶ 20.

Approximately two months before DCHA vacated the property, Mr. Weinstein walked through on different occasions and he was not alone.  On those visits, Mr. Nee would walk Mr. Nee from the front of the warehouse to the back of the warehouse to unlock a gate so that Plaintiff could gain access to that side of the warehouse.  When Plaintiff walked from the front to the back of the warehouse, Plaintiff had a view of the new offices, locker rooms, the storage shelves, and all the heating and air conditioning equipment including the duct work.  During this time, Plaintiff did not comment on any

of the enhancements that DCHA made to the property except that he was happy with the way DCHA maintained his property.

In 2010 when DCHA vacated the Property, the heating and air conditioning systems were operable. Id. ¶ 21. During Mr. Nee's occupancy, DCHA had the interior of the Property cleaned three times a week. Id. ¶ 22. His staff was responsible for cleaning the parking lot. Id. ¶ 23. If there were leaks in the building, DCHA repaired them. Id. ¶ 23. In 2010 at the time of the move out, DCHA was unaware of any leaks at the property. Id ¶ 24. DCHA had repairs made to the overhead garage doors as needed. Id. ¶ 25. The doors were operable at the time of the move out. Id. ¶ 26. As part of the 2006, repairs, roof work was done. Id. ¶ 27. At move out, DCHA left the property clean and broom swept. Id. Mr. Nee was directed by Chris Stennett to remove everything that we put in the Property and leave it broom swept. He was advised that Plaintiff requested that DCHA do so. Id. ¶ 28.

Prior to vacating the property, DCHA hired a contractor to do the demolition work. Id. ¶ 29. When DCHA vacated the Property, the HVAC system was working. Id. ¶ 30. On June 30, 2010, prior to the move out, Plaintiff walked through the warehouse and indicated additional items he wanted removed. Plaintiff told Mr. Nee that he wanted everything in the area where the temporary wooden stairs removed and broom swept. Mr. Nee did as he was directed and removed everything including the stairs and had that area broom swept. Id. ¶ 31. When Plaintiff returned to the Property later that day Plaintiff asked about the steps and Mr. Nee asked Weinstein if he wanted them and he said no, that's okay. Id. ¶ 32. Mr. Nee would have retrieved the steps and put them back because they were still on the truck. Id. ¶ 33.

Finally, the Property contained outdated light fixtures in the bay and warehouse that were obsolete and could not be repaired or maintained as DCHA no longer had access to the required bulbs.  Id. Id. ¶ 34.   The wall heater had a life expectancy of 8 to 10 years.  Id. ¶ 35.  The rooftop air conditioning unit had a life of 20 years. Id. ¶ 36.  The roof top exhaust fan had a life of approximately 10 years.  Id. ¶ 37.  The gas heater had a life of approximately 20 years, and the wall heat pump had a life of approximately 10 to 15 years.  Id. ¶ 38.  The normal life for a shingled roof is about 12 to 15 years.  Id. ¶ 39. The roof was worn and rusted by whether and is the results of normal wear and tear.  Id. ¶ 40.

### ii.    DCHA's Overpayments

If the Court determines that an Accord and Satisfaction was no reached as argued in Defendant's Motion for Summary Judgment, DCHA contends the following:

DCHA continues to dispute Plaintiff's calculations of how late charges were assessed and imposed as it relates to rent and real estate taxes.  Contrary to Plaintiff's assertions, DCHA has previously objected to Plaintiffs' incorrect charges prior to May 21, 2012.  Plaintiff's Lease provided a provision for a penalty of late charges and interest totaling 6 ½ %.  However, DCHA objects to the way Plaintiff imposed such penalties. Plaintiff not only failed to impose the 6 ½ % as a daily rate, Plaintiff imposed compounded interest of 6 ½ % on any outstanding payments and any interest and late charges already imposed.  The Lease clearly does not have a provision that included compounded interest and late charges.  *See* Exhibit A.

Additionally, over a significant portion of the Lease, Plaintiff included unimposed tax penalties to which the Lease did not provide a provision for.  The Lease only

provided a provision for the inclusion of an imposed DC Office of Tax and Revenue ("OTR") penalty.  Since no such OTR penalty was ever imposed, DCHA was not required to pay for such penalties.  Contrary to Plaintiff in fact acknowledges in his PL SMF the actually meaning of "imposed."  Here, Plaintiff has asserted that he "imposed monthly late fees in accordance with the formula set forth in the 2004 Addendum."  *See* PL SMF ¶ 14.  Here, in support of his claims, Plaintiff provided spreadsheets that support his position that he "imposed" monthly penalties.  Plaintiff, however, has not produced any document to establish that OTR imposed any late payment charges as Plaintiff concedes that OTR has never imposed any late penalties.  *Id.* ¶ 13, 14, 18.  As such Plaintiff improperly imposed OTR penalties and improperly compounded interest and late charges against the improper OTR penalties.  *See* Motion, Appendix A, Spreadsheets, generally.  Finally, nowhere in the Lease does it state that utilities, late charges and interest, and penalties imposed by the Office of Tax and Revenue ("OTR"), are considered rent or additional rent.  Which should not have been assessed the compounded interest and late charges.  *See* Def. Motion, Def. SMF ¶ 2.

### iii.   **The Lease Termination**

By letter dated December 1, 2009, DCHA served written Notice of Nonrenewal ("Notice") on Plaintiff by Certified Mail Receipt # 7002 3150 0001 0273 6281.  *See* Def. Motion, Def. SMF, ¶ 3; *see also*, Dean Aff., ¶ 7.  The Notice was mailed to Plaintiff's address of record where DCHA also mailed Plaintiff's monthly rent payments. *Id.*  SMF, ¶ 4; *see also*, Def. Motion, Dean Aff., ¶ 8.  Defendant's records indicate that Plaintiff received the monthly rental payments at the same address for September, October, November, and December, and all months prior to and subsequent to mailing of the

December 1, 2009, Notice.  *See* Def. Motion, Def.  SMF, ¶ 5; *see also*, Def. Motion, Dean Aff., ¶ 9.  Pursuant to the Notice, Plaintiff was advised that DCHA intended to terminate its lease effective May 31, 2010 and advised that DCHA did not intend to renew the additional two-year term beginning June 1, 2010.  *See* Def. Motion, Def. SMF, ¶ 6; *see* also, Def. Motion, Dean Aff. ¶ 10.

By email dated December 2, 2009, DCHA also notified Plaintiff and advised that DCHA intended to vacate the Property at the end of the Lease.  *See* Def. Motion, Def. SMF, ¶ 7; *see also*, Def. Motion Dean Aff., ¶ 11.  Upon information and belief, on December 4, 2009, the U.S. Postal Service ("USPS") made its first attempt to deliver the Notice. *See* Def. Motion Dean Aff., ¶ 12.  The USPS was unsuccessful and made several unsuccessful subsequent attempts to deliver the Notice. *Id.* ¶ 13.  The Notice remained unclaimed at Plaintiff's local post office until it was returned to DCHA in January 2010. *Id.,* ¶ 14.

Upon receipt of the returned Notice, DCHA immediately sent the Notice Federal Express overnight delivery.  *Id.,* ¶ 15.  On or about January 20, 2010, Plaintiff accepted and acknowledged receipt of the Notice.  *See* Def. Motion Def. SMF, ¶ 8; *see also,* Complaint ¶ 19.  Plaintiff considered the December 1, 2009 Notice a Notice to Terminate. By letter dated April 30, 2010, Plaintiff alleged that DCHA owed Plaintiff $77,762.97 which Plaintiff claims included amounts due for unpaid rent, real estate taxes, water and sewer charges, and accrued late charges.  *Id.,* ¶ 9; *see also*, Def. Motion, Dean Aff., ¶ 17; *see also*, Complaint, ¶ 20.

By letter dated May 21, 2010, DCHA advised Plaintiff that DCHA intended to settle all lawful charges owed pursuant to the Lease as follows:

1. First half of the 2010 real estate taxes, late fees and interest in the amount of $46,897.11;

2. One additional month of rent for June in the amount of $7,000.00;

3. First half of the 2010 Business Improvement District ("BID") taxes in the amount of $2,162.40;

4. 1/6 of the real estate taxes for the Property for the second half of the 2010 tax year at $9,150.83; and

5. 1/6 of the 2010 BID taxes for the Property for the second half of the year at $305.02

*See* Def. Motion, Def. SMF, ¶ 10; *see also,* Def. Motion, Dean Aff., ¶ 18.  In its May 21, 2010, settlement letter, DCHA advised that the total amount due was $65,082.44 which included all late fees, interests and credits for some of Defendant's overpayments.  *See* Def. Motion, Def. SMF, ¶ 11; *see also*, Def. Motion, Dean Aff., ¶ 19.  DCHA also advised that the total amount offered in settlement of this matter did not include the cost of insurance because DCHA had not received the bill from Plaintiff at that time.  *See* Def. Motion, Def. SMF, ¶ 12; *see also*, Def. Motion, Dean Aff., ¶ 20.   DCHA requested that Plaintiff provide the insurance premium bill as soon as possible or DCHA would pay for the prorated insurance cost from 6/15/10 through 6/30/10 using $1,313.00, the amount of the last premium paid by DCHA.  *See* Def. Motion, Def. SMF, ¶ 13; *see also*, Def. Motion, Dean Aff., ¶ 21. Finally, in the May 21, 2010 letter, DCHA also requested that Plaintiff permit DCHA to remain in the Property until June 30, 2010.

Pursuant to its May 21, 2010, settlement letter, DCHA mailed check number 299204 in the amount of $65,082.44 dated June 1, 2010 to Plaintiff.  *See* Def. Motion, Def. SMF, ¶ 14; *see also*, Def. Motion, Dean Aff., ¶ 22.  Included with the sum of $65,082.44, was $7,000 in consideration for Plaintiff allowing DCHA to remain in the

Property until June 30, 2010.  See Def. Motion, SMF.  On June 10, 2010, Plaintiff met with Ms. Dean and Associate General Counsel, Qwendolyn Brown.   On that date, Plaintiff handed Ms. Dean a letter.  By letter dated June 10, 2010, Plaintiff acknowledged receipt of the check and claimed a balance due of $39,056.34. *See* Def. Motion, SMF, ¶ 15; *see also*, Def. Motion, Dean Aff., ¶ 23.

During the June 10, 2010 meeting, Ms. Dean advised Plaintiff that the check was for the settlement of all funds due and owing under the Lease through the Lease termination date of June 30, 2010. See Def. Motion, Affidavit of Qwendolyn Brown ("Brown Aff.") ¶ 9. On that same date, Ms. Brown also personally reiterated DCHA's position to Plaintiff as it related to the June 1, 2010 check, which was for settlement of all outstanding claims as outlined in the May 21, 2010 letter. Id. ¶ 10.  On June 11, 2010, Plaintiff deposited the June 1, 2010 settlement check.  *See* Def. Motion, Def. SMF, ¶ 18 *see also*, Def. Motion, Dean Aff., ¶ 24.

DCHA does not owe Plaintiff any money under the terms of the lease as DCHA made payment in full accord and satisfaction as outlined in DCHA's May 21, 2012 letter to Plaintiff.  See Def. Motion, Affidavit of Lorry Bonds ("Bonds Aff.") ¶ 5. After Plaintiff received the May 21, 2010 letter and the June 1, 2010 check, Plaintiff cashed the June 1, 2010 check. Id. ¶ 6. DCHA intended that the June 1, 2010 letter was for final payment as outlined in the May 21, 2010 letter. Id. ¶ 7. Had Plaintiff retuned the check and not cashed it, no accord and satisfaction would have been reaches as it relates to the issues addressed in the May 21, 2010 letter. Id.¶ 8.  Pursuant to the Lease, DCHA was not responsible for the normal wear and tear of the property.  Id. ¶ 9.

### iii.    DCHA's Overpayment

DCHA's Deputy Executive Director of Administration in the Office of Finance Management ("OFM") reviewed the records and determined that DCHA does not owe Plaintiff any money as outlined in DCHA's May 21, 20109 letter as DCHA made payment in full accord and satisfaction.   See Def. Motion, Affidavit of Ralph Staley ("Staley Aff.") ¶ 5.  DCHA determined the following:

a.   DCHA paid an $8,000 security deposit.

b.   DCHA overpaid Plaintiff in the amount of $16,764.70 in Office and Tax and Revenue penalties and interest.

c.   DCHA overpaid Plaintiff in the amount of $1,615.60 in penalties and interest.

d.   DCHA overpaid Plaintiff in the amount of $7,000 in base rent.

Id.  ¶ 6.

## III.    ARGUMENT

### A.  Plaintiff is not entitled to judgment as a matter of law as DCHA does not owe Plaintiff any rent as an accord and satisfaction was reached as outlined in DCHA's May 21, 2010 letter

Contrary to Plaintiff claims, DCHA did not fail to pay rent, additional rent, real estate taxes, water and sewer charges, and late charges and interest.   Judgment must be entered against Plaintiff on his Breach of Contract claim because DCHA did not breach its commercial lease with Plaintiff.  For breach of contract claim under federal common law, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages

caused by the breach.  *See Red Lake Band of Chippewa Indians v. U.S. Department of the Interior, et al.,* 624 F.Supp.2d 1 (D.D.C. 2009).

Plaintiff has established two of the elements of breach of contract.  Here, a valid contract existed under the contract as Plaintiff and DCHA entered into a Lease in October 1997.  In additional Plaintiff and DCHA entered into subsequent modifications and addenda through the Lease term from October 1997 to the termination of the Lease on June 30, 2010.  Pursuant to the Lease, DCHA was required and did pay rent, taxes, insurance and utilities in consideration for the use of the Property.  Plaintiff however, is unable to establish a breach of duty and damages caused of the alleged breach as an Accord and Satisfaction had been reached as it relates to certain claims arising from the termination of the Lease.

### i.    An Accord and Satisfaction was reached when Plaintiff cashed the June 1, 2010 check.

Judgment must be entered against Plaintiff on his Breach of Contract claim because DCHA did not breach its commercial lease with Plaintiff as DCHA does not owe Plaintiff any rent as an accord and satisfaction was reached when plaintiff cashed the June 1, 2010 Check.  For an Accord and Satisfaction, the fundamental requirement is that the debtor "must intend the amount paid as a liquidation of [the creditor's] claim, and the [creditor] in accepting it must understand that it is so intended." *See Curtis Builders v. General Floor Service, Inc.,* 107 A.2d 705, 706 (D.C. 1954) (*citing Andrews v. Haller*, 32 App. D.C. 392 (D.C. 1909)).

If the creditor cashes the check with that understanding, it is of no moment that the creditor withheld assent to treating the payment as payment in full or even "expressed protest before the check was tendered or that the parties came away from their meeting

with contrary understandings," because "the creditor's action speaks louder than his words and is operative as an acceptance of the offer was made.  *See Double H Housing Corp. v. David*, 947 A.2d 38 (2008); *see also, Laganas v. Installation Specialists*, 291 A.2d 187 (1972).

Here, DCHA intentions were clear in its May 21, 2010 letter.  "Under the doctrine of accord and satisfaction, as to the agreement that the debtor will pay and the creditor will accept something other than the original amount due, not only need it not be explicit, but even if the creditor affirmatively rejects the debtor's offer of accord and satisfaction, the accord and satisfaction will still be effective if the creditor proceeds to cash the check."  *See Double H Housing Corp. v. David*, 947 A.2d 38 (D.C. 2008).   For there to be an accord and satisfaction, there must be (1) a legitimately disputed or unliquidated claim, (2) a mutual agreement that the debtor will pay and the creditor will accept something other than the original amount due in satisfaction of the disputed claim, and (3) the actual giving and taking of the agreed upon substitution. *Id.*

Moreover, the fundamental requirement for accord and satisfaction is that the debtor must intend the amount paid as a liquidation of the creditor's claim, and the creditor in accepting it must understand that it is so intended; if the creditor cashes the check with that understanding, it is of no moment that the creditor withheld assent to treating the payment as payment in full or even expressed protest before the check was tendered or that the parties came away from their meeting with contrary understandings, because the creditor's action speaks louder than his words and is operative as an acceptance of the offer.  Id.  If a creditor takes the satisfaction by accepting payment for

an amount less than the amount of the debt originally claimed, he is bound by the accord.  Here, Plaintiff is bound by the accord.

In this case, an Accord and Satisfaction was reached.  Here, DCHA intended to terminate the Lease.   In response, Plaintiff served DCHA with a letter dated April 30, 2010, claiming amounts owed pursuant to the Lease.  In response, DCHA disputed the amount Plaintiff claims were owed by settlement letter dated May 21, 2010 and offered Plaintiff a different amount from the amount Plaintiff believed was due.  DCHA explicitly included in its May 21, 2010 settlement letter an accounting of the various payment discrepancies and advised Plaintiff that the total amount due and payable, including all late fees, interest and credits for DCHA overpayments is $65,082.44. Pursuant to the May 21, 2010 letter, DCHA issued a check in the amount of$65,082.44. to Plaintiff.

Here, even though by letter and at a meeting dated June 10, 2010, Plaintiff affirmatively rejected DCHA's offer of accord and satisfaction, and after DCHA advised Plaintiff that with the payment of the $65,082.44, was to settle all lawful amounts owed pursuant to the Lease as outlined in the May 21, 2010 letter, the accord and satisfaction was effective once Plaintiff cash the check on June 11, 2010.  Since Plaintiff did not return the check and instead cashed it, the accord and satisfaction was reached and he is bound by the accord.  *See* SMF, ¶ 16; *see also,* Dean Aff., ¶ 24.

Moreover, even though the settlement offer amount of $65,082.44 was less than the amount Plaintiff believed was due and owing, the settlement offer considered money DCHA overpaid to Plaintiff as well as included consideration for the June 2010 payments and a new Lease termination dated of June 30, 2010, the accord and

satisfaction was effective when Plaintiff took the satisfaction by depositing the June 1, 2010 check on June 11, 2010.  For the reasons stated above, Plaintiff is not entitled to judgment as a matter of law as DCHA contends that the accord and satisfaction was reached and he is bound by the accord.  *Id.*

> **B.  Plaintiff is not entitled to judgment as a matter of law as it relates to Plaintiff's claims for reimbursement of money paid out to make repairs to his Property as DCHA is not liable for any repairs and or damage to Plaintiff's Property**

Even if the Court finds that an accord and satisfaction was reached pursuant to the May 21, 2010 letter, Plaintiff is also not entitled to judgment as a matter of law as it relates to Plaintiff's claims for reimbursement of money paid out to make repairs to his Property as DCHA is not liable for any repairs and or damage to Plaintiff's Property

Contrary to Plaintiff's claims, DCHA did not make substantial alterations to the Property without authorization.  DCHA also did not fail to restore the Property or damage the Property and as such DCHA did not breach its Lease with Plaintiff.

The Lease provided the following under § 7 Use of Premises:

(b) Tenant shall have the privilege of installing any furniture, fixtures and equipment necessary in the conduct of its business and the same shall remain the property of the Tenant provided same shall be removed by Tenant before the expiration of the term herein.  In the event any damage is done to said premises in the installation or removal of said furniture, fixtures and equipment, Tenant shall, at its cost and expense, restore said premises to the original condition, or promptly reimburse Landlord for all such costs.  In the event Tenant shall fail to remove said furniture, fixtures and equipment from said premises before the termination of the term herein, it is agreed that Tenant has abandoned same, in which event, such furniture, fixtures and equipment shall then become the property of Landlord, who shall have the right to use, remove or dispose of them. I such furniture, fixtures and equipment are disposed of by Landlord, Tenant shall promptly reimburse Landlord for all such costs of removal and disposal.

The Lease provided the following under § 9 Maintenance:

Landlord warrants that the building and premises including the roof, are clean and in good condition, and that all heating, plumbing and electrical systems are in good working condition at the beginning of the tenancy. Tenant shall, at its risk, cost and expense, make all repairs and replacements necessary to keep both the interior and exterior of the Demised Premises and the fixtures and equipment therein in good repair and in property sanitary condition, and all repairs, replacements and additions necessary to comply with and carry out all orders requirements or conditions now or hereafter imposed by the ordinances, rules or regulations of the District of Columbia, whether required of landlord or otherwise.  Tenant shall, at its cost and expense furnish heat to said premises at such times and season of the year when heat may be required, and shall maintain the heating and plumbing systems in good operating condition at all times, and repair (including replace, if necessary), any damages caused by freezing or by its negligence or the negligence of its employees or invitees.  Tenant shall keep the interior and exterior of the Demised Premises in a clean, neat, orderly and attractive condition at all times.  Tenant shall furnish adequate and proper receptacles for trash, debris and garbage and shall remove trash, debris and garbage from said premises as often as necessary.  Notwithstanding, the forgoing Tenant shall not be liable for responsible for any hazardous materials which was not abated prior to the beginning of this tenancy.

The Lease provided the following under § 10 Alterations:

Tenant shall not, without the written approval of Landlord, make any alterations or structural changes in or do any work involving substantial additions to or changes in plumbing or gas pipes and fixture or electric wiring in said premises or building. All alterations, additions or improvements to the Demised Premises, made by either party (except movable furniture, fixtures and equipment of Tenant), shall immediately become a part of said premises and be surrendered with said premises upon the termination of the term herein without disturbance or injury.

The Lease provided the following under § 17 Surrender:

Tenant shall upon the termination of the term herein and without further notice, surrender and deliver possession of said premises to Landlord in the same condition in which they were received, usual wear and tear excepted.


DCHA did not breach any provisions of the Lease.

### i.    Use of Premises

Section 7(b) Use of Premises of the Lease permits DCHA to install any furniture, fixtures and equipment necessary in the conduct of its business.  Additionally, DCHA was permitted to remove said furniture, fixtures and equipment before the expiration of the term at its cost and expense, and to restore said premises to the original condition. Here, DCHA did just that and removed most improvements that DCHA made to the Property, and returned it clean and broom swept.

Here, in October 1997, after DCHA Leased the Property, Hugh Triggs assessed the Property for DCHA's needs.  Triggs Aff. ¶ 3.  Plaintiff had not done anything to the Property in preparation for DCHA's tenancy and received the Property "as is".  As the Property was not turnkey[2] ready, Mr. Triggs determined consistent with § 7(b) of the Lease that Property needed to be improved in order to meet DCHA's needs which included repairing and or replacing existing wiring and plumbing. Id. ¶ 4.  The Property was a dirty, vacant shell of a building and contained abandoned wires and duct work. DCHA required several months of work to get it to usable condition and habitable for DCHA's employees to work in. Id. ¶ 5. The electrical circuit panel was not labeled and at the conclusion of the tenancy on June 30, 2010, DCHA returned the Property and the electric circuit panel unlabeled just as it received it in 1997.

In 1997, DCHA also repaired the offices, and repaired, cleaned, and painted the entire Property walls and floors and tiled the office floors.  Id. ¶ 11.  DCHA put in a new water fountain as the one that was there was in such poor condition that it was unusable as it appeared not to have been used for a lengthy period of time.  Id. ¶ 12. DCHA also renovated the men's and women's bathrooms and put them back into usable condition.

---

2 The Property was leased to DCHA was not move in ready and not ready to be used.

Id. ¶ 13.  DCHA put in a fence and storage racks through the entire building to store

material and equipment for DCHA employees.  Id. ¶ 14.

DCHA repaired the stairs and also repaired and fixed all the two overhead garage

doors located at the front of the building as they were in poor condition and none worked.

Id. ¶ 15.   Due to the poor condition of the overhead garage doors the overhead garage

doors required frequent repair.  Id. ¶ 16. DCHA entered into a maintenance contract and

continued to have the overhead garage doors serviced and repaired as needed.   Id.

Additionally, during Mr. Triggs' occupancy, DCHA repaired the roof and any

leaks to the roof as needed.   Id. ¶ 17. During his occupancy, Mr. Triggs stored paint,

plumbing supplies, cleaning supplies, equipment and tools in the Property.   Id.¶ 18.

Additionally, he kept the heating and cooling systems and fans maintained and serviced.

Id. ¶ 19.  He occupied the Property until 2002. Id. ¶ 20. As a tenant of the Property,

DCHA was not required to bring the Property to code. Id. ¶ 21.

In 2005, Joseph Nee occupied the 16 M Street Warehouse (the "Property").  See

Nee Aff.  He also made additional improvements to the property consistent with § 7(b) of

the Lease.  As part of those improvements to continue to meet the needs of the office, Mr.

Nee contracted and put in three free standing offices and locker room.  None of the

freestanding structures were affixed to the ceiling of the Property.  DCHA also put in

three new heating units because the old ones were inoperable as they were too old. Id. ¶

11.  The new heating units also consisted of two through the wall units. Id.¶ 13. The

through the wall units went into the same place as the old units and the others were

placed on top of the office build outs at the Property and did not disturb the wall and

connected the units to new duct work.  Id. ¶ 14.   Additionally, as part of the

improvements, DCHA also put in parking lot fencing.   Id ¶ 15.  At the end of the tenancy and consistent with §§ 7(b) and 17 of the Lease, DCHA removed most of the improvements.

ii.   **Alterations**

DCHA did not violate any provision of § 10 of the Lease.  DCHA was not required to get the Landlord's written approval before it made improvements to the Property as DCHA complied with § 7(b) of the Lease.  Moreover, the improvements made during DCHA's tenancy by DCHA did not consist of alterations or structural changes in or do any work involving substantial additions to or changes in plumbing or gas pipes and fixture or electric wiring in said premises or building. The improvements made were not substantial and did not include substantial additions to or changes in plumbing or gas pipes, fixture or electric wiring.

Additionally, from at least 2005 to 2010, Plaintiff has acknowledged and Mr. Nee confirmed that Plaintiff visited the Property once or twice a year.  Id ¶ 16.  Plaintiff would park in the parking lot and step into the loading dock to look around. Id. ¶ 17. Moreover, after the 2006 improvements, Mr. Nee spoke with Plaintiff about the work he had done in the Property and wanted to show it to Plaintiff who declined.  Plaintiff however, could see the improvements form the loading dock of the Property during each of his visits and when he entered the property in or around April 2010 to June 30, 2010 prior to the termination of the Lease.  Plaintiff had not complained or requested that DCHA remove any of the improvements until in or about April 2010. In fact from 2005 to 2010, Plaintiff routinely commented to Mr. Nee that he was happy about the way that DCHA maintained his property in clean and good condition.  At the end of the tenancy

and consistent with §§ 7(b) and 17 of the Lease, DCHA removed most of the improvements.

          iii.    **Maintenance**

DCHA properly maintained the Property consistent with § 9 of the Lease. Mr. Triggs and Mr. Nee and their staff maintenance the property and contracted for service, repair and replacement of fixtures and equipment located in the Property.  Mr. Nee's Staff also maintained the Property and the adjacent parking lot, and the heating, air conditioning, and water at the Property from 2005 to 2010. See Nee Aff. Exhibit A. p. 19 l. 2-7. Id. ¶ *6*.   His staff consisted of licensed boiler personnel and HVAC mechanics and plumbers who performed preventive maintenance before the heating season on the heat and before the summer season on the air conditioning and repairs as needed.  Id. ¶ 7. Additionally, Mr. Nee and his staff maintained the exterior of the Property including the parking lot.  Again, Plaintiff never objected to the maintenance of the Property during the Lease and routinely commented on the fact that DCHA kept his building in good shape.

Moreover, Plaintiff complains of various fixtures and equipment that were inoperable or that needed significant repair.  Plaintiff however, waited several months before he had work done on his Property.  As DCHA left the Property in good working condition, DCHA is not responsible for any damage or repair that resulted or was necessary during the period of time that DCHA did not occupy the Property after June 30, 2010.

Here, the Property contained outdated light fixtures in the bay and warehouse were obsolete and could not be repaired or maintained as the required bulbs DCHA no longer had access to.  For example most of the Property fixtures, equipment, furnishing

and roofing has a life expectancy and will deteriorate over time.  For example the wall

heater had a life expectancy of 8 to 10 years.  The rooftop air conditioning unit had a life

of 20 years. The roof top exhaust fan had a life of approximately 10 years.  The gas

heater had a life of approximately 20 years, and the wall heat pump had a life of

approximately 10 to 15 years.  In fact, DCHA installed three lights in the loading dock as

a result.  Plaintiff has owned the Property for at least 40 years and DCHA leased the

Property for 13 years.  Pursuant to the Lease, DCHA is not responsible for the normal

wear and tear of the Property, its equipment, fixtures or furniture.

       iv.    **Building Codes**

Plaintiff also seeks compensation for the renovations that Plaintiff is legally

required to do when leasing to a new tenants.  Plaintiff owned the Property for over 40

years and the Property was not up to code at the end of DCHA's tenancy.  A commercial

Tenant is not required to bring the Demised Premises up to code.  Furthermore, the Lease

does not contain any provision that required DCHA to bring the Property up to code.

Here, DCHA took possession of the Property that contained an unlabeled electric circuit

panel, it contained hanging abandoned wires, and abandoned duct work.  Clearly based

on the evidence presented thus far, Plaintiff's contractors clearly made upgrades as the

Property was not returned to the original condition and Plaintiff was required to bring the

Properly up to code.   DCHA concedes that it did remove the water fountain it put in the

property at the beginning of the tenancy because the water fountain that was in place was

inoperable.

Therefore, Plaintiff is not entitled to judgment as a matter of law as it relates to his claim for reimbursement for the cost of renovations to his Property after DCHA terminated the Lease.

### C.   **Plaintiff is not to judgment as a matter of law as it relates to attorney's fees and costs**

Plaintiff is not to judgment as a matter of law as it relates to attorney's fees and costs   Contrary to Plaintiff's claim, Plaintiff is not entitled to attorney fees and costs. As demonstrated above, Plaintiff fails to establish a material breach of contract claim as an accord and satisfaction was reached and DCHA is not responsible for reimbursement of all of Plaintiff's repairs.

### D.   **Plaintiff is not entitled to judgment as a matter of law as if this Court determines that no accord and satisfaction was reached, DCHA is entitled to reimbursement of its security deposit and any overpayments made to Plaintiff**

Plaintiff is not entitled to judgment as a matter of law as if this Court determines that no accord and satisfaction was reached, DCHA is entitled to reimbursement of its security deposit and any overpayments made to Plaintiff.  Here, in response to DCHA's notice of termination of the Lease, by letter dated April 30, 2010, Plaintiff made a claim for money that he felt was due and owing under the Lease.  By letter dated May 21, 20I0, DCHA offered to fully settle claims as provided in the same letter in the amount of $65,082.44.  Pursuant to the May 21, 2010 letter, DCHA issued a check dated June 1, 2010 in the amount of $65,082.44.  Plaintiff acknowledged receipt of the June 1, 2010 check on June 3, 2010.  In response to the settlement offer, by letter dated June 10, 2010, Plaintiff rejected the offer and advised that he intended to accept the $65,082.44 as rent. On that same date, Plaintiff met with Ms. Dean and her counsel, Ms. Brown where they

reiterated to Plaintiff the Agency's position and again advised that the June 1, 2010 check was for settlement of claims pursuant to the May 21, 2010 letter.  Despite knowing that it was DCHA's intent that the $65,082.44 was a settlement offer, Plaintiff admittedly accepted the check on June 11, 2010 when he deposited it into his account and as such an Accord and Satisfaction was reached.   *See Double H Housing Corp. v. David*, 947 A.2d 38 (2008); *see also, Laganas v. Installation Specialists*, 291 A.2d 187 (1972).

However, assuming *arguendo* that this Court determines that an Accord and Satisfaction was not reached between the Parties, DCHA would then be entitled to reimbursement of its security deposit and any money overpaid to Plaintiff under the Lease and any other lawful relief.  A review of the payments made to Plaintiff has established that DCHA overpaid Plaintiff in as follows:

a.   DCHA paid an $8,000 security deposit.

b.   DCHA overpaid Plaintiff in the amount of $16,764.70 in Office and Tax and Revenue penalties and interest.

c.   DCHA overpaid Plaintiff in the amount of $1,615.60 in penalties and interest.

d.   DCHA overpaid Plaintiff in the amount of $7,000 in base rent.

See Affidavit of Ralph Staley ("Staley Aff.") ¶ 5, 6.

IV.   **<u>CONCLUSION</u>**

WHEREFORE, for the foregoing reasons, Defendants respectfully request that the Plaintiff's Motion for Summary Judgment be denied as DCHA has established an accord and satisfaction was reached and even if this Court concludes that such an accord and satisfaction was reached on some of Defendant's claims, as demonstrated above, there are still material facts in dispute as it relates to Plaintiff's claims.

Dated: July 13, 2012

Respectfully Submitted,


_____*/s/ Nicola N. Grey*_____
Nicola N. Grey
Bar No. 492150
Office of the General Counsel
District of Columbia Housing Authority
1133 North Capitol Street, NE, Suite #210
Washington, DC  20002
(202) 535-2835 (telephone)
(202) 535-2521 (facsimile)
*Counsel for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANFORD B. WEINSTEIN,** | ) |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 2010 CA 01768 (RC)** |
| | ) |
| **DISTRICT OF COLUMBIA HOUSING** | ) |
| **AUTHORITY,** | ) |
| | ) |
| **DEFENDANT.** | ) |

## ORDER

Upon consideration of Plaintiff's Motion for Summary Judgment, any opposition

thereto, and reply, and the record herein, it is hereby this _____ day of _____

_____, 2012.

**ORDERED**, that the Motion shall be **DENIED.**

**SO ORDERED**.

_____
The Honorable Rudolph Contreras
United States District Judge

**Copies to:**

Nicola N. Grey, Esq.
District of Columbia Housing Authority
1133 North Capitol Street, NE
Suite 210
Washington, DC  20002

Judah Lifschitz, Esq.
Laura Fraher, Esq.
Shapiro Lifschitz & Schram, P.C.
1742 N Street, NW
Washington, DC 20036

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Motion was served electronically, on this 13th day of July, 2012, to the following:


Judah Lifschitz, Esq.
Laura Fraher, Esq.
Shapiro Lifschitz & Schram, P.C.
1742 N Street, NW
Washington, DC 20036

/s/ Nicola N. Grey

# EXHIBIT A