**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STANFORD B. WEINSTEIN,                         :
                                               :
          Plaintiff and Counter-Defendant,  :        Civil Action No.:      10-1768 (RC)
                                               :
          v.                                   :        Re Document No.:    40, 42, 43
                                               :
DISTRICT OF COLUMBIA                            :
HOUSING AUTHORITY,                             :
                                               :
          Defendant & Counter-Claimant.  :

<u>**MEMORANDUM OPINION**</u>

**Denying the Plaintiff's Motion to Strike; Denying the Parties' Cross-Motions**
**for Summary Judgment**

**I. INTRODUCTION**

The plaintiff is a landlord who entered into a contract to lease non-residential property to

the District of Columbia Housing Authority ("DCHA").  He alleges that the tenant has breached

the contract in various ways, owing the landlord for unpaid rent, late payment fees, penalties,

water and sewer charges, and taxes.  The landlord also alleges that the tenant failed to maintain

the property and made alterations that damaged the property when the tenant vacated it, thereby

owing the landlord for the cost of restoring the property to its original condition.  The tenant has

filed a counterclaim, alleging that the landlord miscalculated the amount owed and that the debt

was settled with an accord and satisfaction, or that in the alternative, the tenant overpaid late

fees, penalties, and taxes owed, entitling it to a credit.  The tenant also contends that it does not

owe repair costs because the property was not in turnkey condition at the time the lease began,

that the tenant made alterations to bring the property up to code, and that it did not damage the

property.  The parties have filed cross-motions for summary judgment, and the landlord has also

filed a motion to strike the tenant's motion for summary judgment.  Because the landlord has

failed to demonstrate that it was prejudiced by the tenant's late filing of its motion, and has not

shown that the tenant introduced new and contradictory evidence after a Rule 30(b)(6)

deposition, the landlord's motion to strike is denied.  Further, because there are genuine disputes

of material fact as to the landlord's claims for an outstanding debt and for repairs, and as to the

tenant's claim of an accord and satisfaction, the parties' cross- motions for summary judgment

are denied.

## II.  FACTUAL & PROCEDURAL BACKGROUND

The landlord is the owner of a warehouse and adjacent parking lot (collectively "the

property") in the District of Columbia.  Pl.'s Stmt. of Mat. Facts ¶ 1.  In October of 1997, the

landlord entered into a written agreement to lease this property to the tenant.  *Id.* ¶ 2.  From time

to time thereafter, the parties entered into written extensions and addendums to the lease.  *Id.* ¶ 3.

The latest and final addendum to the lease was in August of 2008.  *Id.*; Def.'s Stmt. of Mat.

Facts.  ¶ 2.  The lease required that all rental payments would be paid to the landlord, and that if

the tenant was delinquent "in the payment of any rental installment for more [than] seven (7)

calendar days past the due date," that the [tenant] would pay both a late charge of 5% and

interest of 1.5 % per month or fraction thereof.  Compl., Ex. 1 ("Lease") ¶ 4.  The lease also

stipulated that the tenant would pay "as additional rent" all real estate taxes payable on the

property for the duration of the lease.  *Id.* ¶ 5.  If the tenant did not timely pay such taxes, it was

required to pay both a late charge of 5% and interest of 1.5 % per month or fraction thereof.  *Id.* ¶

5.

In addition, the lease allowed the tenant to install any furniture, fixtures, and equipment

necessary to the conduct of its business, but that if the property was damaged while installing or

removing these items, the tenant was to pay to restore the property to its original condition or to reimburse the landlord for the cost of removal.  *Id.* ¶ 7(b).  The tenant was also required to make all repairs and replacements necessary to keep the property, including its fixtures and equipment, in good repair and proper sanitary condition.  *Id.* ¶ 9.  The lease further stipulated that the tenant would not make any alterations or structural changes, among other things, without the landlord's written approval.  *Id.* ¶ 10.

As mentioned earlier, in August of 2008, the parties signed an addendum to the lease ("addendum").  *See* Compl., Ex. 2, ("Lease Addendum").  The addendum stated that the lease would end on May 31, 2010, and that it would be automatically renewed for two years, until May 31, 2012.  *Id.* ¶ 2.  But the lease could be terminated before May 31, 2012, if either party gave a notice of termination six months in advance.  *Id.* ¶ 23.  In addition, the landlord was required to take steps to obtain a reduction in the assessed value and taxes due on the property, where, after taking into account any attorney's fees and other costs incurred in obtaining the reduction, the parties would share equally in the resulting benefit.  *Id.* ¶ 24.

By letter dated December 1, 2009, the tenant sent the landlord a notice to terminate the lease, stating that the lease would be terminated on May 31, 2010.  Def.'s Stmt. of Mat. Facts ¶ 3; Compl., Ex. 3 ("Def.'s Notice of Nonrenewal."  On December 4, 2009, the U.S. Postal Service attempted to deliver the notice, was unsuccessful, and then made several subsequent attempts to deliver it.  Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 9.  The notice remained unclaimed at the landlord's local post office until it was returned to the tenant in January of 2010, *id.*, marked "Undeliverable as Addressed," Pl.'s Response to Def.'s Stmt. of Mat. Facts ¶ 25.  The tenant asserts that the notice was mailed to the landlord's address of record, where the tenant had also mailed its monthly rent payments prior and subsequent to mailing the notice.  Def.'s Stmt. of

Mat. Facts ¶ 4; Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 8; *see also* Pl.'s Response to Def.'s Stmt. of Mat. Facts ¶ 4.  Upon receiving the returned notice, the tenant sent it to the landlord via Federal Express overnight delivery.  Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 9.  On or about January 20, 2010, the landlord accepted and acknowledged receipt of the notice.  *Id.*

On April 30, 2010, the landlord sent a letter to the tenant, indicating that the landlord was owed $77,762.97 for unpaid rent, real estate taxes, water and sewer charges, and accrued late charges.  Def.'s Stmt. of Mat. Facts ¶ 9.  On May 21, 2010, the tenant mailed the landlord a letter in response, stating that the tenant sought to settle all lawful charges owed pursuant to the lease ("May 2010 letter").  *Id.* ¶ 10; Compl., Ex. 4 ("Def.'s May 2010 Letter") at 1.  The letter claimed that the landlord's April 2010 letter had miscalculated the amount owed, and outlined in detail the discrepancies between the parties' calculations.  *See generally* Def.'s May 2010 Letter.  The tenant also proposed in the letter to pay $65,082.44 plus insurance costs, and thereby settle all lawful amounts pursuant to the lease and resolve any outstanding concerns regarding the termination of its tenancy.  *Id.* at 4-5.  On June 1, 2010, the tenant sent a check to the landlord in that amount ("June 2010 check").  Def.'s Stmt. of Mat. Facts ¶¶ 14-15.

On June 10, the landlord met and spoke with DCHA employees.  Pl.'s Response to Def.'s Stmt. of Mat. Facts at 16; Def.'s Stmt. of Mat. Facts ¶ 15.  At that meeting ("June 10 meeting"), the tenant received a letter dated June 10, 2010 ("June 2010 letter") stating that the landlord disagreed with the tenant's position in its May 2010 letter, and that the landlord did not accept the tenant's proposed payment as payment in full under the lease, but instead as a payment on account to be applied against the balance due.  Def.'s Stmt. of Mat. Facts ¶ 15; Def.'s Mot. for Summ. J., Ex. 2, at 28.  The letter further stated that even after depositing the tenant's check, the landlord was still due $39,056.34.  Def.'s Mot. for Summ. J., Ex. 2, at 28.  On June 11, 2010, the

landlord deposited the check.  Def.'s Stmt. of Mat. Facts ¶ 16.  On June 21, 2010, the tenant

emailed the landlord, stating that the tenant's General Counsel was currently reviewing the

information that the landlord had provided, that some of the tenant's employees planned to meet

with the General Counsel regarding the landlord's "settlement offer," and that they would get

back to the landlord shortly thereafter.  Pl.'s Mot. for Summ. J., Ex. 20 at 15.  On June 30, 2010,

the tenant vacated the property.  Pl.'s Stmt. of Mat. Facts ¶ 41.

 The landlord then filed this action, claiming that the tenant breached the contract by

failing to pay in full late payment fees, penalties, water and sewer charges, taxes, and expenses

for restoring the property to its original condition after the tenant had damaged it.  The tenant has

filed a counterclaim, alleging that other than the landlord's claim for post-tenancy clean-up and

repair costs, it settled all debts with an accord and satisfaction, or that in the alternative, it is

owed a credit for overpayments (e.g., deposit and prepaid rent).  The tenant also alleges that it

owes no post-tenancy clean-up or repair costs.  The parties have filed cross-motions for summary

judgment, and the landlord has also filed a motion to strike the tenant's motion for summary

judgment.  The court now turns to the parties' arguments and the applicable legal standards.


### III.  ANALYSIS

#### A.  Legal Standard for a Rule 56 Motion for Summary Judgment

 Summary judgment may be granted when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the

litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if

sufficient evidence exists such that a reasonable factfinder could return a verdict for the non-

moving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. *Id.* at 323; FED. R. CIV. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials"). In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine issue that is suitable for trial. *Celotex*, 477 U.S. at 324. On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## B. The Landlord's Motion to Strike

### 1. The Tenant's Filing of its Cross-Motion for Summary Judgment After the Deadline, and Submission of an Altered Version When Asked to Re-File It

The landlord has filed a motion to strike, claiming that the Court should not evaluate the tenant's motion for summary judgment and three accompanying affidavits. The landlord first contends that when filing its motion for summary judgment, the tenant requested several extensions from the Court, and that when the tenant did ultimately file the motion, it did so after midnight on the final deadline. Pl.'s Mot. to Strike, 3-4. In addition, the landlord argues that after the tenant filed this overdue motion, the Clerk of the Court asked the tenant to refile the submission, due to a technical error. *Id.* at 4-5. The landlord avers that the tenant then refiled

the motion later that same day, but that that version was altered to include additional substantive content and attachments, as compared to the initial version filed earlier that day. *Id.*

The tenant responds by saying that when it initially filed the motion, it believed that the submission was filed two minutes before the midnight deadline, and that the tenant only learned later that the motion was deemed filed four minutes after the deadline. Def.'s Opp'n to Mot. to Strike at 4-5. The tenant surmises that this discrepancy may be due to technical problems that its office's internal network clock was experiencing at the time. *Id.* at 5. Because the four-minute delay in filing was caused by the tenant's unknowing mistake, the submission will not be stricken. Further, if the delayed filing had indeed been intentional, the Court would not condone it, but the motion would still not be stricken because the landlord has not demonstrated why it was prejudiced by a one-day delay.

The landlord is correct, however, in asserting that the initial submission differs from the second one that was filed later that day. *Compare* Dckt. #41 *and* #42. The major difference is that the tenant added additional arguments, including stating that it had maintained the property while occupying it, and that the property was not turnkey ready when the tenant began the lease, thereby requiring the tenant to make repairs and improvements to make it habitable and usable. *See* Def.'s Mot. for Summ. J. at 21-24. The tenant does not provide a clear explanation as to why this was done without a request for more time and, therefore, the Court admonishes the DCHA for this maneuver. But, because the altered document was filed later in the same day, there is no indication as to how adding arguments a few hours later would prejudice the landlord. Indeed, if the tenant had requested a short extension that was supported with a cogent explanation, the Court likely would have granted it. And, after all, the Court favors deciding cases on the merits. Further, the sections that the tenant added to its cross-motion for summary

judgment appear verbatim in the tenant's opposition to the landlord's summary judgment motion, so even if such arguments were stricken from the summary judgment motion, these arguments would still be considered by the Court in resolving the cross-motions.  Accordingly, the motion will not be stricken.

### 2.  The Three Affidavits Attached to the Tenant's Re-Filed Submission

The landlord also asserts that the Court should strike three affidavits that the tenant attached to its motion for summary judgment.  Pl.'s Mot. to Strike at 5.  The landlord states in his motion that he noticed the deposition of the tenant, pursuant to Federal Rule of Civil Procedure 30(b)(6).  *Id.* at 2.  Under Rule 30(b)(6), a party may name a governmental agency as a deponent, and the agency then designates one or more officers, directors, managing agents or other people to testify on its behalf, who must testify about "information known or reasonably available to the organization."  FED. R. CIV. P. 30(b)(6).  During one such deposition, Lorry Bonds, a DCHA employee, testified about conversations between the DCHA and the landlord.  Def.'s Mot. for Summ. J., Ex. 2 ("Bonds Dep.") at 33-34.  She indicated that she had not participated in such conversations, but that Lisa Dean, another DCHA employee, had told her about them, including a particular conversation that Ms. Dean had had with the landlord.  *Id.* at 34.  During the deposition, Ms. Bonds was asked whether Ms. Dean had told her that she had said to the landlord, "if you cash that [June 2010] check, it's all over, or words to that effect."  *Id.*  Ms. Bonds stated, "[t]here were no words to that effect."  *Id.*

After the deposition, the tenant filed an affidavit by Qwendolyn Brooks, DCHA's Associate General Counsel.  *See* Def.'s Mot. for Summ. J., Ex. 1 at 69.  Ms. Brooks stated in her affidavit that on June 3, 2010, the landlord acknowledged that he had received the June 2010 check.  *Id.* ¶ 8.  Ms. Brooks also noted that on June 10, the landlord advised the tenant that it

owed additional funds. *Id.* ¶ 9.  In addition, Ms. Brooks stated in her affidavit that Ms. Dean

personally advised the landlord that the June 2010 check in the amount of $65,082.44 was for the

settlement of all funds due and owing under the lease. *Id.* ¶ 9.  Further, Ms. Brooks indicated

that she, herself, "personally reiterated" to the landlord DCHA's position regarding the June

2010 check, which was for settlement of all outstanding claims as outlined in the May 2010

letter. *Id.* ¶ 10.

In its motion to strike, the landlord contends that Ms. Bonds' earlier testimony is

contradicted by Ms. Brooks' later-filed affidavit.  Pl.'s Mot. to Strike at 6-7.  Specifically, the

landlord asserts that while Ms. Bonds testified that the tenant did not tell the landlord that

cashing the June 2010 check was a settlement of all funds, Ms. Brooks' affidavit stated that the

tenant did indeed tell the landlord that. *Id.* at 7-8.  The landlord thus argues that because Ms.

Brooks' affidavit contradicts Ms. Bonds' earlier deposition, that Ms. Brooks' affidavit should be

stricken. *Id.* at 7-8.

In actuality, Ms. Bonds did initially testify as the landlord describes, where she stated that

during the tenant's meeting with the landlord, "[t]here were no words" indicating that the check

was a settlement of all funds.  Bonds Dep. at 34.  But Ms. Bonds immediately followed up her

response with "there might have been words to that effect." *Id.*  Further, she testified that she

was not present during the DCHA's conversations with the landlord, but only learned of what

occurred from Ms. Dean. *Id.*  By contrast, Ms. Brooks stated in her affidavit that she was

actually present during a conversation with the landlord, and that she personally communicated

such words to him, herself. *Id.* at 7-8.  There thus appears to be no direct contradiction between

the earlier deposition testimony and the later affidavit.

The landlord also asserts that the Court should strike the affidavit because it presents new, supplemental information that could have been raised at the 30(b)(6) deposition, and that the tenant failed to adequately prepare its 30(b)(6) witness.  Pl.'s Mot. to Strike 14-15.  Yet "[i]t is often impossible in any enterprise where employees have distinct roles for there to be one person who can answer all questions posed during a 30(b)(6) deposition."  *Covad Commc'ns Co. v. Revonet, Inc.*, 267 F.R.D. 14, 25 (D.D.C. 2010).  Indeed, "[i]gnorance in one area, provided it is professed in good faith . . . should not lead to" reprimand or similar consequences, as these "should be reserved for[,]" *id.* at 26, instances where a corporation's officers or managing agents are deposed but "disclaim[] knowledge of the facts that are clearly known to the organization[,]" id. at 25.  Here, Ms. Bonds did not disingenuously disclaim knowledge of facts, but instead, offered all of the information to which she was privy about the discussions between DCHA employees and the landlord.  *See* Bonds Dep. at 31-35.  The Court will therefore not strike Ms. Brooks' affidavit.

Additionally, the landlord argues that two other DCHA employees' respective affidavits should be stricken.  Pl.'s Mot. to Strike at 8.  The landlord asserts that DCHA employee Kenneth Arthur stated during his deposition that when the tenant occupied the property, the building interior was dirty, there were no working toilets, and that there was a water fountain with lead pipes.  *Id.* at 10.  The landlord claims that the Mr. Arthur testified that other than these three issues, the rest of the property was in fine working condition.  *Id.*  When defense counsel questioned Mr. Arthur later on in the same deposition, he stated that there were also issues with the paint, phone lines, ceiling tiles, and floor tiles.  *Id.* at 11.  The landlord thus contends that because this later testimony in response to leading questions contradicted his earlier testimony, and because his later-filed affidavit and DCHA employee Hugh Triggs' affidavit contradicted the

testimony, as well, the affidavits should be stricken pursuant to Federal Rule of Civil Procedure 30(b)(6).  *Id.* at 11-12.

As noted earlier, under Rule 30(b)(6), a party may name a governmental agency as a deponent, and the agency then provides one or more designees on its behalf to testify about information known or reasonably available to the organization. FED. R. CIV. P. 30(b)(6).  The rule "aims to prevent a corporate tenant from thwarting inquiries during discovery, then staging an ambush during a later phase of the case."  *Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 95 (D.D.C. 1998).  In other words, if a deponent initially pleads ignorance when asked about a subject, but a declaration filed by another employee later raises "new or different allegations that could have been made at the time of the 30(b)(6) deposition," the later filing will not be considered.  *Id.* at 94.

That is not the case here.  Mr. Arthur did not feign ignorance during his deposition to allow another DCHA employee to raise new information at a subsequent stage of the litigation. Rather, it appears from the deposition transcript that Mr. Arthur was initially confused by the questions, and when later asked in the deposition about specific parts of the building, he proceeded to provide information about each.  *See* Pl.'s Mot. to Strike, Ex. M [Dckt. #43-1] at 33-56 ("So, for example, the electrical system, as far as you know, as you sit here today, was to code and in fine working condition, correct?" "I can't say that—" "Well, you don't know—" "—because—" "—anything to the contrary, correct?" "But I don't know anything to the contrary but—").

This additional information came minutes, as opposed to months later, and the affidavits in question did not introduce anything contradictory when they were filed.  *See* Def.'s Mot. for Summ. J., Ex. 1 [Dckt. #42-1] at 6-8, 49-51.  These declarations will therefore not be stricken.

*See Flynn v. Veazey Const. Corp.*, 424 F. Supp. 2d 24, 35 (D.D.C. 2006) ("Courts are especially lenient in accepting later testimony that may not be wholly consistent with an earlier account where . . . the initial statement took the form of a deposition rather than . . . an affidavit. . . because [a] deponent may have been confused about what was being asked or have lacked immediate access to material documents.") (internal quotation marks and citation omitted); *id.* ("To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness . . . was stating the truth.") (citing *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)).

Finally, the landlord contends that because Mr. Arthur's affidavit is not based upon personal knowledge, the Court should strike it pursuant to Rule 56(c)(4). Pl.'s Mot. to Strike at 18. Yet if a corporate officer is noticed for deposition pursuant to Rule 30(b)(6), "his sworn affidavit is admissible," even if that declaration is not based on personal knowledge. *Williamson v. Life Ins. Co. of N. Am.*, 2012 WL 3262857, at *1 n.1 (D. Nev. Aug. 8, 2012); *Schwendimann v. Arkwright Advanced Coating Inc.*, 2012 WL 928214, at *1 n.1 (D. Minn. Mar. 19, 2012) (finding that the Court would consider the declaration even though the signor lacked personal knowledge of its contents, because the signor was a designated Rule 30(b)(6) representative); *Sunbelt Worksite Mktg., Inc. v. Metro. Life Ins. Co.*, 2011 WL 3444256, at *2 (M.D. Fla., Aug. 8, 2011) ("While Rule 54(c)(4) does require an affidavit to be based on personal knowledge . . . an affidavit by a Rule 30(b)(6) designee does not have to be based on personal knowledge but is expected to be based on the organization's collective knowledge."). In addition, Mr. Arthur's affidavit described some things that DCHA employee Hugh Triggs did to improve the property upon occupying it, including repairing the toilets, replacing the water fountain, painting the

building, and installing wiring.  Def.'s Mot. for Summ. J., Ex. 1, Arthur Dep., ¶¶ 7-8.  Though

Mr. Arthur may not have had personal knowledge of these events, the argument is moot because

Mr. Triggs, himself, described these same repairs in his own affidavit, *id.*, Triggs Dep. ¶¶ 4-8,

11-16, and so these arguments would still be considered by the Court in resolving the cross-

motions.  The affidavits will therefore not be stricken.

### C.  The Parties' Cross-Motions for Summary Judgment

### 1.  The Tenant's Affirmative Defense of Accord and Satisfaction

The landlord has filed a motion for summary judgment alleging that the tenant breached

the contract and owes the landlord for unpaid rent, late payment fees, penalties, taxes, and water

and sewer charges.  *See generally* Pl.'s Mot. for Summ. J.  In response, the tenant has filed a

cross-motion for summary judgment, contending that the landlord's calculations for the amounts

owed are erroneous.  *See generally* Def.'s Cross-Mot.  The tenant also argues that it sent the

landlord its May 2010 letter proposing a compromise, where the tenant would pay the landlord a

specific amount (less than the landlord's claim of the amount due) plus insurance costs to settle

all of the outstanding claims in dispute.  *Id.* at 15-16.  The tenant broke down the $65,082.44

total offered amount (before insurance costs) as payment of:

1. The first half of 2010's real estate taxes, late fees, and interest charges, in the amount of $46,897.11.

2. One additional month of rent in June, in the amount of $7,000.00.

3. The first half of the 2010 business improvement district ("BID") taxes, in the amount of $2,162.40.

4. One-sixth of the real estate taxes for the property (presumably for the month of June), in the amount of $9,150.83.

5. One-sixth of the BID taxes for the property (presumably for the month of June), in the amount of $305.02.

Def.'s May 2010 Letter at 5.  The tenant contends that by cashing the June 2010 check that the tenant sent in the $65,082.44 total, the landlord accepted the proposal and entered into an accord and satisfaction, thereby resolving all of the landlord's claims.  *Id.* at 16.

The landlord counters that the tenant's May 2010 letter did not propose or establish an accord and satisfaction.  Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 15; Pl.'s Reply to Def.'s Mot. for Summ. J. at 3.  The landlord further claims that before he cashed the check, he informed the tenant that he did not agree with the tenant's position in its May 2010 letter, and that cashing the check only counted toward the total amount due.  Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 15.

Accord and satisfaction is an affirmative defense with the burden of proof on the proponent.  *Pierola v. Moschona*s, 687 A.2d 942, 947 (D.C. 1997).  Under this doctrine, if the parties have a dispute about an unliquidated claim or obligation, and the debtor offers payment with the condition that the amount fully satisfies the creditor's claim, then the creditor's negotiating the check with that understanding constitutes an acceptance of the accord and of the condition.  *Calloway v. Cent. Charge Serv.*, 440 F.2d 287, 289-90 (D.C. Cir. 1971); *Didriksen v. Sewage & Water Bd. of N. Orleans*, 527 So.2d 319, 320-21 (4th Cir. 1988); *Towne Gardens, Ltd., v. McDonald's Corp.*, 2005 WL 2406004, at *439 (W.D.N.Y. Sept. 29, 2005).  The debtor's intent for an accord and satisfaction can be established through "discussions, correspondence, or unambiguous language on the check."  *Burke Co. v. Hilton Development Co.*, 802 F.Supp. 434, 439 (N.D. Fla. 1992).  "[I]f the [offered] sum is accepted in full settlement of the total indebtedness, accord and satisfaction will result."  *Rhone v. State Auto Mutual Ins. Co.*, 858 F.2d 1507, 1510 (11th Cir. 1988); *Calloway*, 440 F.2d at 289-90.

In this case, the tenant's May 2010 letter offered the landlord a check totaling $65,082.44 to settle the amount due.  Ms. Brooks' affidavit states that at the June 2010 meeting, Ms. Dean

"personally advised" the landlord that the check was for the settlement of all funds due and

owing under the lease through the lease termination date of June 30, 2010.  Brooks' Aff. ¶ 9.

Ms. Brooks further indicated that she "personally reiterated" this position to the landlord at that

meeting.  *Id.* ¶ 10.  In addition, Ms. Bonds testified at her deposition that "there may have been

words" during that meeting indicating that cashing the check resolved all of the outstanding

claims.  Bonds Dep. at 34-35.  By contrast, the landlord testified at his deposition that he gave

the tenant at that meeting a letter.  Pl.'s Reply, Ex. 1 ("Weinstein Dep.") at 99.  The letter stated

that the landlord did not agree with the tenant's position in its May 2010 letter, that the landlord

cashing the check only counted toward the total amount due, and that the tenant would still owe

$39,056.34.  *See generally* June 2010.  Further the landlord cashed the check on June 11, and on

June 21, 2010, the tenant emailed the landlord ("June 21 email"), stating that the tenant's

General Counsel was currently reviewing the information that the landlord had provided, that

some of the tenant's employees planned to meet with the General Counsel regarding the

landlord's "settlement offer," and that they would get back to the landlord.  Pl.'s Mot. for Summ.

J., Ex. 20 at 15.

There are thus several disputes of fact there, including what the May 2010 letter

represented before the June 2010 meeting, as well as a dispute of fact as to what transpired at the

meeting, as to the understanding that the parties walked away with thereafter, and as to what the

May 2010 letter represented after the meeting.  Specifically, a reasonable factfinder could find

that the amount offered in the tenant's May 2010 letter was not a settlement offer.  This is

because, as mentioned previously, an accord and satisfaction is only fulfilled if the parties have a

genuine dispute about an unliquidated claim or obligation.  *Calloway*, 440 F.2d at 289-90.  The

obligation is considered unliquidated if it is "uncertain or disputed in amount."  *Curtin v. United*

*Airlines*, 275 F.3d 88, 94 (D.C. Cir. 2001) (citation omitted).  "[T]his prerequisite . . . springs

from the basic requirement of consideration in contract formation."  *Pierola*, 687 A.2d at 949.  If

a debtor offers partial payment of a debt that is not disputed as to amount, and concedes that the

offered amount is due anyway, the offer is "not considered sufficient detriment" to constitute

consideration.  *Id.* at 948.

In this case, after the landlord received the tenant's notice of termination in January of

2010, the landlord sent the tenant a letter in April of 2010 stating that it owed $77,762.97 for

unpaid rent, taxes, water and sewer charges, and accrued late charges.  Def.'s Stmt. of Mat. Facts

¶ 9.  In the tenant's May 2010 letter in response, it offered to pay $65,082.44 for 2010 real estate

taxes, late fees, interest, and rent and taxes for the month of June of 2010, as it had occupied the

property during that time.  Def.'s May 2010 Letter at 5.  Though the tenant contested the

landlord's formula for calculating the $77,762.97 that he claimed was due, and thereby contested

that total amount, a reasonable factfinder could conclude that the tenant conceded in its May

2010 letter that it did owe at least the $65,082.44, and, thus, that that offer was not a proposed

compromise.  *Id.* at 1-3.

A reasonable factfinder could thus conclude that because the tenant did not dispute that

$65,082.44 was due, this amount was not a disputed or unliquidated portion of the claim.  *Curtin*,

275 F.3d at 95 n.9 ("even [a]n admission by the obligor that a minimum amount is due does not

liquidate the claim even partially unless he is contractually bound to the admission") (internal

quotation marks and citation omitted).  In this case, a reasonable factfinder could conclude that

the tenant was contractually bound to make the concession.  Essentially, a reasonable factfinder

could infer that offering this amount would not constitute consideration, as it did not require the

tenant to take a position to its detriment.

Thus, on these facts, a reasonable factfinder could conclude that there was no accord and satisfaction as to the $65,082.44, the undisputed portion of the claimed outstanding debt. *Gerald R. Turner & Assoc., S.C. v. Moriarty*, 25 F.3d 1356, 1359-60 (7th Cir. 1003) (determining that in the realm of accord and satisfaction, "payment of part of a debt which is not disputed as to amount does not discharge the debt altogether, even when it is expressly agreed that the partial payment is received in full satisfaction" because it "furnishes no consideration for relinquishing the balance of the debt"); *Guinness PLC v. Ward*, 955 F.2d 875, 888 (4th Cir. 1002) ("a claim which is liquidated and undisputed . . . is not discharged by acceptance of a lesser sum tendered in full settlement") (internal quotation marks and citation omitted); *Stinson v. Mueller*, 449 A.2d 329, 332 (D.C. 1982) (finding that there was no accord and satisfaction because there was no proof that the appellee disputed his indebtedness for a failure to perform services); *cf. Curtin*, 275 F.3d at 95 (finding that an accord and satisfaction was fulfilled because the defendant had paid more than it conceded was owed, as opposed to only the amount that it believed was owed).

With respect to the remainder of the $77,762.97 that the landlord claimed was due, or $12,680.53, the tenant disputed that it was owed. *See generally* Def.'s May 2010 Letter.  A reasonable factfinder could thus infer that it was an unliquidated or disputed portion of the claim, and that because the tenant did not offer any amount of money to settle this part of the claim, there was no accord and satisfaction as to this disputed part. *See Guinness*, 955 F.2d at 888 ("an acceptance of part of the amount in satisfaction of the whole will bar recovery of the remainder if the settlement is supported by some consideration additional or collateral to the partial payment" that is conceded is owed) (internal quotation marks and citation omitted).

Additionally, there are disputes of fact as to what occurred at the June 10 meeting, including whether the May 2010 letter represented any settlement offer at all, if a new agreement

was made, and what each understood the June 2010 check to represent.  The tenant claims that by cashing the check on June 11, 2010, the landlord fulfilled the accord and satisfaction and settled all claims of indebtedness.  Def.'s Mot. for Summ. J. at 15; *see Valley Asphalt Inc. v. Stimpel Wiebelhaus Assocs.*, 2 Fed. App'x 838, 840 (10th Cir. 2001) ("retention of a check offered as payment in full constitutes assent to the accord and satisfaction even if the recipient of the check notifies the sender [that] it is accepted only as a partial payment").

Yet after the landlord cashed the check, the tenant sent an email on June 21 stating that it was reviewing the information that the landlord had provided, and that it was considering the landlord's settlement offer.  Pl.'s Mot. for Summ. J., Ex. 20 at 15.  A reasonable factfinder could therefore infer that after the June 10 meeting, the parties did not understand the cashing of the check to constitute an accord and satisfaction and settlement of all claims, as settlement discussions were ongoing.  *See Saul Subsidiary II Ltd. P'ship. v. Venator Grp. Specialty, Inc.*, 830 A.2d 854, 865 (D.C. 2003) (determining that "[w]hile an accord and satisfaction need not be explicit, but [may] be implied from the silent act of cashing a check containing a notation of payment in full . . . that implication [could not] be drawn" because there was no clear expression that the payment be treated as payment in full).  It could therefore be reasonably inferred that when the landlord cashed the check the next day, it did not fulfill an accord and satisfaction.  Indeed:

> If the creditor refuses to receive the check in full satisfaction and yet takes the check, either it must be deemed to have assented to the satisfaction, or the debtor must be deemed to have assented to the creditor's refusal, for the voluntary giving of the check by one, and the taking of it by the other, if neither misunderstood the words that were spoken, necessarily indicate assent.

29 WILLISTON ON CONTRACTS § 73:47 (Lord ed., 4th ed. 2003).  Thus, a reasonable factfinder could conclude that the act of cashing the check resulted in an accord and satisfaction of the

disputed claims despite the landlord's protest otherwise.  But, because the landlord made clear at the meeting that he was accepting the check on account and not as full satisfaction and the parties appeared to continue to negotiate the disputed amount subsequent to the cashing of the check, a reasonable factfinder could also conclude that the tenant assented to the landlord's position at the meeting and the subsequent cashing of the check did not result in an accord and satisfaction of the disputed amount.   Further, the May 2010 letter proposing the accord and satisfaction was signed by the tenant and requested the landlord's signature.  *See* Def.'s May 2010 Letter at 5.  But the landlord appears to have never signed it.  *See id.*  A reasonable factfinder could thus infer that the landlord refused to accept the tenant's settlement offer and the check as settlement, thereby raising a question of fact as to whether the landlord refused the settlement offer.  *See So v. 514 10th Street Assoc., L.P.*, 834 A.2d 910, 912 (D.C. 2003) (holding that no settlement agreement had been reached, because although the debtor's check for accord and satisfaction was cashed, the letter proposing the settlement was not signed, and settlement negotiations continued via email afterwards); *cf. Laganas v. Installation Specialties, Inc.*, 291 A.2d 187, 189 (D.C. 1972) (determining that because the creditor negotiated the check, and there was no mutual discussion with the debtor before or after doing so, an accord and satisfaction had been fulfilled).  The Court thus denies the parties' cross-motions for summary judgment as to all disputed claims other than the claim for post-tenancy clean-up and repair costs, which are addressed below.

## 2.  The Tenant's Claim for Repairs

The landlord also alleges that the tenant failed to maintain the property, did not remove all of its alterations as required, and damaged the property upon vacating it, thereby requiring the landlord to restore it to its original condition at his own expense.  Pl.'s Mot. for Summ. J. at 22-

24.  The landlord thus claims that the tenant must reimburse him for such costs.  *Id.* at 22.  In response, the tenant contends that the property was not in usable or turnkey condition when it occupied the premises, that it had to make several repairs and alterations to make it habitable and usable, and that it had to frequently repair areas that were in poor condition in order to maintain them.  Def.'s Mot. for Summ. J. at 19-20.  The tenant further argues that because it was the landlord's responsibility to carry out such tasks, the tenant should not have incurred expenses for them.  *Id.*  Finally, the tenant contends that it did not damage the property upon vacating it, and that no repair costs are owed.

The landlord claims that before the tenant occupied the property, he installed floor tiles in the lower level reception area, main area, and front two offices.  Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. 2 ("Weinstein Aff.") ¶ 2.  He also states that the floors and walls did not have holes or require repair, the stairs had nosings in place and did not require repair, the bathrooms were in good working condition, the roof was free of leaks and was in proper working condition, and the overhead garage door and water fountain were in good condition and did not require repair.  *Id.* ¶¶ 2-4.  The landlord further states that after the tenant occupied the property, it made several alterations, including building a fence inside of the building, modifying the air conditioning system, building several offices in the interior, and installing refrigeration pipes through the roof and fans in the bathroom ceilings.  Pl's Reply, Ex. 1 ("Weinstein Dep.") at 33-34.  The landlord claims that when the tenant attempted to remove these alterations when vacating the premises, it damaged the property, including leaving bolts embedded in the concrete floor after the fence was removed, leaving remnants of the tile floor behind and creating an uneven floor surface, and damaging the air conditioning unit.  *Id.* at 35-37.  The landlord

contends that he is owed for the expenses incurred in restoring the property to its original condition.  Pl.'s Mot. for Summ. J. at 22.

By contrast, the tenant claims that when it first occupied the property, it was not in a habitable condition.  Def.'s Mot. for Summ. J., Ex. 6 ("Arthur Aff.") ¶ 5; id., Ex. 2 ("Triggs Aff.") ¶ 4.  The tenant asserts that the premises was dirty, none of the toilets worked, one of the water fountains had to be removed because it had lead pipes, the electrical system was not up to code, there were abandoned wires on the property, the floor and ceiling tiles needed to be replaced, the insulation was peeling off of the walls, and the roof was in bad shape.  Def.'s Mot. for Summ. J., Ex. 5 ("Arthur Dep.") at 29-30, 32, 55, 57-58, 65.  In addition, the tenant states that the stairs and two overhead garage doors had to be fixed.  Triggs Aff. ¶ 15.  The tenant argues that it rectified these conditions at its own cost, when it had been the landlord's duty to tend to all of these problems before the tenant moved in.  *Id.*  Further, the tenant contends that two months before it vacated the property, the landlord walked through the premises on different occasions and commented that he was "happy with the way" the tenant had maintained it.  Def.'s Mot. for Summ. J. at 6.  The tenant states that before moving out, it removed everything that it had changed, did not damage the property, and left it broomswept and clean.  Def.'s Mot. for Summ. J., Ex. 4 ("Nee Dep.") at 126.

Because the parties have offered conflicting testimony in this manner, there is a genuine dispute of material fact as to the condition of the property both at the time the tenant occupied it, and after it moved out.  *See Fairfax Portfolio, LLC v. Owens Corning Insulating Systems, LLC, 2012 WL 124849*, at *6 (D. Kan. Jan. 17, 2012).  Further, there is a question of material fact as to the steps the tenant took to make alterations to the property to make it habitable and usable. There is also a question of material fact as to whether the tenant maintained the property while

occupying it, and if so, if it complied with the minimal requirements of the contract, or alternatively, if it exceeded these requirements.  In addition, there is a question of material fact as to the repairs that were carried out after the property was vacated, such as whether the tenant removed the fence bolts, or if they remained and had to be extracted by the landlord.  *See U.S. v. Tedards*, 2007 WL 1207196, at *4 (D.D.C. 2007).  Finally, there is a genuine issue of material fact as to what such reasonable alterations and repairs should have cost.  *Id.*  Accordingly, because there are genuine disputes of material fact as to the landlord's claim for repairs, the parties' cross-motions for summary judgment are denied as to this claim.

## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiff's motion to strike, and denies the parties' cross- motions for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 21st day of March, 2013.

RUDOLPH CONTRERAS
United States District Judge